UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Montgomery Ward, LLC, *et al.*,<br><br>  Debtor. | Bk. No. 00-4667(KG)<br><br>Chapter 11<br><br>Adv. Nos.  02-9282(RTL) |
| Montgomery Ward, LLC, *et al.*, Debtor in Possession,<br><br>  Plaintiff,<br><br>vs.<br><br>OTC International, Ltd.,<br><br>  Defendant. | |

## NOTICE OF APPEAL

Montgomery Ward, LLC, *et al.*, Debtor in Possession's ("Debtor" or "Wards" or "Plaintiff") appeals under 28 U.S.C. § 158(a) from the following judgments, orders, or decrees of the Bankruptcy Court entered in this adversary proceeding:

(A)  The **ORDER** entered by the Bankruptcy Court on September 12, 2006 (annexed hereto as Exhibit "A"), including all orders and decrees that are subsidiary to or merged into said Order;

(B)  The accompanying **OPINION** issued by the Bankruptcy Court on September 12, 2006 (annexed hereto as Exhibit "B");

(C)  The Bankruptcy Court's **ORAL DECISION** issued on September 8, 2005 (the transcript of which is annexed hereto as Exhibit "C"); and

(D)  The **ORDER PURSUANT TO BANKRUPTCY RULE 7042(A) CONSOLIDATING COMMON ISSUES OF FACT AND LAW FOR TRIAL** entered by the Bankruptcy Court on December 15, 2004 (annexed hereto as Exhibit "D"), including all orders and decrees that are subsidiary to or merged into said Order.

Dated:  September 21, 2006

*/s/ Daniel B. Butz*
Donna L. Culver, DE SBN 2983
Derek C. Abbott, DE SBN 3376
Daniel B. Butz, DE SBN 4227
Thomas F. Driscoll, III, Esq.
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
**Telephone:** (302) 658-9200   **Fax:** (302) 658-3989

and

Joseph L. Steinfeld, Jr., DC SBN 297101, MN SBN 0266292, VA SBN 18666
Karen M. Scheibe, MN SBN 0300469, ND SBN 05683, SD SBN 1912
A·S·K FINANCIAL LLP
2600 Eagan Woods Drive, Suite 220
Eagan, MN  55121
**Telephone:** (651) 406-9665  ext. 861   **Fax:** (651) 406-9676

Attorneys For Plaintiff, Montgomery Ward, LLC, et al., Debtor in Possession

NOTICE OF APPEAL

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------X

In re:                                                Chapter 11
                                                      Case No. 00-4667(KG)
Montgomery Ward, LLC, et al.,

                        Debtors.
-----------------------------------------------------X
MONTGOMERY WARD, LLC, et al.,

                                                      Adversary Proceeding
                        Plaintiffs,

            v.                                        No. 02-9282 (RTL)

OTC INTERNATIONAL, LTD.,

                        Defendant.
-----------------------------------------------------X

### ORDER

This matter having been tried to the court, for the reasons set forth in the accompany

opinion,

**IT IS HEREBY ORDERED** that judgment be entered in favor of defendant finding no

cause of action.


Dated: September 12, 2006

                                        _Raymond T. Lyons_
                                        Raymond T. Lyons,
                                        United States Bankruptcy Judge

# EXHIBIT "B"

**FOR PUBLICATION**

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

In re:                                          Chapter 11
                                                Case No. 00-4667(KG)

Montgomery Ward, LLC, et al.,

                              Debtors.
-------------------------------------------------------X
MONTGOMERY WARD, LLC, et al.,

                                                Adversary Proceeding
                              Plaintiffs,

         v.                                     No. 02-9282 (RTL)

OTC INTERNATIONAL, LTD.,

                              Defendant.
-------------------------------------------------------X

### **OPINION**

APPEARANCES:

MORRIS, NICHOLS, ARSHT & TUNNELL
Donna L. Culver, Esq.
Derek C. Abbott, Esq.
Daniel B. Butz, Esq.
Co-Counsel for Plaintiff

A.S.K. FINANCIAL, LLP
Joseph L. Steinfeld, Jr., Esq.
Karen M. Scheibe, Esq.
Co-Counsel for Plaintiff

SILVERBERG STONEHILL GOLDSMITH & HABER, P.C.
Kenneth R. Schachter, Esq.
Mitchell L. Kaplan, Esq.
Co-Counsel for Defendant

THE BAYARD FIRM
Kathryn D. Sallie, Esq.
Ashley B. Stitzer, Esq.
Co-Counsel for Defendant

## RAYMOND T. LYONS, U.S.B.J.[1]

Plaintiff sues to avoid preferential payments made within 90 days prior to the filing of bankruptcy on December 28, 2000. The Defendant maintains that all payments were made in the ordinary course and, therefore, not avoidable under 11 U.S.C. § 547(c)(2). Plaintiff responds that a reduction in payment terms from 60 days to 30 days just prior to the preference period prevents the payments from being ordinary.

Because: (1) Montgomery Ward continued its practice of weekly payments of vendor invoices by due date; (2) Change in terms was ordinary between the parties; and (3) Defendant continued to ship without reservation and never engaged in any collection activity, the court finds the payments were made in the ordinary course and not avoidable.

### JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b)(1), and the Order of Reference from the United States District Court for the District of Delaware. Additionally, this is a core proceeding that may be heard and determined by a bankruptcy judge under 28 U.S.C. § 157(b)(2)(F) to determine, avoid or recover preferences.

---

[1] Raymond T. Lyons, U.S. Bankruptcy Judge, District of New Jersey; by assignment to the U.S. Bankruptcy Court, District of Delaware.

2

## FINDINGS OF FACT[2]

Montgomery Ward operated hundreds of retail department stores throughout the nation

for more than a century.  On July 7, 1997, it filed a petition under chapter 11 of the Bankruptcy

Code in this district.  A plan of reorganization was confirmed on July 25, 1999 and Montgomery

Ward emerged as a wholly-owned subsidiary of GE Capital Corp.  Its business plan called for

increased sales and a store remodeling program to attract the modern consumer.  Financing was

arranged through loans from major banks as well as equity, debt and credit enhancements by GE

Capital.

The reorganization did not meet GE Capital's expectations.  Following its second

disappointing Christmas season after reorganization, Montgomery Ward filed for bankruptcy a

second time on December 28, 2000.  The Debtor immediately announced its plan to liquidate and

set out to do just that.  A plan of liquidation proposed by the Creditors Committee was confirmed

on August 6, 2002.  A Plan Administrator, John L. Palmer, now controls the Debtor and has

nearly completed his work.

OTC International, Ltd. ("OTC") is a jewelry wholesaler that sold fine gold and silver

jewelry to Montgomery Ward.  OTC's products are not branded and there are hundreds of

vendors that sell comparable products.  Their business relationship began before Montgomery

Ward's first bankruptcy case.  Prior to 1997, Montgomery Ward commanded the best credit

terms from its vendors, including OTC who sold on 120-day terms.  Upon entering bankruptcy in

1997, Montgomery Ward informed its vendors, including OCT, that it would buy on 30-day

---

[2]  The findings of fact in the court's oral decision rendered September 8, 2005 are
incorporated by reference.

3

terms. OTC acquiesced and continued to ship to Montgomery Ward on credit during the first

bankruptcy case. While in the first bankruptcy case, Montgomery Ward informed its vendors it

was changing terms to 60 days with a 2% discount effective April 9, 1998. OTC again

acquiesced, except when the parties negotiated special terms on certain sales during Christmas

1998. Thirty-two invoices between October 19-27, 1998 had 30-day terms with a 4% discount.

Upon exiting from reorganization, the terms of sale remained the same. For the 1999 Christmas

season through the Summer of the following year, Montgomery Ward purchased from OTC on

terms of 60 days with a 2% discount.

At the Las Vegas jewelry show in June 2000, Montgomery Ward's Chairman and CEO,

Roger Goddu, met with Chuck Fortgang, principal of Montgomery Ward's largest jewelry

supplier, M. Fabrikant & Sons, Inc. ("M. Fabrikant"). Mr. Goddu informed Mr. Fortgang that

Montgomery Ward projected increased jewelry sales in 2000 and wanted to be sure the vendors

could meet the demand. Mr. Fortgage told Mr. Goddu that the only limitation on his company's

ability to supply jewelry was its own finances. If Montgomery Ward wanted to purchase more

jewelry it could help itself by shortening its payment terms. The faster the wholesalers got paid

the more jewelry they could manufacture to restock Montgomery Ward's jewelry cases.

Mr. Goddu took this advice back to Montgomery Ward's Executive Committee.

Although Montgomery Ward needed to maintain cash to meet a covenant in its loan agreement

and the company's policy was to resist shortening vendor's terms, Mr. Goddu convinced the

Executive Committee to shorten the payment terms from 60 days to 30 days with M. Fabrikant.

This was approved at the end of June or beginning of July 2000. They anticipated that the

reduction in terms would spread to other jewelry vendors.

4

.

OTC's principals also attended the Las Vegas jewelry show that June. Montgomery Ward's buyer, Rita Hamilton, was interested in some of the new designs OTC was showing. Following up after the jewelry show, in late July or early August, Yoram Sheinman, President of OTC and his nephew, Michael Sheinman, a salesman, flew to Montgomery Ward's headquarters in Chicago to meet with the jewelry buyers and book orders for the Christmas season. Ms. Hamilton introduced her new boss, Robert Baird, who touted Montgomery Ward's plan to increase jewelry sales in 2000. Both Mr. Baird and Ms. Hamilton were excited about OTC's sterling silver products and the prospects for growth. They asked what could be done to make jewelry sales bigger and better. Yoram Sheinman explained that silver jewelry sold in small units for low prices and required extra labor for handling, packaging and shipping. Mr. Baird, having been informed that the Executive Committee had authorized a reduction in terms for its largest jewelry vendor, asked if a similar reduction from 60 days to 30 days with an additional 1% discount would help OTC's capacity to supply. Naturally, OTC agreed. Yoram Sheinman said that would "speed up the pipeline" for goods. Every Christmas season OTC would reach, or exceed, its credit limit trying to sell as much merchandise as it could. Montgomery Ward's offer to reduce terms to 30 days would give OTC more availability under its credit line and allow it to supply more goods. A change in terms from 2%, 60 days to 3%, 30 days was implemented on August 23, 2000.

For OTC, the meeting in Chicago was strictly a sales call. Prior to the meeting, the Sheinmans never discussed Montgomery Ward's financial condition, accounts receivable from Montgomery Ward, terms of payment or anything to do with credit or collection from Montgomery Ward. Their only concern was booking sales for Christmas 2000 and into early

5

2001. The topic of payment terms was introduced by Montgomery Ward in the context of helping OTC meet Montgomery Ward's anticipated growth in the jewelry business. There was nothing remotely close to a suggestion, request or demand by OTC for a change in terms. Certainly OTC never threatened to withhold shipments of goods or impose a credit limit on Montgomery Ward. To the contrary, when met with the news that Montgomery Ward expected to increase its jewelry business, Michael Sheinman's response was that OTC had never disappointed a customer and would do its best to deliver all orders. It was in this context of excitement on both sides about increased business that Mr. Baird introduced the topic of reducing terms to facilitate production.

Several former Montgomery Ward employees testified about their dealings with OTC during 2000, including the buyer, Rita Hamilton, her boss, Robert Baird, the manager of accounts payable, Barbara McCready, and her supervisors, Timothy Watkins and Ted Penner. None of them could recall OTC ever requesting a reduction in terms, threatening to withhold shipments or engaging in any collection activity. Rita Hamilton, who attended the meeting with the Sheinmans in Chicago, could not recall much. Mr. Baird denied initiating a conversation to reduce OTC's credit terms. He said, in general, Montgomery Ward would not initiate that kind of an action. But, he could not even recall meeting the Sheinmans in Chicago. He recalled no discussion with Yoram Sheinman about a change in terms. He was "relatively sure" OTC's terms changed but he could not recall the details. On the other hand, Yoram and Michael Sheinman both have specific recollection that the reduction in terms was suggested by Mr. Baird without any prodding from them. Their testimony is detailed, credible and unrefuted.

OTC received orders for the Christmas 2000 season and shipped goods on time. OTC

6

never refused an order, delayed delivery or failed to fulfil an order. All Montgomery Ward's purchase orders for Christmas 2000 were filled by OTC. No shipments were made after November 2000, only because Montgomery Ward placed no further orders. In fact, OTC had merchandise in inventory expecting more orders from Montgomery Ward for December and early 2001. When Montgomery Ward closed its doors abruptly on December 28, 2000, OTC was stuck with this inventory and had to unload it elsewhere.

OTC did not engage in any collection activity, either during the preference period or before. OTC never sued Montgomery Ward, never sent a demand letter, never made collection calls outside normal account reconciliation. Neither did OTC place a credit limit on Montgomery Ward or tie delivery of goods to payment. OTC did not impose any payment plan on Montgomery Ward, and did not request collateral, other security or a guaranty. Unlike some other vendors, OTC never received detailed financial information from Montgomery Ward. OTC never requested financial information from Montgomery Ward, nor was it offered – except for the Vendor Letters. After reorganizing in 1999, Montgomery Ward's Chairman and CEO, Roger Goddu, adopted a practice of periodically sending letters to vendors with a status report. The purpose of these Vendor Letters was to encourage the shipment of goods on credit. The information was accurate, but presented with a positive spin. They portrayed Montgomery Ward as implementing a store remodeling program with the support of GE Capital and sufficient cash to carry it out. For example, Mr. Goddu wrote:

> We are in the midst of finalizing our remodel plans for 2000. At this time we anticipate converting at least 35 stores with a new objective to remodel some entire major metro markets by the third quarter in 2000. As soon as our plans are complete, we are looking forward to sharing this exciting news. *December 1999.*

7

Wards continues to be pleased and excited with our remodel store results and we are currently finalizing plans for our 2000 remodel program. There is a deep and shared commitment to continue to rebuild the quality of the Wards infrastructure. *December 1999.*

These actions will provide Wards with more than adequate funds availability to complete this year's remodeling program and fund new marketing and customer acquisition programs. *April 25, 2000.*

To help maintain the aggressive pace of our remodel activity, GE Capital has recently contributed $100 million in additional cash equity to Wards. This cash was used to pay down revolving debt and return our borrowing availability to approximately $150 million. This cash equity infusion did not require any lender approval. *July 13, 2000.*

There are two principal themes in this letter: 1) Wards is on track to achieve our Fall 2000 business plan. September sales were up 5%, which is consistent with our 4th quarter budget and 2) The continuing success of Wards remodel program is being supported by GE Capital Corporation, which allows Wards ample liquidity to execute our strategy. *October 6, 2000.*

Significant cash support has been provided by GE Capital Corporation, reflecting both their confidence in our aggressive remodel program and their continuing support of our turnaround efforts. *October 6, 2000.*

The need for the cash support was created by Spring results below plan, and a reforecast of Wards Fall business plan more aligned with Spring season trends. The resulting additional cash needs are being met by GE Capital to assure that Wards has the funds available to continue our remodel program and maintain adequate borrowing capacity to operate our business. *October 6, 2000.*

Again, we feel that the reforecast projections are very reasonable given Wards sales trends and are confident in our ability to achieve the Fall plan. *October 6, 2000.*

For 2001, Wards current plan is to remodel approximately 35 additional stores and a preliminary working list of candidate stores has been developed. However, depending on the 4th quarter

8

> results, we may announce an acceleration in remodel stores for
> 2001. The majority of these remodels will continue to be
> concentrated in completing entire markets. We have also engaged
> Thompson Associates to identify on a priority basis, new store
> fillbacks for five markets. We will share our 2001 store plan and
> our remodel list with you as it becomes final. *October 6, 2000.*

Less than ten weeks before filing bankruptcy, Montgomery Ward was projecting sufficient

liquidity and support from GE Capital to remain viable in 2000 and continue this store

remodeling program in 2001.

Montgomery Ward, for its part, continued its practice of weekly payment of vendor

invoices by due date. Montgomery Ward's processing of OTC's invoices was consistent with its

practice. Every Sunday those invoices that became due in the prior week, and that had all

supporting documentation such as delivery receipts, inspection, etc., were processed for

payment. Computer generated checks were issued each Monday and sent via U.S. Mail. The

amount of payment was tied to the invoices and numerous invoices were paid in one check. The

remittance advice accompanying this check would itemize the invoices paid. There were no

lump sum payments or payments on account. No payments were handled specially in order to

assure delivery of goods.

Montgomery Ward continued its practice of taking discounts to which it might not be

entitled or withholding payments where, for example, quantity could not be confirmed. After

further investigation, Montgomery Ward would pay for these unauthorized discounts or other

credits by including an amount for vendor charge backs in a check paying dozens of invoices.

These vendor charge backs were not tied to particular invoices and had to be applied on account.

This was consistent with historical payment practices by Montgomery Ward.

9

Each party performed a statistical analysis comparing this payment data from the preference period and an historical period. The data and the analysis were remarkably similar, except that Defendant computed the number of days from due date to check date, while Plaintiff used the days from invoice date to the date the check cleared Montgomery Ward's bank account. In the preference period, 85% of invoices by dollar amount were paid within 30 days after due date. Exactly the same percentage (85%) of invoices were paid within 30 days after due date in the historical period.

Montgomery Ward retained superior bargaining power throughout the relationship with OTC. Montgomery Ward was one of OTC's top customers representing a substantial portion of OTC's business. In contrast, OTC supplied a tiny fraction of Montgomery Ward's purchases and was not even one of its largest jewelry vendors. Negotiation of payment terms and discounts was a normal practice between Montgomery Ward and OTC, but OTC had no power to dictate terms. To the contrary, Montgomery Ward suggested a reduction in terms because it saw an advantage to itself.

During the preference period, Montgomery Ward issued 13 checks totaling $2,395,936.40 to OTC. Each check, save one, was issued on a Monday; in fact, Montgomery Ward issued a check to OTC on each Monday during the preference period starting with the first check on September 25, 2000 and the last check on December 18, 2000. Similarly, data going back to September 1998 shows that Montgomery Ward issued a check to OTC once a week. The only Monday where a check was not issued was November 6, 2000 when Montgomery Ward was experiencing system-wide computer problems and could not generate computer checks for any vendor. A manual check was issued on November 8, 2000 (Wednesday) for $12,358.77.

10

Each check cleared Montgomery Ward's bank within a week to ten days, except for a check dated October 9 that did not clear for 15 days. The largest check was for $865,371.67 that cleared on November 20, 2000. When Montgomery Ward filed bankruptcy on December 28, 2002, OTC's account was nearly paid in full, except for a small balance. OTC did not file a proof of claim in this case.

## DISCUSSION

Defendants stipulated all elements of a preference under 11 U.S.C. § 547(b). The only contested issues related to the ordinary course defense. Plaintiff stipulated that the debt was incurred in the ordinary course under 11 U.S.C. § 547(c)(2)(A). This adversary proceeding was tried in two phases. First there was a consolidated trial involving several defendants in the wholesale jewelry business ("Phase I").[3] That phase was limited to whether payments were made according to ordinary business terms under Section 547(c)(2)(C) of the Bankruptcy Code. The second phase ("Phase II") of this trial involved solely the Defendant OTC and whether the payments to it were within the ordinary cause of business between Montgomery Ward and OTC under Section 547(c)(2)(B).

In the consolidated trial, I found that defendants had proved that the payments were within industry standards. In the course of my decision, I tried to relate Montgomery Ward's situation to the policy behind the preference statute as articulated in the Third Circuit's opinion

---

[3] Eight adversary proceedings involving nine defendants were consolidated regarding common issues and facts. Four defendants settled before trial. Five defendants participated in the consolidated trial, including OTC and M. Fabrikant & Sons, Inc. Plaintiff settled with two defendants after the decision in Phase I. Fabrikant and related companies settled after their Phase II trial but before the court rendered a decision.

in *Fiber Lite Corporation v. Molded Acoustical Products, Inc., (In re Molded Acoustical*

*Products, Inc.),* 18 F.3d 217 (3d Cir. 1994). Specifically, the court instructed,

> On the one hand, the preference rule aims to ensure that creditors
> are treated equitably, both by deterring the failing debtor from
> treating preferentially its most obstreperous or demanding
> creditors in an effort to stave off a hard ride into bankruptcy, and
> by discouraging the creditors from racing to dismember the debtor.
> On the other hand, the ordinary course exception to the preference
> rule is formulated to induce creditors to continue dealing with a
> distressed debtor so as to kindle its chances of survival without a
> costly detour though, or a humbling ending in, the sticky web of
> bankruptcy.

*Id.* at 219.

> We think ordinary terms are those which prevail in healthy, not
> moribund, creditor-debtor relationships.

*Id.* at 227.

With regard to Montgomery Ward, I said,

> • When the credit terms were renegotiated, Montgomery Ward was not moribund
> and not on a slide into bankruptcy. (Transcript of Court's Decision September 8,
> 2005, Page 7, Lines 6-8).

> • Montgomery Ward hardly exhibited morbidity, nor did it appear to be on the
> slide into bankruptcy from which it had emerged just the year previously.
> (Transcript of Court's Decision September 8, 2005, Page 27, Lines 12-14).

> • At all times following the first bankruptcy in August of 1999 until shortly
> before the second bankruptcy in December of 2000, Montgomery Ward's senior
> management ran the business as a going concern, expected it to continue as a
> going concern, and represented to vendors, including all the joint defendants, that
> it would be a going concern. (Transcript of Court's Decision September 8, 2005,
> Page 27, Lines 22-25, Page 28, Lines 1-2).

> • And as to the financial distress, as I said, the information that Montgomery
> Ward provided to its vendors indicated that it was not a company in financial
> distress during the time that the terms were renegotiated in June through August
> of 2000. (Transcript of Court's Decision September 8, 2005, page 39 at 18-22).

12

My findings were based the Vendor Letters portraying positive results for Montgomery Ward's

store remodeling program and assuring vendors that, with the support of GE Capital,

Montgomery Ward had the resources to carry through its plans for 2000.

*Reconsideration*

Plaintiff asks me to reconsider my findings based upon newly discovered evidence that

confidential financial information showing negative performance by Montgomery Ward had

been shared with one of the jewelry defendants - M. Fabrikant & Sons, Inc. Discovery from

Fabrikant between Phase I and Phase II revealed that Michael Saffet, Fabrikant's CFO, had a

folder with financial data Montgomery Ward had provided to a select group of vendors on a

confidential basis. Mr. Saffet had forgotten about this folder when Fabrikant first responded to

discovery. He found it in the interim and produced it.

First of all, the financial information was not newly discovered. It was created by, or for,

Montgomery Ward. There was the audited financial statement for the year end December 31,

1999 prepared by the independent certified public accountants, Arthur Anderson, and the

monthly financial statements prepared by Montgomery Ward's internal accounting staff. Randy

Brown, Montgomery Ward's CFO during the preference period, testified at the consolidated trial

(Phase I). In Phase II he confirmed that he has always had in his files, or could easily have

located, all of the financial documents that were shared by Montgomery Ward with Fabrikant. If

Plaintiff had made any effort to locate these financial statements, it could have obtained them.

What may have been newly discovered by Plaintiff's counsel was the fact that Fabrikant

was privy to these financial statements. Of course, Montgomery Ward's personnel knew that

they had sent these financial statements to Fabrikant. But, with the closure of Montgomery

13

Ward and the disbursal of Montgomery Ward's management personnel among the retail diaspora, Plaintiff's counsel may not have learned the complete story from their client. OTC objects to reconsideration arguing that there is no new evidence and the law of the cause doctrine. OTC is probably correct. Nevertheless, in the interest of accuracy, I will consider whether Fabrikant's possession of these financial statements would change my conclusion that Montgomery Ward did not exhibit financial distress.

Randy Brown, Montgomery Ward's CFO, testified at Phase II that scrutiny of the financial statements revealed negative information about Montgomery Ward's operations in contrast to the admittedly positive spin given by Montgomery Ward's management in the Vendor Letters. First of all, the audited financial statement for the four month period, starting on Montgomery Ward's exit from its first bankruptcy case in August 1999 to the end of that year, showed a loss of $31 million. The last quarter of the year is when a healthy retailer should be profitable. Furthermore, buried in footnote 5 is a cryptic description of an extraordinary transaction with Montgomery Ward's private credit cards that produced a $70 million gain. A savvy reader would eliminate this gain from the income statement and conclude that Montgomery Ward actually lost $100 million from operations at the end of 1999.

Reviewing the monthly financial statements prepared in house for February, March and April 2000, Mr. Brown pointed out that sales revenue failed to meet projections and losses exceeded projections. Furthermore, Montgomery Ward's loan agreement required a minimum liquidity of $75 million. An astute analyst could glean that Montgomery Ward came within $20 million of that $75 million minimum - an uncomfortable margin for a national retailer of Montgomery Ward's size.

14

Furthermore, Plaintiff points out that OTC has not challenged the statutory presumption that Montgomery Ward was insolvent during the preference period starting September 28, 2000. Therefore, argues Plaintiff, one could extrapolate that Montgomery Ward was likely insolvent on August 23, 2000 when OTC's terms were reduced. Plaintiff asks the court to reconsider and find that Montgomery Ward was on the slide into bankruptcy when it agreed to reduce terms with the jewelry vendors.

Arthur Anderson's audited financial report for 1999 had an unqualified opinion – a so called "clean opinion". Mr. Brown confirmed that if Arthur Anderson had concluded that Montgomery Ward might not have survived for the next twelve months, it would have included a "going concern" qualification to its opinion. In fact, Arthur Anderson was considering including a "going concern" qualification but Mr. Brown and the other senior management of Montgomery Ward successfully argued and ultimately convinced Arthur Anderson to issue a clean opinion.

The key factors leading to Arthur Anderson's acquiescence were the projections presented by Mr. Brown and his colleagues and the financial support GE Capital gave to Montgomery Ward, a wholly-owned subsidiary. Mr. Brown testified that Montgomery Ward consistently failed to meet management's projections and that GE Capital's willingness to provide support was not set in stone.

Mr. Brown testified that the information contained in the Vendor Letters was accurate, albeit with a positive spin. The purpose of the letters was to encourage suppliers to continue shipping goods to Montgomery Ward on credit - and they worked. Vendors, particularly the jewelry vendors, continued to accept orders and ship goods without interruption. Although a knowledgeable reader of the financial statements might have concluded that Montgomery

15

Ward's viability was shaky, his confidence would be buoyed by statements in the Vendor Letters

such as

those quoted above at pages 8 to 9.

Furthermore, there is no evidence that anyone at Fabrikant actually analyzed the financial

statements with a trained eye, such as Mr. Brown's (although Fabrikant's CFO, Mr. Saffet,

certainly was capable, being an experienced certified public accountant). Nor is there any

evidence that any of the jewelry defendants were motivated to request a reduction in terms

because of the negative financial information that might have been discovered. The change in

terms for the jewelry vendors was conceived by Roger Goddu at the Las Vegas jewelry show in

June 2000. He presented his plan to Montgomery Ward's Executive Committee and sold them.

His plan was implemented with Fabrikant immediately and among the other jewelry vendors

within a few weeks thereafter, as had been anticipated. There was no concerted effort by the

jewelry vendors to demand a change of terms. No individual vendor, nor group, brought any

pressure to bear on Montgomery Ward. No order was refused, no shipment delayed - not even a

threat or suggestion of withholding product. To the contrary, the jewelry vendors consistently

desired to sell as much to Montgomery Ward as they could and acted accordingly. The change

in terms was not preceded by any collection activity by the jewelry vendors - no suits, demands,

collection letters or collection calls. Montgomery Ward was continuing to pay on a regular

schedule. So long as their invoices were being processed and paid promptly none of the jewelry

vendors exhibited any concern about payments. The only communication from the jewelry

vendors to Montgomery Ward's accounts payable personnel were routine inquiries about missed

invoices, discounts, credits and charge backs.

16

The second key factor identified by Mr. Brown was the support for Montgomery Ward from its owner, GE Capital. Mr. Brown speculated that if Arthur Anderson was asked to audit Montgomery Ward for the six months ended June 2000, it would be unlikely to issue a clean opinion absent a guaranty from GE Capital. In fact, GE Capital provided substantial support for Montgomery Ward starting with the financing that allowed Montgomery Ward to reorganize its first bankruptcy case in August 1999. Then in 2000, GE Capital increased Montgomery Ward's real estate financing and added $100 million to its guaranty of Montgomery Ward's bank debt. Later in July 2000, GE Capital infused $120 million of new equity in Montgomery Ward. As Montgomery Ward's senior management told its vendors:

> To help maintain the aggressive pace of our remodel activity, GE Capital has recently contributed $100 million in additional cash equity to Wards. This cash was used to pay down revolving debt and return our borrowing availability to approximately $150 million. This cash equity infusion did not require any lender approval. *July 13, 2000.*

> The continuing success of Wards remodel program is being supported by GE Capital Corporation, which allows Wards ample liquidity to execute our strategy. . . .

> The resulting additional cash needs are being met by GE Capital to assure that Wards has the funds available to continue our remodel program and maintain adequate borrowing capacity to operate our business. *October 6, 2000.*

To all the world, except a few *cognoscente*, it appeared as if GE Capital was committed to Montgomery Ward.

Having evaluated the additional evidence produced by Plaintiff at the industry phase of this trial, and considered the arguments of counsel, I see no reason to change my conclusions

17

regarding Montgomery Ward's financial condition.[4]

***Ordinary Course - Subjective Test***

Section § 547(c)(2) was enacted in order "to leave undisturbed normal financial relations,

because they do not detract from the general policy of the preference section to discourage

unusual action by either the debtor or creditors during the debtor's slide into bankruptcy". 5

*Collier on Bankruptcy* P 547.04[2][a][ii][B] (Alan N. Resnick & Henry J. Sommer eds., 15th ed.

rev.).

> The purpose of Section 547(c) is to leave undisturbed normal
> financial relations between a debtor and its creditors, even as a
> company approaches bankruptcy. It protects "recurring, customary
> credit transactions that are incurred and paid in the ordinary course
> of business of the debtor and the debtor's transferee."

*United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.),* 180 F.3d 504, 512

(3d Cir. 1999)

While the ordinary course defense has three requirements, only one of them is at issue in

---

[4] The only finding I would change relates to the reasons a change of terms occurred for
Fabrikant. I found two reasons for the change: one, Mr. Saffet's visit to Chicago where he
inquired about credit insurance, that was no longer available, and received a suggestion of a
reduction in terms; and two, Roger Goddu's discussion with Chuck Fortgang at the jewelry
show. Mr. Saffet's testimony at Fabrikant's Phase II trial and the deposition testimony of Irene
Spector from J.P. Morgan Chase clarified that, not only did Mr. Saffet misinterpret the reason for
Ms. Spector's telephone call and mis-convey that message to Montgomery Ward; but the
suggestion by Montgomery Ward at the Chicago meeting of a possible reduction in terms had
nothing to do with the change that took place later. Upon his return to New York, Mr. Saffet did
nothing to follow up with Montgomery Ward on a possible change in terms. The issue died after
the Chicago meeting and played no part in the subsequent reduction in terms. The sole reason
Fabrikant's terms were changed to 30 days was Roger Goddu's conversation with Chuck
Fortgang and Mr. Goddu's belief that it was in Montgomery Ward's best interest to reduce terms
if it wanted to expand jewelry sales.

this case. Section 547(c)(2)(B) requires that the transfer was "made in the ordinary course of business or financial affairs of the debtor and the transferee." In applying the "subjective test" the court must consider the consistency of transactions between the debtor and creditor before and during the preference period. *First Jersey Sec., Inc.*, 180 F.3d at 512; *see also J.P. Frye v. Bradco Supply Corp.*, 891 F.2d. 66, 71 (3d Cir. 1989).[5] The burden of proof is on the Defendant to show that the transfer in question falls under the ordinary course defense. 11 U.S.C. § 547(g). Determining whether the disputed transaction is consistent with the course of dealing between the respective parties is an inherently factual analysis. *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 348 (Bankr. S.D.N.Y. 1999). The Defendant must establish a "baseline of dealing" so that the court may compare the transfers made during the preference period with the parties' prior course of dealings. *Id.* Courts have relied upon several different factors in making a subparagraph (B) inquiry such as (1) the length of time the parties were engaged in the type of dealing at issue, (2) whether the subject transfer was in an amount more than usually paid, (3) whether the payments were tendered in a manner different from previous payments, (4) whether there appears any unusual action by either debtor or creditor to collect or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition. *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.)*, 320 B.R. 541, 548 (Bankr. D. Del. 2004) *citing In re*

---

[5]The 2005 amendments to the Bankruptcy Code made the subjective test and the industry standard alternative defenses rather than conjunctive defenses. *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, Pub. L. No. 109-8, § 409(1) (2005). Congress intended to make it easier for transferees to protect ordinary course payments.

*Allegheny Health, Education and Research Foundation,* 292 B.R. 68 (Bankr. W.D. Pa. 2003).

Where the parties have a long history of dealings, the focus is on those dealings; where the

parties have a short history of dealings, the creditor is required to fill the "gap" by reference to a

more extensive and exacting analysis of industry standards. *Forklift Liquidating Trust v. Spicer

Clark-Hurth (In re Forklift LP Corporation),* 2006 WL 2042979 (D. Del.); *citing In re U.S.

Interactive, Inc.,* 321 B.R. 388, 392-393 (Bankr. D. Del. 2005).

> The term "ordinary" is not defined in the bankruptcy statute. J.P.
> Fyfe teaches the determination of what is "in the ordinary course
> of business" is subjective, calling for the Court to consider whether
> the transfer was ordinary as between the debtor and the creditor.
> Factors such as timing, the amount and manner in which a
> transaction was paid are considered relevant.

*First Jersey Sec., Inc.,* 180 F.3d at 512.

The billing and payment practices between Montgomery Ward and OTC remained

consistent and normal throughout the preference period. The only change was the terms of sale

went from 2%, net 60 days to 3%, net 30 days - i.e., the due date was shortened but the discount

was increased. Montgomery Ward continued its practice of printing checks to pay vendors every

Monday. It had thousands of vendors with a variety of due dates and organized invoices by due

date. Each Sunday those invoices that became due in the preceding week were processed for

payment.

OTC sent hundreds of invoices to Montgomery Ward. Apparently small packages of

jewelry were shipped separately and each shipment resulted in an invoice. All payments except

one during the preference period were by computer-generated check issued in Montgomery

Ward's regular weekly accounts payable process and delivered to OTC by U.S. mail. The one

manual check was issued because Montgomery Ward's computer was not operating on that

particular day. Each check from Montgomery Ward to OTC paid many invoices. The timing

and manner of payment remained consistent during the preference period. As to amount, there

were no lump sum payments or payments on account. The one large check for $865,371.67 in

November 2000, although larger than any in the historical period, paid only invoices that were

due. The large amount was attributed to the fact that OTC shipped a large amount of goods in

the month before. There was no linkage to a credit limit or withheld goods.

In 1989, the Third Circuit took up an ordinary course defense case which required a

substantial subparagraph (B) inquiry. *J.P. Fyfe, Inc. v. Bradco Supply Corp.,* 891 F.2d 66 (3d

Cir. 1989). In *Fyfe*, the terms originally agreed to by the respective parties were 2% on the 10th

of the second month following purchase, net 60 days. The debtor began to experience financial

difficulty and the bank pulled its financing. The debtor then approached the creditor to discuss

alternate payment arrangements and asked for net 90 days. While the creditor agreed to new

terms, the debtor was unable to make any payments within the 90 day period. When the parties

met a second time to discuss the situation, the debtor indicated that they were experiencing

greater financial difficulties than the creditor had previously thought. The creditor initially

threatened to suspend delivery to the debtor, but relented when the debtor made it clear that such

action would jeopardize the debtor's survival. The parties then arranged to defer the debtors past

debt of $500,000 indefinitely in exchange for payment of $130,000 per month applied against

creditor's future deliveries. In addition, the creditor no longer dealt with the debtor on an open

account basis, imposed a ceiling on the debtor's monthly purchases and would file liens and

21

notices in the event of any nonpayment. The Third Circuit ended up affirming the District Court

decision finding that the creditor's imposition of a lump sum payment scheme and new terms

and conditions upon learning of and in response to the debtor's financial deterioration

constituted special treatment that precluded the creditor from claiming the ordinary course

defense. *Id.* at 71-72. The courts understood the creditor's actions to be motivated out of its

desire to stave off any losses associated with the debtor's insolvency. In this case, Debtor made

no such representation to Plaintiff of its financial condition in renegotiating payment terms.

Furthermore, Debtor was not required to make lump sum payments on deliveries in return for

indefinite deferral of a large debt. Nor did the Debtor assume dramatically different payment

terms as imposed by a creditor in response to Debtor's financial deterioration. In fact, this case

presents just the opposite; Debtor asked Plaintiff for new terms in order to increase its own

inventory. The changes in payment terms seen in *Fyfe* involved a creditor's reaction to

knowledge of debtor's insolvency. The changes in the present case resulted from the logistical

rather than financial needs of Debtor. The factual distinctions between *Fyfe* and the present case

may serve as a model for determining which transfers fall inside or outside the ordinary course

defense.

Plaintiff urges the court to hold that a reduction in terms just prior to the preference

period is *per se* extraordinary. Plaintiff cites *Hechinger Liquidation Trust v. Universal Forest

Products, Inc. (In re Hechinger Investment Co. of Delaware, Inc.)*, 326 B.R. 282, 285 (Bankr.

D.Del. 2005), aff'd. 339 B.R. 282 (D.Del. 2006). In *Universal Forest*, the court held that the

defendant failed to prove that the funds it received were nonavoidable under § 547(c)(2) because

the activities giving rise to the disputed transaction were "so extreme and so out of character

22

with the long historical relationship between the parties" that they had to be considered preferential without defense. *Id.* at 292. The court noted that defendant "rarely imposed credit limits" on any of its debtors and that over the lengthy course of the relationship between the parties no credit limit had been imposed up until immediately before the preference period. In addition, the new terms imposed by the Defendant were quite severe. The debtor was required to begin making lump sum payments by wire transfer instead of check and its credit terms were reduced from 1% 10 days, net 30 to 1% 7 days, net 8. The court saw the change in the broader context of parties' relationship as a means for Defendant to limit its exposure to potential losses and allowed Plaintiff to recover.

While *Universal Forest* and the case at bar both involve a reduction in terms just prior to the preference period, the similarity ends there. *Universal Forest* presented a situation where a onetime reduction in terms was imposed by one party on the other, whereas this case is marked by several changes in terms over the course of the relationship between Plaintiff and Defendant. In fact, the previous changes in terms were dictated by Montgomery Ward who retained superior bargaining power throughout. The only change that was negotiated was the Christmas 1998 special situation. Recurrent negotiations to reduce or modify terms between parties are nonavoidable under § 547(c)(2) because their repetition throughout the business relationship tends to make them "ordinary". Onetime impositions of terms, however, may be deemed extraordinary. In fact, courts have distinguished cases from *Universal Forest* on this very basis. See *NSC Creditor Trust v. BSI Alloys, Inc (In re National Steel Company)* 341 B.R. 229, 237-8 (Bankr. N.D. Ill. 2006) (holding that the parties' customary renegotiation of contract terms fell under the ordinary course defense because "nothing had changed"). In addition, the debtor in

23

*Universal Forest* was forced to assume a dramatically different set of new terms than that which was agreed to by Debtor in this case. Plaintiff misconstrues the rationale underlying *Universal Forest*. An ordinary course defense analysis in the Third Circuit does not hinge solely upon the timing of a change in payment terms in relation to the preference period. Instead, courts are required to consider the change as it relates to the entire relationship over time between the parties. Here the reduction in terms was due to Montgomery Ward's desire to assure sufficient supply for its projected increase in jewelry sales, not by any concern over Montgomery Ward's viability.

Plaintiff says that since OTC's balance was negligible when Montgomery Ward filed bankruptcy, OTC manipulated the credit terms to limit its exposure to the detriment of other creditors. Actually, OTC was ready, willing and able to ship more goods to Montgomery Ward. The only reason it did not is Montgomery Ward failed to order more goods. OTC had no plan to reduce its exposure, "the Debtor simply ceased ordering product." *James Austin Co.* 320 B.R. at 545.

### *Empirical Data*

Empirical data is useful in comparing the timing, amount and manner of payment from the preference and before. *Unsecured Creditors Committee v. Manufacturers Consolidation Service, Inc. (In re Color Tile, Inc.)*, 2000 WL 1373004 (Bankr. D.Del. 2000), *First Jersey Securities*, 180 F.3d at 512. Plaintiff contends that where payments made by the debtor to creditor in the preference period are shorter than those made in the historical period, the presumption arises of an extraordinary, avoidable transfer. Plaintiff analyzes the pertinent data

24

by comparing the invoice dates to check clearance dates[6] in the respective periods and claims that the difference in the payment cycle between the historical and preference periods sufficient to find extraordinary change. The Defendant uses the interval between the due date and the receipt of check; a method illustrating no significant change between the periods.

Comparing the pattern of payments during the preference period with the prior year shows that Montgomery Ward consistently paid over 85% of invoices within 30 days after due date.[7] Invoices paid outside this time frame were either unintentionally skipped by Montgomery Ward or delayed because Montgomery Ward had not completed its inspection, delivery confirmation or other documentation in its approval process. Frequently, Montgomery Ward took credits to which it was not entitled, a practice followed by other large retailers. OTC reconciled these credits resulting in Montgomery Ward reversing the credit and issuing a payment referred to as a vendor charge back. These VCB's were allocated to current invoices - sometimes skewing the pattern of payment. None of these payment practices was unusual.

OTC called as an expert in statistics Prof. Jack Williams of Georgia State University

---

[6] For purposes of the ordinary course defense the check clearing date is not the proper reference point – it is the check delivery date. *Rocin Liquidation Estate v. Pan-American Life Insurance Company (In re Rocor International, Inc.)*, 339 B.R. 508, 515 (Bankr. W.D.Ok. 2006), *Official Committee of Unsecured Crditors v. CRST, Inc. (In re CCG 1355, Inc.)*, 276 B.R. 277, 380, n.2 (Bankr. D.N.J. 2002), *Barnhill v. Johnson*, 503 U.S. 393, 396 and 401-402, n.9 (1992). Using the check clearing date would distort the statistics because of delay in depositing the check by the payee or within the banking system.

[7] Plaintiff's exhibit 53, columns J and K reflect the cumulative percentage by dollar amount of invoices paid during each five-day period following the invoice date. Column J for the preference period shows that by the end of 60 days after invoice date (i.e., 30-days past due) 84.95% of invoices had been paid. Column K for the historical period shows that by the end of 90 days after invoice date (i.e. also 30-days past due) 85% of invoices had been paid.

School of Law. Prof. Williams compared the payment patterns in the preference period with those in the historical period and found these entirely consistent with reference to the due date. The Plaintiff performed a similar analysis, but only comparing days from invoice date to payment. As would be expected, Plaintiff's analysis showed that Montgomery Ward paid thirty days faster from invoice date in the preference period. This was attributed solely to this change in terms from 60 days to 30 days.

There are several reasons to adopt the Defendant's past due date method over Plaintiff's invoice date method. First, the past due approach is preferred because it takes into account Debtor's method for processing invoices. Debtor's weekly check run was based on the due date appearing on each invoice. Such a method of payment makes sense, given that Debtor had thousands of vendors all engaged on different terms. The Plaintiff analyzes Debtor's payments without any consideration for the realities of its accounts payable practices. Second, the differential illustrated under Plaintiff's method is accounted for only by the change in terms. As it was common practice for the parties to adjust the terms over the history of their relationship, the change should not be viewed as out of the ordinary. Third, the software used to produce the Plaintiff's illustrations had to undergo substantial manipulation to reflect its contentions. Plaintiff produced a witness who was employed by its own attorneys who specialized in preference avoidance actions and use software specifically designed for preference payment scenarios. The report produced by the witness illustrates a change in Debtor's payment pattern based on the invoice date method. The software was designed to calculate the days past due and had a column for the payment terms. In order to come up with a report using the invoice date method, however, the witness had to "work-around" the software program's default scheme by

26

manipulating the due date and invoice date columns to mirror one another. As a result, the witness could produce data that conformed with Plaintiff's contentions. In short, the software used by specialists in analyzing preference actions (and relied upon by the Plaintiff) would have supported Defendant's claims but for the substantial manipulations of agents of the Plaintiff.

The same law firm represented the plaintiff in *Hechinger Liquidation Trust v. James Austin Company, (In re Hechinger Investment Co. of Delaware, Inc.)*, 320 B.R. 541 (Bankr. D.DE. 2004). In that case, plaintiff presented similar statistical analysis but included the actual credit terms in the data fed into its software. The resulting report focused on the credit terms and segregated the payments into small time periods all related to days past due (days late). *Id.* at 546-548. If Plaintiff's witness in the Montomery Ward - OTC case had used the actual credit terms in his software, rather than a "work-around", his report would have disclosed that the bulk of invoices paid during the preference period matched the bulk of invoices paid historically on a days past due basis.

Plaintiff quotes from Judge Morris Stern's decision *Official Committee of Unsecured Creditors v. CRST, Inc. (In re CCG 1355, Inc.)*, 276 B.R. 377, 383 (Bankr. D.N.J. 2002), "Median time intervals between invoice date and payment date, both before and during the preference period, are logical comparisons in making such an analysis." In that case, the credit terms were vague (60 to 90-day range), were not reduced to writing, and do not appear to have changed during the long history of dealings. Therefore, comparing the interval between payment and invoice date or due date would make no difference. Either calculation would reveal that the payments by CCG during the preference period were significantly later than the historical course

of dealing. Montgomery Ward - OTC is different because there was a change in terms that was respected by the parties.

In a post-trial submission, Plaintiff cites a recent decision by Chief Judge Sue L. Robinson, *Forklift Liquidating Trust v. Spicer Clark-Hurth (In re Forklift LP Corp.)* 2006 WL 2042979, (D.Del. 2006) for the proposition that the proper comparison is days from invoice to payment rather than days past due. Also, Plaintiff maintains that empirical evidence is sufficient to determine that payments were not ordinary.

*Forklift* is distinguishable because the credit terms never changed between the debtor and the defendant. Besides, the court related the days outstanding to days past due by noting that "Zero to 60 was as within terms, 60 to 90 is up to 30 days past due, and 90 to 120 is between 30 and 60 days past due." *Id.* As to the empirical data, in *Forklift* the shift in pattern of most invoices being paid within 60 to 90 days of issuance in the historical period verses more than 120 days in the preference period suggests abnormally where the terms were 60 days throughout. But in the Montgomery Ward - OTC situation where the terms changed, a past due analysis is more appropriate. Here the payment patterns were consistent between the historical and preference periods. The empirical data tends to support the ordinary course defense.

Plaintiff also argues that the actions taken by the Debtor leading up to the preference period constituted "unusual activity", which rendered the transfer extraordinary for the purposes of § 547(c)(2). The assertion that unusual activity between debtor and creditor in the preference period defeats an ordinary course defense is correct. But in making the determination of whether the transactions in this case constitute unusual activity, it is clear that the parties conducted

28

themselves in a manner best characterized as ordinary. One may refer, again, to the Third

Circuit's teaching in *Molded Acoustical Products:*

> Variations in credit terms within an industry demonstrate
> that the market is accommodating variances in buyers' and
> sellers' preferences or needs, at least when the parties deal
> at arms length and brandish equivalent bargaining power,
> and we do not think that Congress intended to hamper
> competition in this area more than necessary to accomplish
> its stated goal of curbing unusual behavior which impels
> bankruptcy and/or treats creditors inequitably....In short,
> we think that a trade debt payment made according to
> longstanding practice between two solvent parties most
> often does not "prefer" that creditor to the disadvantage of
> the debtor or other creditors. *Molded* at 225.

It should stand to reason that variations in credit terms between parties that routinely

adjusted or modified over the course of a lengthy business relationship does not constitute

extraordinary business practice. While unusual activity could defeat an ordinary course defense,

I find that the parties in this case have not engaged in sufficiently irregular transactions.

Plaintiff's expert, Holly Felder Etlin, opined, "[T]here was a substantial shift (to the detriment of

the Debtor) in the payment pattern in the Preference Period in which the Debtor was pressured to

make unusually high payments for the purpose of driving OTC's exposure to the Debtor to an

abnormally low level." There is absolutely no factual support that the Debtor was pressured by

OTC or that OTC had a purpose to drive down its exposure to the Debtor. Ms. Etlin's

conclusions are rank speculation based solely on numbers and not on actual events. The

evidence clearly showed that the change in terms was initiated by Montgomery Ward for its own

purposes and not because of any pressure by OTC or concern about Montgomery Ward's

financial condition.

29

## CONCLUSION

"[T]he court's general inquiry in these preference cases is to determine whether the payments to a creditor made in the 90 days preceding a filing for bankruptcy were in response to a zealous creditor's attempt to collect on a debt through preferential treatment ahead of other creditors, or an attempt by the debtor to maintain normal business practices in hope of staving off bankruptcy." *Troisio v. E.B. Eddy Forest Products US (In re Global Tissue LLC),* 106 Fed. Appx. 99, 102 (3d Cir. 2004). The weekly payments from Montgomery Ward to OTC during the preference period were consistent with historical practices. The change in terms that occurred more than a month before the preference period was not "in response to a zealous creditor's attempt to collect on a debt through preferential treatment ahead of other creditor." *Id.* Montgomery Ward's management made the change because they were convinced it would assure a ready supply of jewelry for their anticipated growth in jewelry sales. They hoped to stave off bankruptcy from which they had recently emerged. OTC continued to do business with Montgomery Ward on an ordinary basis, just as Congress meant to encourage by the ordinary course defense of 11 U.S.C. § 547(c)(2). Plaintiff is not entitled to avoid the payments to OTC during the preference period. Judgment will be entered for OTC.

September 12, 2006                    ____/S/ Raymond T. Lyons, USBJ____

30

# EXHIBIT "C"

```
 1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEW JERSEY
 2
    - - - - - - - - - - - - - - - - x
 3  IN THE MATTER OF:              :
                                   : CASE NO.: 00-4667
 4  MONTGOMERY WARD, LLC,          : Trenton, New Jersey
                                   : September 8, 2005
 5           Debtor               :
    - - - - - - - - - - - - - - - - x
 6  MONTGOMERY WARD, LLC,         :
                                   :
 7           PLAINTIFF,           :
                                   : ADVERSARY PROCEEDING
 8           -vs-                 : NO.: 02-9097
                                   : NO.: 02-9182
 9  CLOVER CORPORATION,           : NO.: 02-9233
    HENG NGAI JEWELRY, INC.       : NO.: 02-9252
10  d/b/a HNJ, INC. and HNJ, LTD., : NO.: 02-9282
    LEER GEM, LTD.,                :
11  M. FABRIKANT & SONS, INC., and :
    OTC INTERNATIONAL, LTD.,       :
12                                 :
             DEFENDANTS.          :
13  - - - - - - - - - - - - - - - - x

14   TRANSCRIPT OF HEARING RE:  ADVERSARY PROCEEDING DECISION

15        BEFORE THE HONORABLE RAYMOND T. LYONS
               UNITED STATES BANKRUPTCY JUDGE
16

17

18

19

20

21

22
    Audio Operator:          Betty Akin
23  - - - - - - - - - - - - - - - - - - - - - - - - - - -
            TERRY GRIBBEN'S TRANSCRIPTION SERVICE
24                27 Beach Road, Unit 4
               Monmouth Beach, New Jersey 07750
25            (732) 263-0044 - Fax # (732) 263-0075
```

```
 1   A P P E A R A N C E S:

 2   For the Plaintiff:          ASK FINANCIAL, LLP
                                 BY: KELLY J. SHANNON, ESQ.
 3                                    JOSEPH H. HESS, ESQ.
                                 Suite 220
 4                               2600 Eagan Woods Drive
                                 Eagan, Minnesota 55121
 5
     For M. Fabrikant & Sons,    LAW OFFICES OF MITCHELL J. DEVACK
 6   Inc., Clover Corp., and     BY: MITCHELL J. DEVACK, ESQ.
     Leer Gem, Ltd:              90 Merrick Ave., Suite 500
 7                               East Meadow, New York 11554

 8   For OTC International,       SILVERBERG STONEHILL & GOLDSMITH
     Inc.:                        BY: MITCHELL L. KAPLAN, ESQ.
 9                                111 West 40th St., 33rd Floor
                                  New York, New York 10018
10
     For Heng Ngai Jewelry,       HANCE SCARBOROUGH WRIGHT
11   Inc., d/b/a                  GINSBERG & BRUSILOW, LLP
     HNJ, Inc. and HNJ, Ltd.:     BY: E. PAUL KEIFFER, ESQ.
12                                The Elm Place Building
                                  1401 Elm Street, Suite 4750
13                                Dallas, Texas  75202

14   For OTC International:        THE BAYARD FIRM
                                   BY: ASHLEY B. STITZER, ESQ.
15                                 222 Delaware Avenue, Suite 900
                                   P.O. Box 2130
16                                 Wilmington, Delaware 19899

17   For Plan Administrator:       HOWARD BROWNSTEIN, ESQ.

18

19

20

21

22

23

24

25
```

Decision                                          3

1          THE COURT:  Ready, Betty?

2          THE CLERK:  Yes, Judge.

3          THE COURT:  Okay.  Good morning.  Let's see.

4   Counsel, do you want to enter your appearances please?

5          MS. SHANNON:   Kelly Shannon from ASK Financial on

6   behalf of the plaintiff, Montgomery Ward.

7          MR. HESS:  Your Honor, Joseph Hess of ASK

8   Financial also on behalf of the plaintiff, Montgomery Ward.

9          MR. DEVACK:  Mitchell Devack, Your Honor, on

10  behalf of the consolidated defendants, Clover Corporation

11  and Fabrikant & Sons, Leer Gem, Ltd., Heng Ngai and OTC

12  International.

13         MR. BROWNSTEIN:  Your Honor, this is Howard

14  Brownstein for the Plan Administrator.

15         MR. KEIFFER:  Your Honor, Paul Keiffer for Heng

16  Ngai and HNJ, Limited.

17         MR. KAPLAN:  Your Honor, Mitchell Kaplan from

18  Silverberg, Stonehill & Goldsmith for defendant, OTC

19  International.

20         THE COURT:  All right.

21         MS. STITZER:  Your Honor, Ashley Stitzer from the

22  Bayard Firm for OTC International.

23         THE COURT:  All right.  Thank you very much.

24  First of all I want to apologize for issuing an oral opinion

25  today.  I know some judges consider it insulting to lawyers

Decision                                    4

1   and parties to have to endure listening to an oral decision

2   and some judges think that the best thing to do is just to

3   write an opinion and send it out by mail or e-mail.

4          But I have to recognize my own limitations in that

5   for me writing an opinion involves a lot of editing and

6   rewriting and it's a long process and I reserve it for

7   issues which I feel there is no precedent in the Circuit or

8   the District.  In the case of preferences, in particular,

9   the ordinary course defense, we have a lot of precedent in

10  this Circuit, especially the Molded Acoustical Products

11  decision by the Third Circuit.  So I don't think anything

12  would be added to the scholarship in that area.

13         And in order to provide the parties with a quicker

14  decision, I'm going to go ahead and issue an oral opinion,

15  but I reserve the right to supplement the record of this

16  oral decision.

17         Several preference actions were consolidated for

18  trial on the common issue of whether transfers were made

19  according to ordinary business terms within the meaning of

20  Section 547(c)(2)(C) of the Bankruptcy Code.  The plaintiff

21  is the debtor, Montgomery Ward, who is now represented by

22  the Plan Administrator pursuant to a confirmed plan of

23  liquidation.

24         The defendants are all manufacturers and

25  wholesalers of fine jewelry who sold products to the debtor

Decision                          5

1  and received payments within 90 days prior to the filing of

2  the bankruptcy petition on December 28th, 2000.  I will

3  refer to this 90 day time frame as the preference period and

4  I believe that it started approximately September 30th of

5  2000.

6           Now the plaintiff has sued to avoid the payments

7  as preferences and the joint defendants all claimed the

8  transfers were made in the ordinary course of business and

9  not avoidable.  The ordinary course defense has three

10  elements.  The third element is that the transfers were made

11  according to ordinary business terms.  That requires

12  evidence of payment practices in the industry where both the

13  plaintiff and the defendant do business.

14           Since each of the joint defendants operates in the

15  same market, the common issue was consolidated for trial.

16  The outcome of this limited trial will not conclude these

17  adversary proceedings, as other issues remain unresolved.

18           The parties have engaged in extensive pretrial

19  discovery in preparation.  Voluminous documentation was

20  introduced into evidence, most of it by stipulation or with

21  limited objection, along with deposition transcripts.

22  Several witnesses testified during two days of hearings.

23  Legal arguments have been presented both in writing and

24  orally.

25           And I want to again compliment counsel not only

Decision                                    6

1   for their skill in advocacy and their diligence in

2   preparation, but also for the professional courtesies that

3   they have shown to each other and to the Court.

4   Professionalism is alive and well and these attorneys have

5   demonstrated that one can be a vigorous effective advocate

6   without vituperation.

7          The primary dispute relates to the reduction in

8   credit terms from net 60 days to net 30 days agreed to in

9   the months prior to the preference period.  Defendants claim

10  that net 30 days is an ordinary credit term within the

11  industry and that renegotiation of credit terms is a normal

12  arrangement.

13         In particular, defendants claim that credit terms

14  were renegotiated to permit Montgomery Ward to purchase more

15  jewelry in the Christmas 2000 season than it had previously.

16  Shorter terms allow the vendors to obtain more credit from

17  their lenders and deliver more goods to Montgomery Ward.

18         Plaintiff argues that net 60 days is the

19  prevailing credit term offered by jewelry vendors to

20  financially healthy national retail department stores and

21  that the reduction to net 30 days is not ordinary for

22  healthy retailers.  Furthermore, plaintiff claims that the

23  jewelry vendors collaborated to exert duress on the

24  financially distressed debtor by reducing credit terms when

25  the debtor was vulnerable and had no alternate source of

Decision                                    7

1    supply.

2           As explained in more detail following, l find that

3    net 30 day credit terms is within the range of terms offered

4    by fine jewelry wholesalers to national retailers and is an

5    ordinary business term.

6           When the credit terms were renegotiated,

7    Montgomery Ward was not moribund and not on a slide into

8    bankruptcy.  Neither Montgomery Ward nor the vendors took

9    any unusual action indicative of favoritism by a fawning

10   debtor or exploitation by a pushy creditor.  There is no

11   evidence of concerted action by the jewelry vendors and no

12   duress exerted by them on Montgomery Ward.

13          None of the vendors ever stopped or threaten to

14   stop shipments of jewelry to Montgomery Ward.  Montgomery

15   Ward retained superior bargaining power throughout 2000 and

16   could have found alternate sources of supply for fine

17   jewelry if these vendors refused to ship.

18          Payments made within 10 days prior to or 45 days

19   after the due date are ordinary.  Payments outside this

20   window may be ordinary depending upon the circumstances.

21   For example, if an invoice has been skipped or if payment

22   was delayed -- let me start that sentence over again.  Is

23   someone on a speaker phone?  I'm picking up a lot of

24   background noise from somebody.  Does anybody know who it

25   is?  Let's start with the plaintiff's counsel.  It's

Decision                              8

1   disappeared.  All right.  Whoever that is, either put us on

2   --

3          UNIDENTIFIED MALE:  Somebody needs to not be on

4   speaker and they need to pick up.

5          THE COURT:  All right.  Let's go through a roll

6   call again.  Let's start with the plaintiff's counsel.

7          MS. SHANNON:  Kelly Shannon, Your Honor.

8          MR. HESS:  Joe Hess, Your Honor.

9          THE COURT:  All right.  Are you folks on a speaker

10  phone?

11         MS. SHANNON:  We are, Your Honor, but I believe

12  that someone else has just dialed in and that's where the

13  feedback was coming from.

14         THE COURT:  All right.  Who just connected to this

15  call?  Nobody is owning up to it.  All right.

16         MR. DEVACK:  Your Honor, this is Mitchell Devack.

17  I'm on a speaker phone because I have my associate in the

18  office with me.  But I don't think we were the interference.

19  What we heard was like a car sound or something.  It sounded

20  like somebody might have been on a cell phone.

21         THE COURT:  All right.  If it happens again we're

22  going to have to start over again.  All right?  I am still

23  getting some feedback.  All right.

24         As I was saying, payments outside this window may

25  be ordinary depending on the circumstances.  For example, if

Decision                                    9

1    an invoice has been skipped or if payment was delayed

2    because all supporting documentation had not been assembled

3    or there was a discrepancy in pricing, quantity or quality,

4    the late payment may nonetheless be ordinary.

5            As to the mode and method of payment, generally

6    national retailers pay by computer generated checks

7    delivered by U.S. Mail.  On occasion, manual checks may be

8    issued and may be delivered by messenger or picked up by the

9    payee.  Whether such payment by different mode or method is

10   ordinary depends on the circumstances.  For example, a

11   manual check could be issued because of a mistake in the

12   computer generated check.  On the other hand, some manual

13   checks were issued to vendors who requested cash in advance

14   because they had lost their factor or credit insurance.

15   That particular factor comes from evidence supplied by Mr.

16   Randy Brown, the former CFO of Montgomery Ward.

17           This Court has jurisdiction over this adversary

18   proceeding under 28 USC 1334(b), 28 USC 157(a), and the

19   order of reference from the United States District Court for

20   the District of Delaware.  This is a core proceeding that

21   may be heard and determined by the Bankruptcy Court under 28

22   USC Section 157(b)(2)(F) as this is a proceeding to

23   determine, avoid or recover preferences.

24           All right.  I make the following findings of fact.

25   Plaintiff Montgomery Ward was a national retail department

Decision                                        10

1   store operator with hundreds of stores.  It had a venerable

2   150 year history.

3          The joint defendants are manufacturers and

4   wholesalers of fine jewelry, gold, diamonds and gems.  Their

5   major customers are national retail department stores such

6   as Sears, J.C. Penney, Macy's, Kohl's and K-Mart.  They also

7   sell to regional department stores, for example, Mervins;

8   large jewelry retailers such as Zales or Sterling, which

9   operates as Kay Jewelers and Freedman; catalog retailers,

10  for example, Service Merchandise, Spiegel; and television

11  shopping channels such as the Home Shopping Network.

12         The jewelry business is seasonal.  Most sales are

13  made during the Christmas season with other active periods

14  around Valentine's Day and Mother's Day.

15         In July, 1997 Montgomery Ward filed a petition

16  under Chapter 11 of the Bankruptcy Code.  That case led to a

17  confirmed plan of reorganization in August, 1999.

18  Montgomery Ward emerged from bankruptcy as a subsidiary of

19  GE Capital Corp. that provided equity and debt financing.

20  The company implemented a new business plan to remodel its

21  stores over time.

22         The reorganized Montgomery Ward sought trade

23  credit from its vendors.  Various business lines offered

24  different trade credit terms.  The retailer's goal is to

25  time the payments to the vendor with the receipt of sales

Decision                                          11

1   proceeds from the retail customers.  So for example,

2   electronics that sell quickly have very short trade credit

3   terms, if any. sometimes ranging in the 10 to 15 day range

4   or no credit terms at all.  Furniture, that takes longer to

5   sell, has longer trade credit terms, 90 to 120 days.

6           Fine jewelry falls in the mid-range of trade

7   credit.  Some vendors who cautiously sold to Montgomery Ward

8   while in Chapter 11 were willing to extend the due date for

9   trade credit.  Before 1997 and the bankruptcy filing by

10  Montgomery Ward it enjoyed very generous trade credit,

11  averaging 86 days as the due date across the entire spectrum

12  of its product lines.

13          While in bankruptcy, trade credit became tight,

14  going down to somewhere in the teens for the number of days

15  as the due date.  Following emergence, some vendors loosened

16  the terms so that at the start of 2000 Montgomery Ward's

17  average payment due date was 32 days across all business

18  lines.

19          The joint defendants, along with other jewelry

20  vendors, agreed to offer Montgomery Ward 60 day terms before

21  and at the beginning of 2000.  Credit terms are heavily

22  negotiated one on one between the retailer and wholesalers.

23  A variety of factors influence credit terms between the

24  large retailer and the fine jewelry wholesaler, price,

25  discount, volume, give backs, for example, co-op

Decision                                    12

1   advertising, and bargaining power.  As Mr. Goddu, the

2   Chairman and CEO of Montgomery Ward during the relevant time

3   period testified, "Changes in terms are normal."

4            Between national retailers and jewelry

5   wholesalers, the retailers enjoy superior bargaining power

6   in light of the heavy volume they purchase.  For some

7   jewelry vendors a department store such as Montgomery Ward

8   would be a major customer, representing 25 percent or more

9   of its business.  On the other hand, fine jewelry

10  represented a small portion, perhaps 5 percent, of

11  Montgomery Ward's annual sales.

12           Fine jewelry is unbranded and there are numerous

13  manufacturers and wholesalers who would jump at the chance

14  to sell to a national retail department store such as

15  Montgomery Ward.  Fine jewelry was a profitable line for

16  Montgomery Ward and it planned to increase sales by 40

17  percent in the 2000 Christmas season over the prior year.

18  Nevertheless Montgomery Ward retained superior bargaining

19  power vis-a-vis any particular jewelry vendor.

20           Of course, some retailers have more clout than

21  others.  Wal-Mart, the world's largest retailer, dictates 45

22  day terms to its fine jewelry vendors.  Pre-bankruptcy

23  Montgomery Ward enjoyed a sterling reputation and could

24  demand the best trade credit.  Bankruptcy changed that.  Yet

25  having survived bankruptcy and reorganized in 1999,

Decision                                    13

1  Montgomery Ward began to restore its reputation.

2         All witnesses agreed that the most important

3  factor affecting trade credit from a fine jewelry wholesaler

4  to a national retailer is the ability of the vendor to

5  obtain financing.  In my view the most articulate witness in

6  this regard was Montgomery Ward's own expert, Holly Etlin.

7  Ms. Etlin has an impressive resume.  She is a principal in a

8  restructuring advisory firm having spent over 20 years in a

9  large international accounting consulting firm specializing

10 in advising retailers in financial distress.

11        Ms. Etlin testified that jewelry wholesalers are

12 thinly capitalized in a specialty business with an inventory

13 of numerous small items.  Only a handful of banks and

14 factors are willing to lend to the jewelry industry.

15 Although the wholesalers would like to sell as much jewelry

16 as the retailers are willing to buy, the lenders put a limit

17 on the wholesalers outstanding credit.

18        The wholesalers need to borrow to pay for

19 manufacturing and importing the jewelry from overseas and

20 then wait until the retailers pay them.  When a wholesaler

21 has reached its borrowing limit with its lender, the only

22 way to finance increased manufacturing of goods is to

23 receive payment faster from the retailer and free up

24 available borrowing.

25        As part of its campaign to revive itself after

Decision                                    14

1   bankruptcy, Montgomery Ward instituted a practice of sending

2   letters to its vendors every few months.  In mid 2000

3   Montgomery Ward reported positive results from its store

4   remodeling program.  Fine jewelry was highlighted as a

5   successful line that Montgomery Ward planned to expand.

6        Roger Goddu, Montgomery Ward's Chairman and CEO,

7   attended the annual jewelry show in June 2000 to prepare for

8   the 2000 Christmas season.  Mr. Goddu met with Chuck

9   Fortgang of Fabrikant and told him that Montgomery Ward

10  planned on increasing its fine jewelry sales by 40 percent

11  over the prior year.  Fine jewelry was doing quite well, one

12  of the "very, very positive divisions in the company",

13  according to Mr. Goddu.

14       Mr. Fortgang advised Mr. Goddu the Montgomery Ward

15  could increase its supply of fine jewelry by offering

16  shorter credit terms to the vendors.  According to Mr.

17  Goddu, Mr. Fortgang told him, "You would help yourself if

18  you contract your payment terms".  As I mentioned

19  previously, speedier payments by Montgomery Ward freed up

20  borrowing availability from the wholesalers' lenders,

21  allowing the wholesalers to manufacture and deliver more

22  jewelry.

23       Robert Baird, who was Montgomery Ward's General

24  Merchandise Manager responsible for fine jewelry, confirmed

25  this.  In his deposition Mr. Baird testified as follows.  He

Decision                                        15

1    was asked about a conversation to discuss a change in terms

2    that would help cash flow to get Montgomery Ward more

3    product into its stores.  This is at page 36, line 11.  Mr.

4    Baird testified,

5              "I don't recall that specifically, but anytime you

6    shorten terms it helps the people on the other end's cash

7    flow or helps them get insurance on the receivables.  So

8    reducing terms would be a positive thing for a supplier."

9    Q    "Would it be a positive thing for Montgomery Ward?

10   A    No, it would be a user of cash.  Well, it depends.  It

11   would be a user of cash, but if it allows you to get product

12   it would be a positive thing if that's what it took to get

13   product."

14   Q    "So in your opinion, changing terms allowed you to get

15   more product into the stores?

16   A    There were some vendors that the only way I think we

17   could have gotten additional product we thought we were

18   going to sell was to shorten terms and we did in fact do

19   that on a number of occasions."

20              On page 43 of the transcript of Mr. Baird's -- who

21   is that?  We're getting terrible feedback.  Does anybody

22   want to confess to that?

23              MR. DEVACK:  This is Mitchell Devack.  We haven't

24   done anything different, so I hope we're not giving any

25   feedback at all.

Decision                                    16

1         THE COURT:  We're getting a lot of background

2    noise.  All right.  That's two strikes.

3         MS. SHANNON:  Your Honor, this is the plaintiff's

4    counsel.  We had the phone on mute so it shouldn't be coming

5    from us.

6         THE COURT:  Okay.  That's good.  Anybody else that

7    can put it on mute, please do.  Who was that?  All right.

8    One more time then.  We'll start over again.  Let's see.

9         At the end of page 42 of Mr. Baird's testimony he

10   was answering about an e-mail that he had sent to the

11   financial people requesting approval for change in terms.

12   And he said on line 19 of page 42, "I think I had some

13   vendors that required or were requesting shorter terms to

14   secure the inventory and minimize their risk and I was

15   probably trying to run that up to Randy, for typically it

16   would be done, to see if that was possible."

17   Q    "So this is an instance where some jewelry vendors are

18   requesting to change terms and you're seeking approval to do

19   that?

20   A    That's correct."

21   Q    "What does it mean?

22   A    We have budgeted plus 20 percent comps for Fall 2000

23   and need this merchandise to hit the goals.  As I said, the

24   jewelry category was performing very well but the only way

25   we were going to continue with those increases was to have

Decision                                                    17

1   the inventory to sell the goods.  So I was real concerned

2   that we have the correct amount of inventory to do what I

3   thought was going -- to what turned out, in fact, to be a

4   great selling season for jewelry.  But if you don't have the

5   goods, you're not going to be able to hit the goals."

6          Lastly on page 64 of the transcript of Mr. Baird's

7   deposition, talking about seeking approval to shorten credit

8   terms, on line 2 Mr. Baird said, "It was kind of a last

9   course.  It's not something we wanted to do, but if you had

10  to do that to get merchandise and we felt that merchandise

11  was critical to our holiday selling season, which it was for

12  those three vendors, I would request that.  I couldn't grant

13  it, but I would request it."

14         Getting back to Mr. Goddu and the jewelry show in

15  2000, following the meeting and the advice that Mr. Goddu

16  had gotten from Mr. Fortgang, Mr. Goddu presented this

17  information to Montgomery Ward's executive committee who

18  approved the plan to increase jewelry purchases by offering

19  shorter credit terms.  Montgomery Ward was aware that

20  changing terms with one vendor in the fine jewelry industry

21  would probably result in a change with all vendors among the

22  tight-knit community.

23         And I'd like to refer to some of the testimony by

24  Mr. Goddu in his deposition transcript.  On page 20,

25  starting at line 4, the question was,

Decision                                    18

1    Q      "In your conversation with Mr. Fortgang in June of 2000

2    did Mr. Fortgang state that Fabrikant was going to change

3    its business relationship with Montgomery Ward in any way if

4    the terms weren't shortened?

5    A      No.  He was a real gentleman about it, as I recall.  He

6    only suggested that we would be helping ourselves if we did

7    that and we said that we would consider his input and we

8    thanked him."

9    Q      "What was the next thing that occurred with respect to

10   the suggestion about shortening the terms?

11   A      Well, we had a weekly executive committee meeting on

12   Mondays and we would discuss various matters that we thought

13   were important to the overall company.  And I distinctly

14   remember coming back from Las Vegas and having this as an

15   agenda item in the subsequent weekly executive committee

16   meeting that followed Law Vegas.  And we opened it up to

17   discussion amongst the entire executive committee, which

18   included four general merchandise managers.

19          The purpose of that was that we didn't want to set

20   precedent by doing something in one part of the business

21   that was inconsistent perhaps with other parts of the

22   business.  Recognize that we have different terms across the

23   business but we were trying to manage cash across the

24   company.  So when we'd get a significant division going into

25   season, like jewelry, and there's a request -- I shouldn't

Decision                                         19

1   even say a request -- there's input from a large jewelry

2   supplier that Ward's would be helping itself by going from

3   60 days to 30 days, that was the suggestion, obviously this

4   runs contrary to our desire to extend terms to preserve

5   cash.

6        So it becomes a balancing act.  And it was one that we

7   gave careful consideration to and we made a decision

8   collectively in the executive committee that we thought in

9   this instance it did make sense for us to contract our terms

10  from 60 days to 30 days with Fabrikant.

11       And I remember our CFO at the time, you know, saying,

12  "Great.  I'm trying to preserve cash and you guys are

13  tightening terms."  So it's obviously a judgment call."

14  Q    "Okay.  Was there a discussion about the -- that if we

15  shorten terms for Fabrikant in the jewelry division as a key

16  vendor, would that impact other jewelry vendors?

17  A    We thought that would be the case."

18  Q    "Do you know whether that ultimately proved to be the

19  case?

20  A    I believe that it -- I can't tell you exactly what

21  occurred, but I believe there were subsequent jewelry

22  vendors whose terms were also changed from 60 to 30,

23  although I cannot with any specificity tell you who or when.

24  But we expected that this could start a change because it's

25  a small industry and word gets out."

Decision                                    20

1  Q    "You're referring to the jewelry industry?

2  A    Yes."

3  Q    "How did --

4  A    We didn't think the term change with Fabrikant would be

5  isolated or remain isolated when we made that decision."

6            As to renegotiation of terms, on page 26 of Mr.

7  Goddu's transcript at line 14, the question is --

8  Q    "Yes.  I guess the question I was asking about though

9  is -- and I asked specifically about Ward's, but I'll ask in

10 general experience in working in these various, you know,

11 large department store companies, are changes of terms, is

12 that part of the normal course of doing business?

13 A    I think changes in terms are normal.  There's a natural

14 desire for vendors to keep terms as tight as possible and at

15 the same time there's a natural desire for the retailer to

16 get as generous or lucrative of payment terms as possible

17 and that's a natural give and take.  It gets discussed

18 regularly."

19            Further on on page 27 at line 10 the question was

20 --

21 Q    "In this case, though, what you're describing happened

22 certainly with respect to Fabrikant, you're talking about a

23 discussion and negotiation?

24 A    Yeah, I believe that's a fair characterization.

25 There's a -- it certainly was a discussion and again it was

1    -- it was up to Ward's to decide to do it or not.  And I

2    think as a gentleman, Mr. Fortgang suggested that it would

3    be a good idea for us to consider that and we took his

4    suggestion and considered it and decided it was good for us.

5    So we consciously made that change."

6           Lastly on page 31 at line 20 of Mr. Goddu's

7    deposition, the question was --

8    Q    "And was the decision to change the terms from 60 to 30

9    days for Fabrikant, was that decision made at the executive

10   committee meeting following your return?

11   A    I believe after a thorough discussion at the executive

12   committee meeting we did decide to contract terms."

13          All right.  Coincidentally, when Montgomery Ward

14   was discussing reducing terms in the jewelry business it was

15   predicting a liquidity squeeze as it built up inventory in

16   advance of the Christmas season.  Randy Brown, Montgomery

17   Ward's CFO, testified that Montgomery Ward had covenants in

18   its loan agreement requiring a minimum liquidity of $75

19   million.  Projections indicated a danger of breaching the

20   liquidity covenant in the second half of 2000.  Shrinking

21   vendor terms decreased liquidity, exacerbating the danger of

22   covenant default.  Montgomery Ward termed this vendor

23   compression.

24          Mr. Brown testified to a policy adopted in mid

25   2000 to resist vendor compression.  He did not believe

Decision                                    22

1   Montgomery Ward would offer to reduce vendor terms during

2   2000.

3        Now struggles such as this between the finance

4   department and the sales department are common in many

5   businesses.  Which department wins the battle depends

6   sometimes on who's in charge.  In this case, Roger Goddu,

7   the Chairman and CEO of Montgomery Ward, had spent his

8   entire career in merchandising.  Randy Brown, the CFO, was

9   actually employed by GE Capital but he functioned as the CFO

10  of Montgomery Ward.

11       Although GE Capital undoubtedly controlled the

12  purse strings, in this instance regarding the jewelry

13  vendors, the merchandising side of Montgomery Ward

14  prevailed.  To increase volume of fine jewelry Montgomery

15  Ward decided to accept shorter terms from its jewelry

16  vendors, going from 60 days to 30 days.  Montgomery Ward

17  recognized that what it did for one jewelry vendor it could

18  expect to do for the others among the community.

19       Vendor compression did seriously impact Montgomery

20  Ward's liquidity.  By the 4th quarter of 2000 average

21  payment terms across all product lines had shrunken to 15

22  days.  That's down from 32 days at the start of 2000 and 27

23  days in June of 2000.  The majority of the fine jewelry

24  vendor terms had been reduced to 30 days, down from 60 days,

25  as had been anticipated and agreed to by the Chairman and

Decision                                    23

1  CEO, Roger Goddu, and the executive committee.

2          I note that although fine jewelry trade credit

3  terms reduced in 2000, they were still above the

4  company-wide average of 15 days.  Among the joint

5  defendants, Fabrikant's terms were reduced from 60 days to

6  30 days effective June 13th, 2000, OTC's terms went from 60

7  days to 30 days effective August 23rd, 2000, and Heng Ngai

8  changed from net 60 days to net 30 days as of August 16th,

9  2000.  I'm eliminating any reference to discount because I

10 don't find it particularly significant in these

11 circumstances.  But I do note that the terms for each of the

12 joint defendants were renegotiated well before the

13 preference period that started about September 30th of 2000.

14         And what was Montgomery Ward telling its vendors

15 about its financial condition in the second half of 2000?

16 Randy Brown, the CFO, and Roger Goddu, the Chairman and CEO,

17 both testified that the company sent out vendor letters that

18 generally contained a positive message and that were meant

19 to induce vendors to continue selling to Montgomery Ward.

20 For example, a vendor letter dated July 13th, 2000 says

21 inter alia,

22         "Wards has generated positive sales momentum in a

23 number of businesses across the chain this Spring, including

24 fine jewelry, furniture, soft home and electronics.  For the

25 Spring season these categories are up plus 5 percent to more

Decision                                    24

1  than plus 20 percent.  While our overall operating

2  performance has lagged, the expectations we shared with you

3  in February primarily due to difficult apparel sales,

4  particularly women's and seasonal merchandise, I am pleased

5  to say that inventory levels are 5 percent lower than last

6  year and moving back to levels projected earlier this year.

7          "We are particularly pleased with the performance

8  of our remodel program and as such we remain committed to

9  our aggressive implementation schedule.  Our remodeled

10 stores continue to generate significant year on year sales

11 growth in line with our expectations.  We have remodeled 65

12 stores in the chain with another 23 to be completed before

13 this holiday season.

14         "To help us maintain the aggressive pace of our

15 remodel activity, GE Capital has recently contributed $100

16 million in additional cash equity to Wards.  This cash was

17 used to pay down revolving debt and return our borrowing

18 availability to approximately $150 million.  This cash

19 equity infusion did not require any lender approval."

20         Skipping down -- "We appreciate the continued

21 support of our trade partners and GE Capital as we

22 reposition Wards.  Sincerely, Roger Goddu, Chairman and

23 Chief Executive Officer."

24         Later on October 6th, 2000 another vendor letter

25 was sent out.  The first page of the vendor letter says,

1      "There are two principal themes in this letter:

2  one, Wards is on track to achieve our Fall 2000 business

3  plan.  September sales were up 5 percent, which is

4  consistent with our 4th quarter budget; and two, the

5  continuing success of Ward's remodel program is being

6  supported by GE Capital Corporation which allows Wards ample

7  liquidity to execute our strategy."

8      Further on it says, "Ward's sales results for

9  September were very good and on plan, with the total store

10  increase of 5 percent.  September represented continuing

11  strength in fine jewelry, up 16 percent, soft home up 5

12  percent, furniture up 30 percent, electronics up 9 percent,

13  and appliances up 6 percent.  With significant increase in

14  the replacement tire business, our auto business was

15  essentially flat for the month of September, which is a

16  significant improvement.

17      "The only major business with a sales decline was

18  apparel, though there are encouraging trends within Ward's

19  apparel business even in the difficult competitive

20  environment.  This positive September performance gives us

21  reason to be optimistic about achieving our Fall operating

22  plan, which we believe to be very realistic."

23      Skipping down, "These results continue to validate

24  Ward's remodel program and represent remodeled store results

25  that are above plan.  We are excited about the continued

Decision                                    26

1   success of our new Ward stores and the upcoming completion

2   of whole market remodels which we will speak to later in the

3   update letter.  Significant cash support has been provided

4   by GE Capital Corporation, reflecting both their confidence

5   in our remodel program and their continuing support of our

6   turnaround efforts."

7        Skipping down again over some of the details of

8   the financing, the letter continues, "The resulting

9   additional cash needs are being met by GE Capital to assure

10  that Wards has the funds available to continue our remodel

11  program and maintain adequate borrowing capacity to operate

12  our business."

13       Again I'll skip down and just read one more

14  sentence from the letter.  "Again we feel that the

15  re-forecast projections are very reasonable given Ward's

16  sales trends and are confident in our ability to achieve the

17  Fall plan."

18       This is not to say that there weren't rumors about

19  Montgomery Ward having some difficulty.  Ms. Etlin heard the

20  rumors.  In fact, her firm considered offering consulting

21  services to Montgomery Ward.  Mr. Brown testified that

22  someone knowledgeable in the department store finances would

23  realize that the liquidity numbers disclosed in the

24  financial information and schedules attached to these

25  glowing vendor letters revealed a less than sterling cash

Decision                                    27

1  position.

2          Of course, Montgomery Ward did not tell its

3  vendors about the covenant in its loan documents requiring a

4  minimum level of liquidity, nor did it tell its vendors that

5  Montgomery Ward projected difficulty in avoiding a breach of

6  that covenant.  Rather Montgomery Ward represented that it

7  was being supported by GE Capital Corp., "which allows Wards

8  ample liquidity to execute our strategy."

9          Montgomery Ward had shown success in its remodeled

10 stores and it had the backing of its owner, GE Capital

11 Corp., one of the largest and strongest financial firms in

12 the world.  Montgomery Ward hardly exhibited morbidity, nor

13 did it appear to be on the slide into bankruptcy from which

14 it had emerged just the year previously.

15         Despite the positive representations made in these

16 vendor letters, Montgomery Ward's results for the Christmas

17 season of 2000 did not satisfy its owner and a decision was

18 made to liquidate the company.  Senior management of

19 Montgomery Ward were not aware of this decision until

20 December.  The petition was actually filed on December 28th,

21 2000.

22         At all times following the first bankruptcy in

23 August of 1999 until shortly before the second bankruptcy in

24 December of 2000, Montgomery Ward's senior management ran

25 the business as a going concern, expected it to continue as

Decision                                    28

1   a going concern, and represented to vendors, including all

2   the joint defendants, that it would be a going concern.

3          Montgomery Ward dealt with three to 4,000 vendors.

4   It established a sophisticated automatic system for its

5   accounts payable.  Vendors were required to submit invoices

6   electronically using a system known as EDI, that's

7   Electronic Data Interchange.  Computer generated checks were

8   cut every Sunday.  Invoices would be scheduled for payment

9   following their due date and after all related documentation

10  had been completed, such as shipping documents, receipts,

11  and verification of quantity, weight, price, quality, for

12  example carat of gold, et cetera.

13         Thus invoices with a 60 day due date were paid

14  sometime after 60 days from invoice date.  Invoices with a

15  30 day due date were paid sometime after 30 days from the

16  invoice date.  On occasion a few invoices that were not yet

17  due would be batched with other invoices in the Sunday run

18  of checks so they might actually be paid a few days before

19  their due date.  Payments up to 45 days after the due date

20  were not unusual.

21         Delay in payment beyond the due date was caused by

22  numerous factors, such as lack of accompanying

23  documentation, i.e. the shipping, receiving, inspection,

24  price verification documentation, et cetera, inefficiencies

25  in data processing with Montgomery Ward's accounts payable

Decision                                      29

1   department or even a unilateral decision by Montgomery Ward

2   to postpone payment for a few days.  And these types of

3   factors that caused delay were common throughout the

4   industry involving national retailers and their methods for

5   payment.

6        In fact, Ms. Etlin testified that it was a common

7   practice among department stores to delay payment for a

8   short while without the consent of its vendors but without

9   any repercussions for doing so.  And Mr. Goddu in his

10  testimony related that another national retailer, I think it

11  was Toys R Us, I don't recall offhand, but in any event,

12  another national retailer had unilaterally changed its

13  payment terms and just imposed those upon its vendor

14  community unilaterally.

15       From the vendor's point of view, all the witnesses

16  agreed and there was no contradictory evidence that as long

17  as there was a steady stream of payments from the retailer,

18  the fine jewelry vendors would not be concerned and would

19  continue shipping merchandise.  And apparently the facts

20  were that all during the year 2000 Montgomery Ward did

21  continue to cut checks every Sunday and payments continued

22  to stream in to the jewelry vendors.

23       Now I spoke about delay within the 45 days beyond

24  the due date, but particular invoices might not be paid even

25  within 45 days beyond the due date.  This might be caused by

Decision                                    30

1  mistake in the accounts payable department, for example, a

2  skipped invoice, which could be remedied by merely sending

3  another copy of that invoice, or there might be a

4  discrepancy in the price, the quantity or the quality of the

5  goods and that discrepancy would have to be adjusted between

6  the parties.

7         On a percentage basis these exceptional invoices

8  where payments extended beyond 45 days were a small

9  percentage, but considering the large volume of invoices

10 that were processed, these skipped invoices or invoices with

11 discrepancies did occur on a fairly regular basis.

12        The vendors, although they did watch their

13 accounts receivable closely, wouldn't be concerned about an

14 invoice until it was at least 60 days past its due date.  At

15 that point the vendor would initiate a telephone inquiry to

16 the retailer's accounts payable department to determine

17 whether the invoice had just been skipped and needed a

18 replacement or whether there were some discrepancies that

19 needed adjustment.  Problems were usually if not always

20 rectified and then payment would be processed.

21        At no time during 2000 did any of the joint

22 defendants undertake or threaten collection activity against

23 Montgomery Ward.  At no time during 2000 did any of the

24 joint defendants withhold or threaten to withhold shipments

25 of fine jewelry to Montgomery Ward.

Decision                                        31

1            All right.  Those are my findings of fact.  Now

2    I'd like to discuss the relevant law and see if I can apply

3    the law to the facts.  As I said, this part of the trial was

4    limited to common issues among the joint defendants relating

5    to the ordinary course defense, specifically Section

6    547(c)(2)(C) that requires the transfer to have been made

7    according to ordinary business terms.

8            The leading decision in the Third Circuit is the

9    Molded Acoustical case, which is reported at 18 F Third page

10   217 from 1993, in which the Court gave an extensive

11   discussion of Section 547(c)(2)(C).  Adopting with slight

12   modification the interpretation of the Seventh Circuit in

13   the Tolana Pizza case, 3 F Third 102, 1993 also, the Third

14   Circuit concluded in quoting from Tolana Pizza with slight

15   modification,

16            "Ordinary business terms refer to the range of

17   terms that encompasses the practice in which firms similar

18   in some general way to the creditor in question engage, and

19   that only dealing so unusual --" That's the Third Circuit's

20   word.  The Seventh Circuit had used only dealing so

21   idiosyncratic.  "-- as to fall outside the broad range

22   should be deemed extraordinary and therefore outside the

23   scope of Subsection C."

24            The Third Circuit noted that Congress did not

25   define ordinary business terms but left it up to the Courts

Decision                                              32

1  to apply that broad concept to particular circumstances.

2  The legislative history states that the purpose of the

3  preference section is to facilitate the prime bankruptcy

4  policy of equality of distribution among creditors.  Again

5  quoting from the Molded Acoustical case,

6          "On the one hand, the preference rule aims to

7  insure that creditors are treated equitably, both by

8  deterring the failing debtor from treating preferentially

9  its most obstreperous or demanding creditors in an effort to

10  stave off a hard ride into bankruptcy, and by discouraging

11  the creditors from racing to dismember the debtor.  On the

12  other hand, the ordinary course exception to the preference

13  rule is formulated to induce creditors to continue dealing

14  with a distressed debtor so as to kindle its chances of

15  survival without a costly detour through or a humbling

16  ending in the sticky web of bankruptcy."

17          The Third Circuit noted that one of the purposes

18  of the preference statute, the prevention of favoritism.

19  Also it's to prevent a pushy creditor or a fawning debtor

20  seeking to advantage a favored creditor.  The Court focused

21  on exploitation or favoritism or self-aggrandizing behavior

22  by a creditor.

23          Now when it comes to the ordinary course defense,

24  the burden of proof is on the creditor to prove that the

25  transfer was ordinary within ordinary business terms by a

Decision                                      33

1   preponderance of the evidence.  Now ordinary business terms

2   does not imply the existence of a single uniform set of

3   industry-wide creditor terms.  Rather it refers to a range,

4   a broad range or a sliding scale window, in the words of the

5   Third Circuit.

6           The preference provisions are designed not to

7   disturb normal debtor-creditor relationships but to derail

8   unusual ones which threaten to heighten the likelihood of

9   the debtor filing for bankruptcy.  The exception encourages

10  creditors to continue conducting business with struggling

11  debtors.

12          The Court's job is to verify that the creditor is

13  not exploiting the debtor's precarious position at the brink

14  of bankruptcy so that it may advantage itself to the

15  detriment of other creditors who continue to extend credit

16  within the letter and spirit of the Code, or at the very

17  least to verify that the creditor is refraining from unusual

18  action to collect ordinary debts.

19          Quoting from the legislative history, "The purpose

20  of this exception is to leave undisturbed normal financial

21  relations because it does not detract from the general

22  policy of the preference to discourage unusual action by

23  either the debtor or his creditors during the debtor's slide

24  into bankruptcy."

25          The first step in applying the law to the facts is

Decision                                        34

1   to determine the range of terms on which firms comparable to

2   the vendor on some level provide credit to firms comparable

3   to the debtor on some level.   The evidence is clear in this

4   case that fine jewelry vendors offer a range of credit terms

5   from 10 days to 120 days to their customers including

6   national retail department stores, regional stores,

7   specialty jewelry retailers, catalog stores and television

8   shopping networks.

9         For national retail department stores, net 60 days

10  appears to be the most prevalent term, although net 30 days

11  is clearly within the range, as the Third Circuit said, the

12  broad range or the sliding scale window of credit terms

13  offered by jewelry vendors.  Of the various types of

14  retailers to whom the jewelry vendors sold, most if not all

15  were comparable on some level to Montgomery Ward.  As the

16  Third Circuit has said, the firms need not be exactly

17  comparable but must be comparable only on some level.  And

18  all these firms were comparable in that they purchased and

19  resold a large volume of fine unbranded jewelry to retail

20  consumers.  Some vendees in each of these sub-groups

21  purchased on 30 day terms.

22        Now the defense expert, John Esposito, has lengthy

23  experience in the fine jewelry business.  And although 60

24  day terms predominate in the industry, some national

25  department stores, including Macy's, buy on 30 day terms.

Decision                                      35

1   Mr. Esposito's company, Andin International, sold to

2   Montgomery Ward on 30 day terms during 1999 and 2000,

3   including within the preference period.

4           Patti Jo Clifton from Heng Ngai Jewelry in the

5   finance department testified that her company has 30 day

6   terms with several large customers including Sterling or Kay

7   Jewelers, Jareds, the I believe it's AAFS, which is a

8   retailer on Army and Air Force bases, Service Merchandise

9   and Home Shopping Network.

10          Lee Rothlein, who is the CFO of OTC, testified

11  that his company has 30, 60 and 90 day terms with various

12  large retailers.  For example, Kohl's, which is a national

13  department store, has 30 day terms.

14          Thus, 30 day terms are within the normal range of

15  credit terms offered by fine jewelry vendors to retailers

16  comparable to Montgomery Ward on some level.

17          Now plaintiff offered no evidence of the ordinary

18  business terms beyond what Montgomery Ward's own records

19  showed.  Montgomery Ward's expert witness, Ms. Etlin, was

20  not retained to give an opinion on ordinary business terms

21  in the relevant industry.  Her assignment was to critique

22  the defendants' expert reports.

23          The only significant data that Ms. Etlin reviewed

24  were Montgomery Ward's own record of its credit terms with

25  its jewelry vendors.  Her research showed that although the

Decision                                    36

1   most prevalent term during the historical period was 60

2   days, there were 13 vendors out of 67 reviewed, which is

3   approximately 27 percent of the entire universe of jewelry

4   vendors dealing with Montgomery Ward, that 27 percent had 30

5   day terms or less throughout the historical period and that

6   the joint defendants and some others changed terms to 30

7   days before the preference period.

8           As to payment practices, the practices of

9   Montgomery Ward were consistent throughout the preference

10  period and before.  Montgomery Ward continued to cut checks

11  every Sunday with the exception of the last week before

12  filing bankruptcy on December 28th, 2000.  On one or two

13  occasions during the Fall of 2000 Montgomery Ward delayed

14  mailing checks for one, two or three days when liquidity was

15  tight.  This is a so-called check hold.

16          One has to recall that there is no evidence that

17  Montgomery Ward did not have the cash to meet its

18  obligations.  At all times it appeared that Montgomery Ward

19  had enough cash to pay the bills.  Montgomery Ward's focus

20  was on its liquidity and the covenant that it had in its

21  loan agreement requiring $75 million of liquidity.  In order

22  to avoid the risk of a technical breach of its loan

23  agreement, Montgomery Ward delayed mailing checks for a few

24  days on a few limited occasions.

25          Montgomery Ward's own expert, Holly Etlin,

Decision                                              37

1  testified that large retailers often unilaterally delay

2  payments and that their superior commercial advantage allows

3  them to do so with impunity.  And as I mentioned before, Mr.

4  Goddu related an incident where another large retailer

5  imposed its own payment delay upon its vendors.  During this

6  time in 2000 Montgomery Ward had an advantage and it used

7  it.  Any delay in payment was not caused by a pushy creditor

8  exploiting the weakness of a debtor on the slide into

9  bankruptcy nor was it a case of favoritism.

10        Plaintiff's main contention, at heart, is that a

11  healthy national retailer would have received 60 day terms

12  from its fine jewelry vendors.  It argues that the change to

13  30 day terms beginning in June 2000 was indicative of a

14  moribund Montgomery Ward, not a healthy one.

15        Plaintiff's own evidence refutes this theory.  The

16  vendor letters that were sent in July and October of 2000

17  paint a rosy picture of Montgomery Ward's financial health.

18  Remodeled stores were doing well, showing increased sales

19  over the same period in prior years.  Overall, sales were

20  meeting projections.  Montgomery Ward was on track to meet

21  its plan.  And although apparel sales were lagging, other

22  lines, including fine jewelry, were growing by double digit

23  percentages.

24        GE Capital had provided a large equity investment

25  of $100 million and had made credit available on a line of

Decision                                                  38

1  credit secured by the real estate owned by Montgomery Ward,

2  which was substantial.  Mr. Goddu testified that changes in

3  terms are normal.

4           I just want to refer to the plaintiff's proposed

5  findings of fact.  Proposed finding number 4, "Ordinary

6  industry terms do not encompass every transaction that may

7  occur sporadically in the relevant industry but only those

8  credit transactions that occur between healthy companies in

9  a normal business environment based upon arm's length

10 bargaining."

11          And then proposed finding number 5 by the

12 plaintiff says, "Terms compression from net 60 day terms to

13 net 30 day terms is not ordinary for the relevant industry

14 when such is based upon the buyer's financial distress or

15 where the same is the result of collaborative industry

16 imposed duress upon the buyer to agree to such terms."

17          Also proposed finding number 7 by the plaintiff

18 reads, "A predatory compression in terms to the detriment of

19 the debtor is not endemic of an ordinary business

20 relationship."

21          I find that there is no evidence of collaboration

22 among the jewelry vendors.  There were a few minor pieces of

23 evidence that refer to communication among the jewelry

24 vendors.  For example, plaintiff's exhibit 13, which is I

25 believe a string of e-mails, one of which was from Mr. Randy

Decision                                    39

1   Brown, he says something to the effect that if you grant a

2   change in terms to one jewelry vendor you can expect to do

3   it for all because they all talk.

4          Ms. Etlin also testified that in her experience

5   the jewelry vendor industry is a close industry.  Mr. Goddu

6   in his deposition testimony said, "It's a small industry and

7   word gets out."  And also Mr. Shaffet, who testified for the

8   defense, admitted on cross examination that credit managers

9   in the jewelry manufacturing business do talk to each other.

10         But the best that can be said is that Montgomery

11  Ward agreed to change terms with one vendor and it expected

12  that it would have to do so with other vendors.  There's no

13  evidence of any kind of conspiracy, collaboration, collusion

14  or anything like that among the jewelry vendors.  There was

15  no stopping of shipments.  There was no threat to ever stop

16  shipments.  There was certainly no collective pressure

17  asserted by the defendants.

18         And as to the financial distress, as I said, the

19  information that Montgomery Ward provided to its vendors

20  indicated that it was not a company in financial distress

21  during the time that the terms were renegotiated in June

22  through August of 2000.  The suggestion that Montgomery Ward

23  was subjected to duress to me is nothing but a product of an

24  advocate's imagination.  And I don't mean that in an

25  insulting way.  There was no witness from Montgomery Ward

Decision                                           40

1   that testified about any duress.  There is a complete lack

2   of evidence that anyone at Montgomery Ward believed that

3   unless it acceded to the jewelry vendors' demands they

4   wouldn't be able to fill their cases with jewelry.

5        As to an alternate source of supply in the event

6   the jewelry vendors had not shipped as much as requested,

7   there was no evidence that Montgomery Ward looked for other

8   sources of supply and couldn't find it or even that anyone

9   at Montgomery Ward was concerned that the jewelry vendors

10  would not meet their needs.  To the contrary, all the

11  evidence indicates that the jewelry vendors wanted to ship

12  as much to Montgomery Ward as Montgomery Ward would order

13  and that the only limitation was the financing that the

14  vendors could get from their own factors and lenders.

15       As Mr. Fortgang told Mr. Goddu, one way to

16  overcome that limitation was to shorten payment terms so

17  that the vendors would have more credit available and could

18  manufacture and ship more jewelry.  Montgomery Ward took

19  that advice, discussed it, considered it, and made a

20  voluntary decision to increase its supply of fine jewelry by

21  shortening its terms.

22       In fact, the evidence about alternate sources of

23  supply is completely contrary to the suggestion in the

24  plaintiff's proposed findings of fact or arguments to the

25  Court.  The only evidence that was offered confirms that

Decision                                            41

1    there are many jewelry manufacturers and wholesalers and

2    that they were eager to sell to Montgomery Ward.  Although

3    the merchandise may not always be readily available and that

4    a manufacturer may not have everything in stock and there

5    would be some lead time in order to manufacture particular

6    goods, there was no indication that there was anything other

7    than a ready alternate source of supply if Montgomery Ward

8    wanted it.  So there was absolutely nothing to suggest any

9    duress on the part of the jewelry vendors and no concerted

10   action or collective action on their part.

11         There was additional evidence as to particular

12   reasons for changing terms.  As far as Heng Ngai goes, Ms.

13   Clifton testified that her company is owned by an individual

14   in Asia and that the owner was planning to do an initial

15   public offering of stock on the Singapore Stock Exchange and

16   that their investment bankers had advised them that having

17   shorter payment terms with their customers would demonstrate

18   a stronger cash flow and reflect more favorably on the

19   marketability of their initial public offering.  The

20   renegotiation of credit terms between Montgomery Ward and

21   Heng Ngai specifically focused on this IPO and had nothing

22   to do with Montgomery Ward's financial condition but was

23   driven by a desire to present a more favorable financial

24   outlook for Heng Ngai in its IPO.

25         With regard to Fabrikant, the testimony revealed

Decision                                    42

1    and other evidence revealed two reasons that account for the

2    change in terms between Fabrikant and Montgomery Ward in

3    June of 2000, which of course was more than six months prior

4    to the bankruptcy filing.  First was the desire of

5    Montgomery Ward to increase jewelry purchases because that

6    line of business had showed improvement and profitability.

7    As Mr. Goddu testified, he accepted Mr. Fortgang's

8    suggestion that Montgomery Ward would do itself good by

9    offering faster payment terms to its jewelry vendors.

10          In addition, Mr. Shaffet, Fabrikant's CFO, learned

11   from his lenders in the Spring of 2000 that Montgomery Ward

12   was providing credit insurance through a subsidiary of GE

13   Capital to some of its vendors and as testimony from other

14   witnesses, including Mr. Brown, confirmed, indeed there was

15   a program of credit insurance that had been provided through

16   a subsidiary or an affiliate of GE Capital but that program

17   had been used to maximum.

18          And Mr. Shaffet actually went out and visited

19   Montgomery Ward in Chicago and he asked for credit insurance

20   as he had been encouraged to do by his lenders.  He then

21   learned that although credit insurance had been given to

22   some vendors, it was no longer available.  And so to appease

23   Fabrikant's lenders, Montgomery Ward agreed to a reduction

24   in payment terms from 60 days to 30 days and Mr. Shaffet was

25   grateful for what he was able to get and apparently that

Decision                                    43

1  satisfied his lenders, although they naturally would have

2  preferred credit insurance.

3          OTC changed its credit terms with Montgomery Ward

4  in August of 2000 from 60 days to 30 days because OTC was

5  having cash flow problems of its own and difficulty in

6  obtaining financing for the volume of business that it

7  wanted to do with Montgomery Ward and its other customers.

8  The owners of OTC actually met with Montgomery Ward in

9  Chicago and requested faster payment terms to assist in

10  their cash flow problems and Montgomery Ward agreed to it

11  because it wanted to increase the volume of purchases from

12  OTC.

13          All right.  Considering all of the facts here and

14  in light of the legislative purpose, the ordinary course

15  defense is meant to leave undisturbed normal business

16  arrangements and to encourage suppliers to continued doing

17  business with the debtor, perhaps enabling the company to

18  avoid bankruptcy.  The joint defendants here, these jewelry

19  vendors, continued to ship on credit right up until the

20  bitter end.  Their actions are what Congress sought to

21  encourage.

22          Although bankruptcy was not avoided by Montgomery

23  Ward in this case, in fact the jewelry vendors' terms were

24  longer on average than most other vendors dealing with

25  Montgomery Ward.  In the beginning of 2000 Montgomery Ward's

Decision                                    44

1   average payment days across all lines was 32 days, while the

2   majority of the jewelry vendors were offering 60 day terms.

3   Later in 2000 when Montgomery Ward's average days had

4   shrunken to 15, the jewelry vendors were still at 30 day

5   terms.  One can't help but compare that with electronic

6   suppliers such as Sony, who demanded cash in advance.

7        And I also think one should consider the policy

8   behind the whole 547(c) exception to the preference statute

9   including the so-called contemporaneous exchange defense in

10  547(c)(1).  If a vendor will not extend credit but ships COD

11  to a company and gets paid within 90 days prior to the

12  bankruptcy filing, that transfer cannot be avoided because

13  it's a contemporaneous exchange for new value given.  The

14  rationale is that the debtor's net assets are not depleted.

15  It exchanges one asset that's cash, for another that's

16  inventory.  However, liquidity is depleted and cash flow is

17  disrupted for a debtor, as Mr. Brown testified to

18  extensively.

19        If the policy is to consider whether one creditor

20  is engaging in self-aggrandizing behavior, why should a

21  vendor such as these jewelry vendors who are willing to ship

22  on credit be treated less favorably by the same section of

23  the Bankruptcy Code than a vendor who is unwilling to ship

24  except for cash?  That doesn't make sense to me and it's not

25  what I perceive Congress had in mind when it established the

Decision                                    45

1   ordinary course defense.

2           And I think if one takes a look at the amendments

3   to the Bankruptcy Code in the 2005 legislation, it reveals

4   that Congress amended 547(c)(2) to change the word and to or

5   between (c)(2)(B) and (c)(2)(C), thus making the third

6   prong, that is that payment according to ordinary business

7   terms is now an alternate to prove ordinary course and not a

8   requirement. The result of this change adopted by Congress

9   is that fewer transfers to vendors will be avoided.  It

10  suggests that Congress felt that too many normal business

11  payments were being challenged.

12          And as the Third Circuit has instructed, the

13  ordinary course defense is not meant to disturb normal

14  business dealings, but to encourage continued commerce.

15  Only unusual actions by a pushy creditor exploiting a

16  debtor's disadvantage or a fawning debtor showing favoritism

17  to the disadvantage of other creditors are meant to be

18  avoided.

19          Here, the jewelry vendors continued to ship on

20  credit, giving Montgomery Ward a chance at survival, and the

21  terms they offered were more favorable than other vendors,

22  particularly those who demanded cash in advance.  Montgomery

23  Ward's willingness to renegotiate terms was not driven by

24  favoritism but by plans to increase jewelry sale and

25  reducing the terms would help Montgomery Ward meet its own

Decision                                          46

1  goals.

2          So to reiterate, I find that net 30 day credit

3  terms is within the range of terms offered, I find, by

4  jewelry vendors to national retailers and is an ordinary

5  business term.  Payments made within 10 days prior to or 45

6  days after the due date are ordinary.  Payments outside this

7  window may be ordinary depending upon the circumstances.

8          As to the mode of payment and method of payment,

9  generally payment is by computer generated check and

10  delivered by U.S. Mail.  The issuance of a manual check may

11  be ordinary, again depending on the circumstances.  And

12  delivery by messenger or allowing for the picking up of the

13  check again may be ordinary depending upon the

14  circumstances.

15          So those are my conclusions regarding this limited

16  aspect of the trial.  I want to express my wish that this

17  resolution will do what the parties hoped and that is set a

18  template for further consideration as to whether particular

19  transfers may be avoided under 547(b) or may be protected by

20  the ordinary course defense under 547(c).  And I thank you

21  for your attention.

22          Let me ask the plaintiff's counsel.  Is there

23  anything else we should discuss before we close for today?

24          MS. SHANNON:  Your Honor, this is Kelly Shannon on

25  behalf of the plaintiff.  We would request leave to file an

Decision                                      47

1    interlocutory appeal of Your Honor's decision.

2              THE COURT:  Why should I allow that?  Ms. Shannon,

3    maybe you didn't hear me.  Why should I allow that?

4              MS. SHANNON:  Your Honor, we feel there are a

5    number of findings and also conclusions of law that would

6    have an effect on the remainder of the trial and also a few

7    of those that we would like to have a directive prior to

8    that.

9              THE COURT:  Mr. Devack.

10             MR. DEVACK:  Your Honor, I'd like a little bit of

11   time actually to digest what Your Honor has said today, to

12   consider it in the context of what the other discovery has

13   shown as far as the range of payments, the individual

14   payments made by each of the joint jewelry defendants.  But

15   on the simple question of whether or not there should be an

16   interlocutory appeal, I don't see that as appropriate.  I

17   think the trial should proceed in the last week of October

18   on the individual trials.

19             THE COURT:  All right.  Let's just take a look at

20   the rules for a minute, Ms. Shannon.  Let me just take a

21   look at the rules.  I don't think it's -- I think that a

22   motion for leave to appeal must be presented to the District

23   Court.

24             MS. SHANNON:  Your Honor, with respect to you,

25   these matters, because there is not a final decision with

Decision                                      48

1    respect to all issues, I know that in order to file an

2    appeal of this decision, Your Honor's permission is

3    required.

4              THE COURT:  Where do you get that?

5              MS. SHANNON:  Oh, I wish I knew off the top of my

6    head.  I'm looking.

7              THE COURT:  If you look at Rule 8003, it says the

8    clerk shall transmit the notice of appeal, the motion for

9    leave to appeal to the clerk of the District Court.  So I

10   don't think that you need my leave to appeal but you have to

11   seek it from the District Court.  So unless you -- let's

12   see.  Look also at 8001b.  So I think --

13             MS. SHANNON:  It could be -- it says as permitted

14   by 28 USC 158.  I'm not sure what that says.

15             THE COURT:  Well, let's take a look at it.  158

16   says the District Court shall have jurisdiction to hear

17   appeals with leave of the Court from other interlocutory

18   orders and decrees of bankruptcy judges.  I think you go to

19   the District Court for your leave to appeal.  So I'm not

20   going to rule on that unless you find some authority that

21   says otherwise.  There may be a local rule in Delaware that

22   I'm not aware of.  All right?  Anything else from the

23   plaintiff's point of view, Ms. Shannon?

24             MS. SHANNON:  Pardon me, Your Honor?

25             THE COURT:  Anything else that we should discuss

Decision                              49

1  from your point of view?

2           MS. SHANNON:  No, Your Honor.

3           THE COURT:  Okay.  Mr. Devack, from the defense

4  point of view?

5           MR. DEVACK:  Your Honor, I just -- and again, I

6  haven't had a chance to speak to the other counsel with

7  respect to the individual trial, but I would say one point

8  that I would like to just leave with Your Honor is in

9  Fabrikant, Leer and Clover, I don't think there's any

10 serious dispute with respect to the timing of payments and

11 how they were made.  I think we're very close on our

12 respective schedules of when the payments were made in

13 relationship to the due date, the mode of payment and the

14 methods.

15          Given Your Honor's decision, which I think has not

16 only set a template for industry terms but has, because of

17 the way the evidence went in, Your Honor will recall that we

18 had originally wanted to keep out discussions relating to

19 the change of terms.  Plaintiff insisted, pursued it and it

20 ultimately was obviously carefully considered by Your Honor.

21 It's my belief that there are probably no real triable

22 issues left in the individual trial other than an inclusion

23 as to whether or not we also meet the criteria of

24 547(c)(2)(B), ordinary as between Montgomery Ward and each

25 of the defendants.  And we would request, with Your Honor's

Decision                                    50

1   permission, the right to file a motion for summary judgment.

2              THE COURT:  All right.  I'm not going to address

3   that now.  Why don't you discuss it with your adversary and

4   you can just submit a letter telling me either that both

5   sides agree that the matter is ripe for summary judgment or

6   that one side requests leave to file a motion for summary

7   judgment and the other side doesn't consent.  And I'll

8   consider that request after receiving it.  But I don't want

9   to do it now.  I want to give everybody an opportunity to

10  fully consider it.

11             All right.  Anything else, Mr. Devack?

12             MR. DEVACK:  No, Your Honor.

13             THE COURT:  Okay.  Thank you very much.

14             MR. DEVACK:  Have a good day, Your Honor.  Thank

15  you.

16             MS. SHANNON:  Thank you, Your Honor.

17             THE COURT:  Good-bye.

18                     *          *          *

19

20

21

22

23

24

25

51

```
 1                       CERTIFICATION

 2          I, LINDA KELLY, a Certified Agency Transcriber, do

 3   hereby certify that the foregoing transcript of proceedings

 4   is prepared in full compliance with the current Transcript

 5   Format for Judicial Proceedings and is a true and accurate

 6   transcript of the proceedings as recorded in the matter of

 7   Montgomery Ward heard by the United States Bankruptcy Court

 8   on September 8, 2005.

 9

10   /s/ LINDA KELLY                     AOC NUMBER

11

12   TERRY GRIBBEN'S TRANSCRIPTION SERVICE
                                          DATE
13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------X

In re:                                          Chapter 11
                                                Case No. 00-4667(KG)
Montgomery Ward, LLC, et al.,

         Debtors.
----------------------------------------------------------X
MONTGOMERY WARD, LLC, et al.,

                                                Adversary Proceeding

         Plaintiffs,
      v.                                        No. 02-9282 (RTL)

OTC INTERNATIONAL, LTD.,

         Defendant.
----------------------------------------------------------X

## ORDER

      This matter having been tried to the court, for the reasons set forth in the accompany

opinion,

      **IT IS HEREBY ORDERED** that judgment be entered in favor of defendant finding no

cause of action.

Dated: September 12, 2006

Raymond T. Lyons,
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

**APPEAL TRANSMITTAL SHEET**

Case Number: _Adv 02-9282_    ○ BK  ● AP

If AP, related BK Case Number: _00-4667_

Title of Order Appealed: _Order Granting Judgment in favor of Defendant Maintaining that all Payments Were Made in the Ordinary Course and not avoidable_

Docket Number: _145_    Date Entered: _9/13/06_

Item Transmitted: ● Notice of Appeal          ○ Motion for Leave to Appeal
                   ○ Amended Notice of Appeal   ○ Cross Appeal
Docket Number: _148_    Date Filed: _9/21/06_

*Appellant/Cross Appellant:                  *Appellee/Cross Appellee

Counsel for Appellant:                        Counsel for Appellee:

_Daniel B. Butz_                              _Ashley B. Stitzer_
_Morris, Nichols, Arsht + Tunnell_           _the Bayard Firm_
_1201 N. Market St_                          _P.o. Box 25310_
_Wilmington DE 19899_                        _Wilmington DE 19899_

*If additional room is needed, please attach a separate sheet.

Filing Fee paid? ● Yes  ○ No

IFP Motion Filed by Appellant? ○ Yes  ● No

Have Additional Appeals to the Same Order been Filed? ○ Yes  ● No
    If so, has District Court assigned a Civil Action Number? ○ Yes ○ No  Civil Action # _____

Additional Notes: _Notice of Appeal #BAP 06-61_

_10/17/06_                          By: _M. E. Behornar_
Date                                    Deputy Clerk

Bankruptcy Court Appeal (BAP) Number: _BAP 06-61_     FOR USE BY U.S. BANKRUPTCY COURT
7/6/06