**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Montgomery Ward, LLC, *et al.*,<br><br>                                  Debtors, | Case No. 00-4667(KG)<br><br>Chapter 11 |
| Montgomery Ward, LLC, *et al.,* Debtor in Possession,<br><br>                                  Plaintiff,<br><br>          v.<br><br>OTC International, Ltd.,<br><br>                                  Defendant. | Adv. Pro. No. 02-9282 (RTL) |

**APPELLEE'S DESIGNATION OF RECORD ON APPEAL PURSUANT TO
RULE 8006 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Appellee, OTC International, Ltd., by and through its undersigned counsel, pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure, designates the following additional items to be included in the record on appeal:

| NUMBER | DATE OF FILING | DOCKET NUMBER | DOCUMENT |
|---|---|---|---|
| 1. | 7/14/2006 | 140 | Plaintiff's Trial Brief |
| 2. | 7/14/2006 | 141 | Trial Brief for Defendant OTC International, Ltd. |

Dated:  October 9, 2006                    THE BAYARD FIRM

By: _____

Ashley B. Stitzer (No. 3891)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
(302) 655-5000
(302) 658-6395 (facsimile)

-and-

1

SILVERBERG STONEHILL &
   GOLDSMITH PC
Mitchell L. Kaplan, Esquire
111 W. 40th Street, 33rd Floor
New York, NY  10018
(212) 730-1900
(212) 391-4556 (facsimile)

Attorneys for OTC International, Ltd.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Bk. No. 00-4667(KG) |
| Montgomery Ward, LLC, *et al.*, <br> Debtor. | Chapter 11 <br><br> Adv. Nos. 02-9282(RTL) |
| Montgomery Ward, LLC, *et al.*, Debtor in Possession, <br> Plaintiff, <br> vs. <br><br> OTC International, Ltd., <br><br> Defendant. | Trial Date: July 19-20, 2006 <br> Time: 10:00 a.m. <br><br> Location: 402 East State Street <br> Trenton, NJ 08608 <br><br> Estimated Length of Trial: 2 days |

# PLAINTIFF'S TRIAL BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL
Donna L. Culver, DE SBN 2983
Derek C. Abbott, DE SBN 3376
Daniel B. Butz, DE SBN 4227
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
**Telephone:** (302) 658-9200  **Fax:** (302) 658-3989

        and

A·S·K FINANCIAL, LLP
Joseph L. Steinfeld, Jr., DC SBN 297101,
MN SBN 0266292, VA SBN 18666
Karen M. Scheibe, Esq., MN SBN 0300469, SD SBN 1912,
ND SBN 05683
2600 Eagan Woods Drive, Suite 220
Eagan, MN 55121
Telephone: (651) 406-9665  Fax: (651) 406-9676

Co-Counsel For Plaintiff, Montgomery Ward, LLC, *et al.*,
Debtor.

Dated: July 14, 2006

## TABLE OF CONTENTS

I.    Introduction ...................................................................................................................1

    A.    Nature, Course, And Disposition Of The Proceedings ...................................................1

    B.    Stipulations ...................................................................................................................2

II.   Summary of Argument ...................................................................................................3

III.  Statement of Facts ...................................................................................................6

IV.   Argument......................................................................................................................13

    A.    Plaintiff Requests The Court Alter Or Amend Its Previous Decision In The Industry Trial Based On Newly Discovered Evidence To Reflect That The Debtor Was Moribund And Sliding Into Bankruptcy At The Time Of The Parties' Terms Change.13

    B.    The Evidence Establishes The Transfers Were Outside The Ordinary Course Of Business Between The Parties ...................................................................................................17

        1.    Prior Payment Practices Establish That The Transfers Were Outside The Ordinary Course Of Business Between Defendants And The Debtor And Illustrate A Marked Statistical Deviation Therefrom........................19

        2.    The Actions Taken By Defendant And The Debtor Leading Up To The Preference Period Constitute Unusual Activity Rendering The Payments Resulting Therefrom Extraordinary...................................................23

    C.    The Purpose And Policy Of The Preference Statute Require Defendant To Return The Funds To The Estate For The Benefit Of All Creditors ...........................................24

    D.    Plaintiff Is Entitled To An Award Of Pre-Judgment Interest From The Date Of The Complaint ...................................................................................................................28

V.    Conclusion ...................................................................................................................29

# TABLE OF AUTHORITIES

## Cases

In re Allegheny Health, 292 B.R. 68 (Bankr. W.D. PA. 2003) ........................................18

In re CCG 1355, Inc., 276 B.R. 377 (Bankr. D.NJ 2002) ........................................22, 24

In re CM Holdings, Inc., 264 B.R. 141, 154-55 (Bankr. D.Del. 2000) ..............................23

In re Color Tile, Inc., 2000 WL 1373004 (Bankr.D.Del.) ........................................18

Comcast Canada, Inc. v. Laclede Steel Co. (In re Laclede Steel Co.), 271 B.R. 127, 130-31 (Bankr. App. 8th Cir. 2002) ........................................18

Coregis Ins. Co. v. Baratta & Fenerty, Ltd., 264 F.3d 302, 309 (3d Cir.2001) ................14

In re Continental Energy Assoc. Lim. Partnership, 228 B.R. 96 (Bankr.M.D.Pa. 1998) ..................21

In re Craig Oil Co., 785 F.2d 1563, 1566 (11th Cir. 1986) ........................................23

In re First Jersey Securities, Inc., 180 F.3d 504 (3d Cir. 1999) ........................................18

In re Foreman Indust., Inc., 59 B.R. 145, 155 (Bankr. D. Ohio 1986) ..............................28

Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir.1985)........................................13, 14

In re Hayes Lemmerz International, Inc., et al., 2006 WL 197600 (Bankr.D.Del.) ..........................20

Hechinger Liquidation Trust v. Universal Forest Products, Inc. (In re Hechinger Investment Co. of Delaware, Inc.), 326 B.R. 282, 285 (Bankr.D.Del. 2005) ........................................21

Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.), 182 B.R. 728, 737 (Bankr. W.D.Va. 1995) ........................................23

In re IRFM, Inc., 52 F.3d 228, 232 (9th Cir.1995)........................................2

In re Jones Truck Lines, Inc., 130 F.3d 323, 326 (8th Cir.1997) ........................................24, 25

J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp., 891 F.2d 66, 69-70 (3d Cir. 1989) ....................18

In re L&T Steel Fabricators, Inc., 102 B.R. 511, 521 (Bankr. N.D. La. 1989) ..............................28

Lorenzo v. Griffith, 12 F.3d 23, 26 (3d Cir.1993) ........................................14

Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991) ........................................18

In re M Group, Inc., 308 B.R. 697 (Bankr. D.Del. 2004) ........................................20, 21

Miller & Rhoads, Inc. v. Robert Abbey, Inc. (In re Miller & Rhoads, Inc.), 153 B.R. 725 (Bankr.E.D.Va. 1992) ........................................23

In re Molded Acoustical Products, Inc., 18 F.3d 217, 223 (3d Cir. 1994) ....................24, 25, 26, 27

In re Moltech Power Sys., Inc., 327 B.R. 675 (Bankr. N.D. Fla. 2005)........................................22

In re Roberds, Inc., 315 B.R. 443 (Bankr. S.D. Ohio 2004) ........................................18

In re SGSM Acquisition Co., LLC, 439 F.3d 233 (5th Cir. 2006)........................................22

In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1032 (7th Cir. 1993) ........................................19, 25

In re TWA, Inc., 327 B.R. 706 (Bankr. D.Del. 2005) ........................................19, 20

Venen v. Sweet, 758 F.2d 117, 122 (3d Cir.1985) ........................................14

**<u>Rules & Other Authorities</u>**

11 U.S.C. § 547 ........................................................................................................1, 24
11 U.S.C. § 547(b) .............................................................................................................4
11 U.S.C. § 547(b)(3) ........................................................................................................2
11 U.S.C. § 547(c)(2)(A) ...................................................................................................2
11 U.S.C. § 547(c) ...............................................................................................1, 17, 24
11 U.S.C. § 547(c)(1) ...................................................................................................24, 25
11 U.S.C. § 547(c)(2) ...............................................................................2, 14, 15, 26
11 U.S.C. § 547(c)(2)(B) ...............................................1, 2, 22, 27, 29
11 U.S.C. § 547(c)(2)(C) ...............................................................................1, 2
11 U.S.C. § 547(c)(4) ...............................................................2, 25, 27, 29
11 U.S.C. § 547(g) ..............................................................................................................1
11 U.S.C. § 550 ...............................................................................................1, 2, 28
11 U.S.C. § 550(a) ...........................................................................................................28
11 U.S.C. § 1107 ..............................................................................................................28
Bankruptcy Rule of Procedure Rule 7052 .....................................................................13
Bankruptcy Rule of Procedure Rule 9023 .....................................................................13
Federal Rules of Civil Procedure Rule 52(b) ................................................................13
Federal Rules of Civil Procedure Rule 59 .....................................................................13

I.     **INTRODUCTION**

A.     **Nature, Course, And Disposition Of The Proceedings.**

Montgomery Ward, LLC, *et al.*, Debtor in Possession's ("Debtor" or "Wards" or "Plaintiff") bankruptcy case was commenced on December 28, 2000 (the "Petition Date") when the Debtor filed a petition for bankruptcy protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code."). Therefore, the ninety (90) day preference period attending this matter is September 29, 2000 through December 28, 2000 (the "Preference Period").

This adversary proceeding was commenced on or about September 25, 2002 when Plaintiff filed its Complaint to Avoid and Recover Transfers of Property (the "Complaint") against OTC International, Ltd. ("OTC" or "Defendant" and, collectively with Plaintiff, the "Parties"). The Complaint sought to avoid and recover as preferential pursuant to 11 U.S.C. §§547 and 550 transfers from the Defendant in the total amount of $2,395,936.60 (the "Transfers"). *See* Docket Index Number 1 (hereinafter "D.I. __"). On or about December 31, 2002, Defendant filed its answer to the Complaint. D.I. 3.

On August 18-19, 2005 a consolidated industry trial (the "Industry Trial") was held on the defense codified at 11 U.S.C. § 547(c)(2)(C) as to whether the range and payment terms of the Transfers were "made according to ordinary business terms" for large retailers in the jewelry industry. The Court issued an oral decision regarding the Industry Trial on September 8, 2005 (the "Industry Decision"). Therein, the Court made numerous findings regarding the terms of payment, range of payment, change in payment terms and the status of the Debtor's financial condition, morbidity, and slide into bankruptcy. Thereafter, the Court made conclusions of law based upon these findings. Following the Industry Trial, the record remained open for evidence to be presented regarding the relationship between the Parties and any remaining issues to be determined under 11 U.S.C. §§ 547 and 550.

Defendant's liability in the remainder of the trial herein will depend upon whether it can prove its statutory defense under 11 U.S.C. § 547(c)(2)(B). Pursuant to 11 U.S.C. § 547(g), Defendant bears the burden of proof on its 11 U.S.C. § 547(c) defenses, which it cannot satisfy except to the extent it will be entitled to new value. The evidence at trial will show the Transfers were not made in the ordinary course of business or financial affairs between the Debtor and Defendant (the "Subjective Test"), as required by

11 U.S.C. § 547(c)(2)(B). Moreover, the newly discovered financial documents to be introduced at trial will also require the Court to alter or amend its prior findings of fact and conclusions of law set forth in the Industry Decision to prevent a manifest injustice. Plaintiff hereby respectfully submits its trial brief for the above-captioned adversary proceeding.

**B.    Stipulations.**

The Parties have stipulated to Plaintiff's *prima facie* case under 11 U.S.C. § 547(b), including §547(b)(3) that the Debtor was insolvent at the time of each of the Transfers -- with the first transfer being delivered to Defendant on September 29, 2000, the first day of the Preference Period. To the extent avoidable, the Parties have agreed the Transfers may be recovered under 11 U.S.C. § 550. The Parties have further stipulated that Defendant's only potential defenses to avoidance and recovery of the total amount of the Transfers are a partial new value defense pursuant to Bankruptcy Code Section 547(c)(4), and a potential defense with respect to some or all of the Transfers pursuant to the ordinary course of business exception ("OCB").

The Parties have agreed that the first element of the OCB defense under 11 U.S.C. § 547(c)(2)(A) – that each Transfer was in payment of a debt(s) incurred by the Debtor in the ordinary course of business or financial affairs of the Parties – is met with respect to the Transfers. The Bankruptcy Court has determined the third element of the OCB defense under 11 U.S.C. § 547(c)(2)(C), that the Transfers were made according to ordinary business terms, has been met.

With respect to 11 U.S.C. § 547(c)(4), the Parties have stipulated that the maximum amount of new value credit to which Defendant may be entitled is $443,694.71.[1] The Parties have agreed that, in the event the Court determines the ordinary course of business defense is applicable to a portion of the Transfers, they will attempt to stipulate to an amount of new value applicable to the remaining transfers. If unable to do so, the Parties will submit post-trial briefing on the legal and factual issues regarding whether

---

[1] This figure is accurate if no Transfers are found to qualify for the safe harbor of the OCB defense under 11 U.S.C. § 547(c)(2). Any invoices paid by Transfers found within the OCB defense will no longer qualify for new value credit because they would have been paid by an "otherwise unavoidable transfer." *See* 11 U.S.C. § 547(c)(4)(B). If only some Transfers are found to be non-OCB, Defendant is entitled to apply all available new value, but only against those Transfers found to be non-OCB. The math necessary to do the temporally sensitive calculation and analysis of Section 547(c)(4) cannot be performed until the OCB defense under § 547(c)(2) is adjudicated. In re IRFM, Inc., 52 F.3d 228, 232 (9th Cir.1995).

new value credit should be allowed for the full purchase order amount or the actual price of the goods that Plaintiff would have paid after the discounts and credits were applied.

## II.    SUMMARY OF ARGUMENT

This is a classic preference case wherein Defendant deviated substantially from its prior payment terms with the Debtor after the Debtor's financial condition began to rapidly deteriorate. Defendant was able to gain a significant and unfair advantage over most of the Debtor's other creditors, who continued to provide the Debtor credit on level terms. The fact that a handful of other large creditors may have had enough leverage to contract terms to COD or cash in advance does not render Defendant's perhaps lesser contraction in terms ordinary. Rather, because the contraction came at a time when the Debtor was unquestionably in financial distress, Defendant joined the class of preferred creditors who were favored by the Debtor due to its financial weakness. Defendant was favored with unusually early payments that were inconsistent with the historic course of dealings between the Parties. Consequently, these payments enabled Defendant to receive payment on all of its invoices in full as of the Petition Date[2] and to thereby, eliminate its credit exposure. In requesting the return of the preferred payments, Plaintiff is seeking to place Defendant on the same footing as the thousands of unsecured creditors who were not paid in full by the Debtor who have asserted claims in the Debtor's bankruptcy proceeding totaling approximately $2.674 billion.[3]   Upon the return of the preferential payments, Defendant will be able to share in the pro rata distribution thereby ensuring the equality of treatment that the Bankruptcy Code demands.

During the Industry Trial, M. Fabrikant, *et al.* ("Fabrikant") and the other jewelry defendants, including, but not limited to, Defendant (hereinafter collectively referred to as the "Joint Jewelry Defendants"), joined in building the Industry Trial record and submitting a joint defense. Following the Industry Trial, the Court found the contracted credit terms (30 days versus 60-120 days) were within the

---

[2]Defendant contends the Debtor owed it a nominal amount of approximately $16,579.87 as of the Petition Date, for which Defendant did **not** file a claim in the Debtor's bankruptcy case.

[3]Plaintiff's current estimation of the total unsecured claims is $350 million. At this time, allowed general unsecured and reclamation claims total approximately $330 million when the payout to reclamation creditors is taken into consideration.

ordinary course of business in the jewelry industry. In addition, the Court found that when the terms were changed the Debtor was not moribund and not on a slide into bankruptcy. However, the Court's extraordinary findings concerning the Debtor's financial condition were based almost entirely on Fabrikant's misstatements made at the Industry Trial.[4] After the Industry Trial, and only after the Court granted Plaintiff's motion to compel, Fabrikant turned over a large file that contained the Debtor's detailed monthly financial information. Such evidences the Debtor's morbidity and slide into bankruptcy well before the Preference Period. Due to the newly discovered evidence and admittedly false testimony and incomplete documentation provided by one of the Joint Jewelry Defendants, the Court must reconsider its findings in the "objective" industry standard phase of this trial that the Debtor was not moribund on August 23, 2000.[5]

Moreover, it is notable that during the Industry Trial Defendant had not stipulated to the elements of Plaintiff's *prima facie* case under 11 U.S.C. Section 547(b), including that the Debtor was insolvent at the time of each of the Transfers. However, it has now. Accordingly, since it is admitted that the Debtor was insolvent on September 29, 2000, the date of first preferential Transfer, Plaintiff submits that it is inconceivable that the Debtor was not moribund and not sliding into bankruptcy just thirty-seven (37) days early on August 23, 2000.

Defendant has the burden to prove: (1) the change in terms was ordinary between these Parties; (2) the payment pattern was consistent with a baseline course of dealings at a time when the Debtor was not in financial distress; and (3) Defendant was not favored with more generous payment terms at a time when the Debtor could ill afford such favored treatment. However, the terms change became effective on

---

[4]Fabrikant's witness testified at the Industry Trial that he only received positive information from the Debtor relating to the Debtor's financial condition. Industry Trial Transcript 08/18/2005 67:8-12 and 113:21-24. Defendant's witness, Lee Rothlein ("Mr. Rothlein"), Chief Financial Officer for Defendant, testified at the Industry Trial he did not receive any financial information from the Debtor in 2000. Exhibit P64 (Transcript of Trial Testimony of Lee Rothlein 155:3-5) (hereinafter "Exhibit P64 (Rothlein Industry Trial Testimony __:__)"). Having received no financial information from the Debtor regarding the Debtor's financial condition as evidenced by Mr. Rothlein's trial testimony and Defendant's lack of production of the same pursuant to Plaintiff's discovery requests, Defendant allegedly had no knowledge about the Debtor's deteriorating financial condition and, thus, was not concerned about it. Exhibit P64 (Rothlein Industry Trial Testimony 155:16-17 and 196:17-19).

[5]The Court has already ruled that the newly discovered financial documentation concerning the Debtor's financial condition is relevant and admissible pursuant to the Court's Order Denying Defendant's Motion *in Limine* Concerning Randy Brown and the Debtor's Financial Documentation.

August 23, 2000 -- after all orders had been placed for the critical fall buying season when the Debtor's need for product was at its zenith and its ability to negotiate better terms and/or obtain an alternative supplier was at its nadir. Defendant's only stated reason for the change was its own liquidity and cash flow problems. Yet, Defendant's needs do not normalize what otherwise would be unusual creditor treatment. By Defendant's own admission, it had always had cash flow problems. The only change was that the Debtor in its severely weakened financial condition could not afford to say no to a request to contract terms (by 50% from Net 60 days to Net 30 days) from a vendor whose products were already on order and could not be replaced for the critical holiday season.

Furthermore, there is no evidence to support Defendant's claim that the Debtor sought a terms change because it intended to ramp-up its holiday merchandise orders for the year 2000. In fact, the evidence shows the Debtor's purchases of Defendant's product decreased as compared to the same time period one year prior. Also, despite Defendant's liquidity and cash flow problems, Defendant was unable to and/or did not obtain a terms change from its other large customers, the Debtor's competitors. Defendant's own records reveal that Defendant's credit terms with its other large customers remained unchanged and predominately at Net 60 days during the relevant time frame. In the end, it was Defendant who received a substantial benefit from the thirty day reduction in payment terms, which Defendant admits. In contrast, the terms contraction was a significant disadvantage and detriment to the Debtor and its many other unsecured creditors who were owed millions of dollars as of the Petition Date.

Importantly, even if the Court does not find clear evidence of overt creditor pressure, there is overwhelming and uncontested statistical evidence of the impact of the change in terms during the all-important holiday season. Standing alone, the reduction in days to pay from 80 to 48 days after invoice to check deposit date establishes a significant change in the Parties' course of dealing. It is admitted that the predominant credit term between the Parties during the historical course of dealings was between 60 and 120 days. Also, it is admitted that for more than two years prior to the Preference Period payments were made (on a weighted average basis) 80.53 days from invoice date. In contrast, during the Preference Period, the credit terms were contracted by 50% to 30 days and payments were made a weighted average of 48.08 days from invoice date – a contraction of 32.45 days or 40%. This significant change in the

5

payment pattern allowed Defendant to completely eliminate its credit exposure almost two weeks before the Petition Date, costing the Debtor almost $2 million in cash that would otherwise have been available to other creditors who did not contract terms.

Defendant contends that a 30-day terms change just days before the Preference Period is ordinary and the number of days late as opposed to days to pay from invoice date is the standard to be considered. However, there is absolutely no case law to support this position. Accordingly, the Court should not accept Defendant's legally unsupportable invitation to completely disregard case law construing the purpose of the preference statute, as these facts cannot support a finding that the Transfers were made in the ordinary course of business as between the Parties.

## III.    STATEMENT OF RELEVANT FACTS

The Plaintiff was a large national retailer, whose business was highly seasonal. Exhibit D13 (Expert Report of Gerard D'Amato, CPA, CIRA, CPP and Jack F. Williams, JD, p. 9) (hereinafter "Exhibit D13 (Defendant's Expert Report, p. __)"). Randy Brown ("Mr. Brown"), former Chief Financial Officer for the Debtor, will testify that the holiday season, namely September through December, is the time of the year when the majority of sales and profits generally occur. As Mr. Rothlein previously testified, Defendant is a privately held jewelry company manufacturing and wholesaling fine jewelry for large retailers and department stores that have fine jewelry departments. Exhibit P64 (Rothlein Industry Trial Testimony 143:20-24 and 150:13-17); *see also* Exhibit D13 (Defendant's Expert Report, p. 9). According to Defendant's president, Yoram Sheinman, Defendant has been in existence since approximately 1977. Transcript of Discovery Deposition Testimony of Yoram Sheinman 05/27/2004, 17:17-18 (hereinafter "Y. Sheinman Discovery Depo. __:__").

Mr. Brown will testify that Defendant was one of the Debtor's top jewelry vendors. Rita Hamilton ("Ms. Hamilton"), former gold and silver jewelry buyer for the Debtor from 1996 through and including the Petition Date, testified in her trial deposition that the Debtor purchased nearly all of its silver jewelry and a significant portion of its gold jewelry from Defendant. Exhibit P66 (Transcript of Trial Deposition of Rita Hamilton 50:8-16) (hereinafter "Exhibit P66 (Hamilton Trial Testimony __:__)"). She also testified that gold and silver jewelry was the most profitable line in the jewelry department, and jewelry was the most

profitable department for the Debtor. Exhibit P66 (Hamilton Trial Testimony 50:5-7). Accordingly, Ms. Hamilton and Robert Baird ("Mr. Baird"), the Debtor's General Merchandise Manager for jewelry, each testified in their respective trial depositions that Defendant was an important vendor for the Debtor because it was a key supplier and the product was important to the Debtor's survival. Exhibit P66 (Hamilton Trial Testimony 49:20-24 and 50:3-10) and Exhibit P65 (Transcript of Trial Deposition of Robert Baird 41:6-9, 51:15-17 and 91:4-6) (hereinafter "Exhibit P65 (Baird Trial Testimony __:__)").

The Debtor's business relationship with Defendant spanned approximately fifteen years. Y. Sheinman Discovery Depo. 21:8-9. The Parties historically did business on terms of Net 120 days from early in their relationship until mid-July, 1997. Exhibit P66 (Hamilton Trial Testimony 28:15-17) and Exhibit P38 (Invoice dated July, 1997 showing payment term of 120 days). Shortly after the Debtor filed its petition for bankruptcy protection in 1997, an interim payment term of Net 30 days was put in place between the Debtor and Defendant. Exhibit P39 (Letter dated April 9, 1998 from Montgomery Ward to OTC) and Exhibit P66 (Hamilton Trial Testimony 19:16-24 and 20:1-18). This was a temporary, across the board change in terms the Debtor offered to most vendors as part of its first bankruptcy filing. Id. Then, upon the Debtor's emergence from bankruptcy, the terms were changed to Net 60 days. This continued for more than two years prior to the Preference Period, from April 9, 1998 until August 23, 2000 (with the exception of certain October, 1998 invoices for Christmas merchandise[6]). Exhibit P39 (Letter dated April 9, 1998 from Montgomery Ward to OTC) and Exhibit P45 (OTC print screen from "Magic Generator" dated September 7, 2000). Because of the length of time they were in place, these Net 60 day terms establish the Parties' baseline dealings for purposes of this adversary proceeding. Id.

---

[6]The stated payment term between the Debtor and Defendant with respect to thirty-two (32) invoices dated between October 19, 1998 and October 27, 1998 with a total gross invoice amount of $839,993.05 for certain Christmas merchandise was changed from the regular payment term of 2% discount, Net 60 days to Net 30 days with a 4% discount. All of the 3820 other invoices between the Parties dated between June 30, 1998 through and including August 14, 2000 with a total gross invoice amount of $6,356,354.33 remained at the **regular payment terms of 2% discount, Net 60 days**. Exhibit D17 (Memo to Mark Bloom from Rita Hamilton regarding OTC invoices dated November 2, 1998), Exhibit P40 (Letter from Yoram Sheinman to Tim Watkins dated November 24, 1998 and attachments thereto) and Exhibit P59 (Spreadsheet entitled "Vendor Historical Paid Invoice Report 'Baseline,'" which shows the detail for the historical invoices from 9/07/98 to 9/23/2000).

As Mr. Brown will testify, the goods sold by Defendant were important to the Debtor because they had a high markup and opportunity for profitability. Notwithstanding fine jewelry's potential for profitability, Mr. Brown and Ms. Hamilton both previously testified that in order for the Debtor to get an adequate return on its investment in fine jewelry and keep its stores stocked for the full year, the Debtor needed longer terms from its jewelry vendors. Jewelry has a very slow turnover compared to other lines of merchandise. Exhibit P65 (Baird Trial Testimony 34:10-25 and 35:1-8) and Exhibit P66 (Hamilton Trial Testimony 20:3-24 and 21:1-8). Ms. Hamilton explained "turnover" to mean the Debtor experienced very long periods of time where the Debtor had very slow fine jewelry sales and a short period of time, the holiday season, where it had very large sales. Id.

Ms. Hamilton also testified that planning in the fine jewelry department for the holiday season begins in February/March of each year. Id. at 22:8-14. Merchandise would be finalized by April/May and purchase estimates were given to jewelry vendors by July. Id. at 22:14-22. In order to get the stores set up in October for the holiday season, the Debtor would place its orders in June through August, and the jewelry vendors would usually make two large shipments to the Debtor – one shipment by late September and another by late October. Id. at 23:4-16 and 24:8-14. Therefore, by July of each year, jewelry vendors would have planned their sales and production for the remainder of the year, Id. at 23:4-5, meaning the Debtor could not replace Defendant's product. In fact, Ms. Hamilton testified in her trial deposition as follows:

```
Q: If you had to have found a replacement for OTC for the holiday
season in the year 2000, could you have done that?

A: Depending on when I would have had to get that - depending on
when I had to start that assignment.

Q: Let's say you had to start that assignment in August of 2000.

A: No, because jewelry is a long lead time for manufacturing, which
is why we begin working in the spring on Christmas advertising.
```

Id. at 51:6-16.

With the all important 2000 holiday season approaching and its financial health declining, the Debtor needed to bide its time until the revenue of that season was in house in order to pay its bills. With respect

to the Debtor's overall financial condition, Mr. Brown will testify generally that the Debtor was suffering financially as it was eating up cash with no signs of returning to profitability on its downward spiral into bankruptcy. In support of Mr. Brown's evaluation of the Debtor's negative financial status, Mr. Brown will also testify:

- During the twenty-two week period after the Debtor's emergence from bankruptcy, which period of time includes the fourth quarter of 1999 - typically the most profitable quarter for a retailers, the Debtor lost $31 million.

- During this same time frame, the Debtor had to borrow $226 million in order to pay for product and finance its operations.

- For the year 2000, the Debtor suffered unabated losses every month.

- The Debtor never met its projections as to earnings (losses), sales and borrowing levels for 2000.

- The Debtor saw its net worth decline from over $300 million at the start of 2000 to just $44 million by the end of October, 2000, despite the infusion of $120 million of additional capital by GE Capital.

- The Debtor saw its borrowing rise by $577 million and suffered $611 million in losses from operations for the first ten months of 2000.

- The Debtor saw its borrowing capacity shrink from over $300 million to less than $90 million during the first ten months of 2000 notwithstanding GE Capital's guarantee of an additional $100 million in debt and contributing $120 million paid in capital.

Mr. Brown's testimony concerning the Debtor's deteriorating financial condition is supported by Exhibits P24 through P28, P30 through P33, P35 and P36 (the "Ward Financial Documentation").

Further, Mr. Brown will testify the company was bleeding dry as a result of trade compression in the form of, *inter alia*, tightened credit terms by creditors who knew and/or believed the Debtor was struggling. Thus, the Debtor instituted a policy in the third quarter of 2000 to resist trade compression at all costs. Exhibit P43 (Memorandum dated August 24, 2000 from Randy Brown to Rich Wacker: "Wards Payables Compression"). This policy is memorialized in various contemporaneous business records and reports, which are submitted with Plaintiff's exhibits. *See* Exhibits P42 through P44 and P46 through P51. Mr. Brown will also testify that by contracting its credit terms Defendant caused the Debtor to further delay payments to its other creditors who were paid little and held substantial unsecured claims at the Petition Date. Id.

On August 23, 2000, the Parties' long-standing business relationship was significantly altered. As a result of Defendant's liquidity and cash flow problems in 2000, Exhibit P64 (Rothlein Industry Trial Testimony 176:8-13 and 197:12-17) and Exhibit P75 (Defendant's Bank and Financial Documents produced by Defendant on April 13, 2006), Defendant requested that the Debtor agree to contract its payment terms from Net 60 days to Net 30 days. This enabled Defendant to receive payment thirty days quicker. Although Defendant claims the contraction in terms was suggested by the Debtor, Mr. Baird testified he did not offer shorter terms to Defendant. Exhibit P65 (Baird Trial Testimony 52:5-10). Mr. Baird also testified he did not have the authority to contract payment terms. Id. at 39:22-24. Furthermore, Mr. Baird and Ms. Hamilton each testified the Debtor would not have initiated a reduction in terms to any of its jewelry vendors in the year 2000 because shortened payment terms would have been a disadvantage. The Debtor was attempting to preserve its cash as it tried to fend off bankruptcy. Id. at 36:15-17, 38:23-25, 39:1-3, 59:13-19, 60:18 and 63:16-18 and Exhibit P66 (Hamilton Trial Testimony 49:9-17). In fact, Mr. Baird testified in his trial deposition:

> Q: Okay.  Did OTC ever request a terms change from Wards, to your knowledge?
>
> A: I believe they did.

Exhibit P65 (Baird Trial Testimony 47:4-6).

Regardless of which party initiated the terms change, it is clear that the contraction in terms favored Defendant and disadvantaged the Debtor and its other creditors. Mr. Rothlein and Yoram Sheinman admit said reduction provided Defendant with a significant benefit, improving its financial condition by increasing its cash flow. Exhibit P64 (Rothlein Industry Trial Testimony 176:8-13 and 197:12-14) and Y. Sheinman Discovery Depo. 60:19-25. In contrast, a contraction in payment terms was a considerable detriment to the Debtor and its many other unsecured creditors whom the Debtor was unable to pay. Exhibit P65 (Baird Trial Testimony 36:15-17, 38:23-25, 39:1-3, 59:13-19 and 60:18) and Exhibit P66 (Hamilton Trial Testimony 49:9-17).

Also, Defendant's claims about who contracted terms are wholly unsupported by third-party trial testimony and documentary evidence. Mr. Baird testified in his trial deposition he has absolutely no

recollection of meeting with Yoram Sheinman and Michael Sheinman, Director/Vice President of Sales for Defendant, in Chicago, Illinois in late July or early August, 2000. Exhibit P65 (Baird Trial Testimony 52:24-25 and 53:1). Likewise, Ms. Hamilton testified she has no recollection of said meeting. Exhibit P66 (Hamilton Trial Testimony 46:8-11). Further, Ms. Hamilton testified she has no recollection of any specific plan by the Debtor to significantly increase their purchases of fine jewelry in 2000. Id. at 40:1-3, which by August would have been too late to effect the holiday season any way. While Mr. Baird testified the Debtor's sales forecast called for a 20% increase in fine jewelry year over year, Exhibit P65 (Baird Trial Testimony 82:15-16), Mr. Baird did not testify that he informed Defendant that the Debtor intended to purchase more product. Defendant's claims to the contrary are dramatically contradicted by the actual sales figures for the 2000 holiday season, which show over a $1 million decrease in product purchased by the Debtor from Defendant when compared to 1999.[7] Thus, the anticipated ramp up in orders was under a figment of Defendant's imagination.

Whatever the reason for the contraction, it is evident that the Debtor would not have agreed to these onerous terms had it not been in a rapidly declining financial condition, without reasonable means to obtain an alternative silver and gold jewelry supplier in July/August 2000. Exhibit P66 (Hamilton Trial Testimony 51:6-16). There is no dispute that the Debtor reluctantly agreed to the terms change in order to ensure that the Debtor would timely have the product it needed for the holiday season from one of its most important jewelry vendors. Exhibit P65 (Baird Trial Testimony 66:12-24). Accordingly, the terms were changed from Net 60 days, 2% discount to Net 30 days, 3% discount and became effective on August 23, 2000. Exhibit P45 (OTC print screen from "Magic Generator" dated September 7, 2000).[8]

---

[7]Defendant's own records evidence the Debtor purchased from Defendant approximately $2,779,303.80 in merchandise for the 1999 holiday season (from September, 1999 through December, 1999). During the same four month period for the year 2000, the Debtor purchased only $1,751,739.84 in merchandise. Thus, there was a substantial **decrease** ($1,027,564.96) in purchases for the 2000 holiday season as compared to the same period one year prior. Exhibit D13 (Defendant's Expert Report - "Exhibit 12 - Comparison of Christmas Season Purchases").

[8]Both Plaintiff and Defendant agree that payment terms are more important than discounts on purchases. Plaintiff's witness, Mr. Brown, will testify that it was not advantageous for the Debtor to reduce payment terms in exchange for an additional nominal 1% discount. Likewise, Defendant's witness, Mr. Rothlein, admitted that the thirty day reduction in payment terms was more beneficial to Defendant, Exhibit P64 (Rothlein Industry Trial Testimony 184:7-9, 176:8013 and 197:12-14), than the extra discount point it gave to the Debtor.

No matter what the reasons for it, it is undeniable that the payment practices between the Parties drastically changed during the Preference Period. During the Parties' historical baseline dealings, in the two years prior to the Preference Period, the Debtor paid Defendant on a weighted average of 80.53 days from invoice date. Exhibit P53 (Summary Aging Analysis of Days To Pay From Invoice Date Comparing Preference Period to Historical Period). In the Preference Period, the payment pattern accelerated so that the vast majority of the payments to Defendant (approximately 81%) were made within a compressed fifteen day time frame of between 41 and 55 days from invoice (which only occurred approximately 16% of the time historically)[9]. Id. Further, 84.75% of all payments in the Preference Period were made 55 days or earlier from invoice date, while only 10% had been made this early historically. Id. Finally, while only 15.05% of all payments in the Preference Period were paid later than 65 days from invoice date, over 92% of all payments in the historical period were made over 65 days from invoice date. Id.

Defendant minimized and eventually eliminated its credit risk at the expense of the Debtor's other creditors through the change in credit terms and shift in the Parties' payment pattern. As William Shafton ("Mr. Shafton"), an employee of Plaintiff's counsel who prepared the analyses from the Debtor's payment records, will testify the data illustrates the payment pattern was accelerated and the Debtor paid down its outstanding balance to the Debtor quicker and earlier than the year before. As a result, Defendant's accounts receivable credit exposure as of December 28, 2000, the Debtor's Petition Date, was zero, which had not happened previously. Exhibit P55a-b (Graphical Representations of Accounts Receivable Running Balance Comparisons of 9/29 to 12/31 1999 to 2000 and entire years 1999 to 2000).[10] Defendant was paid in full while over 7000 unsecured creditors were left holding claims worth hundreds of millions of dollars.

---

[9] By comparison, the vast majority of the historical payments made by the Debtor to Defendant (approximately 82%) were made within an extended fifty-five day time frame between 66 and 120 days from invoice (which only occurred approximately 10% of the time in the Preference Period). Id.

[10] During the holiday season in 1999, Defendant's highest accounts receivable outstanding balance from the Debtor was $1,783,948.00 (on December 11, 1999). This amount was not paid down substantially until January 2000. During the holiday season in 2000, however, Defendant's highest accounts receivable balance from the Debtor was $1,782,458.51, which was attained on November 11, 2000 – one month earlier than the year before. This amount was **paid off** within approximately one month and before the end of the year. Id.

## IV.    ARGUMENT

### A.    Plaintiff Requests The Court Alter Or Amend Its Previous Decision In The Industry Trial Based On Newly Discovered Evidence To Reflect That The Debtor Was Moribund And Sliding Into Bankruptcy At The Time Of The Parties' Terms Change.

The fundamental purpose for a request for reconsideration is to remedy errors of law or fact or to present newly discovered precedent or evidence which, if discovered previously, might have affected the court's decision. Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir.1985), cert. denied, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). It is on this basis and pursuant to Federal Rules of Civil Procedure 52(b) and 59, as made applicable herein pursuant to Bankruptcy Rules of Procedure 7052 and 9023, respectively, that Plaintiff respectfully requests permission to supplement the record with newly discovered evidence.[11] Plaintiff also requests reconsideration and an amendment of certain findings of fact in the Industry Decision, to wit:

- When the credit terms were renegotiated, Montgomery Ward was not moribund and not on a slide into bankruptcy. Exhibit P67 (Transcript of Hearing Re: Adversary Proceeding Decision dated September 8, 2005, 7:6-8) (hereinafter "Exhibit P67 (Transcript of Industry Decision __:__)").

- Montgomery Ward hardly exhibits morbidity, nor did it appear to be on the slide into bankruptcy from which it had emerged just the year previously. Id. at 27:12-14.

- At all times following the first bankruptcy in August of 1999 and until shortly before the second bankruptcy in December of 2000, Montgomery Ward's senior management ran the business as a going concern, expected it to continue as a going concern, and represented to vendors, including all the joint defendants, that it would be a going concern. Id. at 27:22-25 and 28:1-2.

- As to the financial distress, as I said, the information that Montgomery Ward provided to its vendors indicated that it was not a company in financial distress during the time that the terms were renegotiated in June through August 2000. Id. at 39:18-22.[12]

---

[11] The newly discovered evidence consists of Exhibits P24 through P28, P30 through P33, P35 and P36 (the "Ward Financial Documentation") that was produced by Fabrikant after the Industry Trial and only after the Court granted Plaintiff's motion to compel. In addition, Plaintiff respectfully asks the Court to review and consider Exhibit P37 (Transcript of Trial Testimony of Michael Shaffet given on February 14, 2006 and February 15, 2006) (hereinafter "Exhibit P37 (Shaffet Trial Testimony __:__)"), particularly pages 202 through 262 from February 14, 2006)

[12] Exhibit P67 (Transcript of Industry Decision 7:6-8, 27:12-14, 27:22-25, 28:1-2 and 39:18-22) are collectively referred to herein as the "Erroneous Findings of Fact."

Plaintiff's request is necessary in order to present newly discovered evidence and to correct manifest errors of fact resulting from one of the Joint Jewelry Defendants' failure to produce certain evidence and from material misstatements of fact made during the Industry Trial. *See* Harsco Corp., 779 F.2d at 909. Plaintiff's request is appropriate at this stage of the proceedings because the trial record remains open for purposes of the continued trial proceedings with respect to Defendant's alleged defense under 11 U.S.C. Section 547(c)(2)(B). Furthermore, requests filed under these provisions are properly characterized as requests for reconsideration and are within the discretion of the trial court to grant. Venen v. Sweet, 758 F.2d 117, 122 (3d Cir.1985); Coregis Ins. Co. v. Baratta & Fenerty, Ltd., 264 F.3d 302, 309 (3d Cir. 2001); Lorenzo v. Griffith, 12 F.3d 23, 26 (3d Cir.1993).

The Erroneous Findings of Fact regarding the Debtor's financial condition were the result of one of the Joint Jewelry Defendants' (Fabrikant) material misstatements to Plaintiff and the Court. Throughout years of litigation and discovery and at all times prior to the Industry Trial, Fabrikant claimed they were unable to locate any relevant letters, notes or memoranda nor any other business records, except for: (a) a 15-month payment history prepared by counsel; and (b) two vendor letters sent by the Debtor to the Joint Jewelry Defendants dated July 13, 2000 and October 6, 2000, respectively (the "Post-Terms Change Vendor Letters"). Since Fabrikant failed to produce relevant documentary evidence during discovery, Plaintiff had no means to rebut the Post-Terms Change Vendor Letters. The same were introduced by Fabrikant on behalf of the Joint Jewelry Defendants at the Industry Trial, and the Court held they painted a rosy picture of the Debtor's financial health. Exhibit P67 (Transcript of Industry Decision 37:15-17). Then, without Plaintiff having opportunity to challenge the Joint Jewelry Defendants' witnesses with the non-produced materials that showed the opposite to be true, each of the Joint Jewelry Defendants[13] testified at the Industry Trial that they only received positive financial information from the Debtor. Industry Trial

---

[13]Except for Defendant herein who offered no testimony or documentary evidence to support the Court's Erroneous Findings of Fact.

Transcript 08/18/2005 67:8-12 and 113:21-24.  Based upon this limited and one-sided evidence, the Court made the improper Erroneous Findings of Fact.[14]

The Ward Financial Documentation paints an entirely different picture than the Post-Terms Change Vendor Letters.  They reveal, as Mr. Brown will testify, that before the terms were renegotiated and became effective on August 23, 2000, the Debtor was moribund and sliding into bankruptcy.  Furthermore, when confronted about the Ward Financial Documentation during the remainder of the trial held on the Subjective Test of Fabrikant's alleged OCB defense (the "Fabrikant Trial"), Fabrikant's witness, Michael Shaffet ("Mr. Shaffet"), repeatedly amended, revised and/or recanted his previous Industry Trial testimony about the wholly positive nature of the Debtor's financial information.  Mr. Shaffet admitted that the Ward Financial Documentation did not show positive information about the Debtor's financial condition.  In fact, a detailed review and examination of these documents during the Fabrikant Trial compelled Mr. Shaffet to admit to this Court at least thirteen (13) times that he had, in fact, received negative monthly and quarterly detailed financial information.  For example, Mr. Shaffet gave testimony such as:

```
A: There were some things that were not positive.

A: Yes, there were some things that would be negative.

A: It's a negative result as we're looking at it today.

A: I understood that they were losing money, yes.

Q: And everything continued in the same fashion, negative, negative,
negative, correct?  A: Yes.
```

Exhibit P37 (Shaffet Trial Testimony 204:8 and 19, 227:24, 250:18 and 251:22-24).  He admitted these reports showed the Debtor suffered uninterrupted losses and a significant deteriorating financial condition throughout the year 2000, up to and including the day the Debtor filed bankruptcy, thereby recanting his

---

[14]Although Defendant did not stipulate to the Debtor's insolvency in the Industry Trial, it has now.  The fact of the Debtor's insolvency on September 29, 2000 is further reason the Court must correct the Erroneous Findings of Fact and find that the Debtor was moribund and sliding into bankruptcy on August 23, 2000 - just thirty-seven (37) before the Preference Period.

Industry Trial testimony.[15]  At the conclusion of Plaintiff's cross-examination of Mr. Shaffet, Mr. Shaffet had no other choice but to say:

> Q: Okay. And then you received the October 6th letter, correct, which is plaintiff's exhibit 36?
>
> A: Yes.
>
> Q: Which is what you made the basis of your testimony that Wards provided you with nothing other than positive financial information, correct?
>
> A: Yes.
>
> Q: And now you agree, after looking through all of these documents [The Ward Financial Documentation] that we've looked at, that that statement is not even close to being true?
>
> A: The financial information was not showing positive results.

Exhibit P37 (Shaffet Trial Testimony 256:11-22).  Thus, the Joint Jewelry Defendants' witness(es)' testimony before this Court in the Industry Trial and upon which the Court relied in making its findings of fact on the issue of the Debtor's financial condition as set forth in the Industry Decision  was inaccurate, if not disingenuous.   The relevant documents were not produced by the Joint Jewelry Defendants. Accordingly, the Court was led to make erroneous findings of fact based upon an incomplete and distorted record.

Therefore, Plaintiff respectfully requests the Court's permission to supplement the Industry Trial record with the following documentary evidence and witness testimony: (1) Exhibits P24 through P28, P30 through P33, P35 and P36 (the "Ward Financial Documentation"); (2) Exhibit P37 (Shaffet Trial Testimony), wherein Mr. Shaffet concedes that Fabrikant, a member of the Debtor's jewelry vendor community, received information from the Debtor evidencing the severe financial distress of the Debtor **before the terms were renegotiated between all of the jewelry vendors including Defendant; and** (3) Mr. Brown's testimony regarding the Debtor's deteriorating financial condition evidenced by the Ward

---

[15]Plaintiff directs the Court attention to the following excerpts from Mr. Shaffet's trial testimony given during the Fabrikant Trial wherein Mr. Shaffet admitted that the financial information he received from the Debtor was negative rather than positive as he previously testified.  Exhibit P37 (Shaffet Trial Testimony (204:3-8 and 19, 211:10-15, 213:16-18, 227:22-24, 232:13-15, 239:6-8, 247:6-9, 250:18, 251:22-24, 256:11-22, 260:7-12 and 68:9-11).

Financial Documentation. Further, the Industry Decision should be amended to reflect that Defendant presented no evidence contradicting the financial information provided to Fabrikant.

Plaintiff respectfully requests the Court to reconsider and amend its findings of fact contained in the Industry Decision to include the following:

- Prior to the time when the credit terms were renegotiated between the Debtor and Defendant, the Debtor provided significant and detailed financial information to certain members of its vendor community, including Fabrikant, one of the Joint Jewelry Defendants, which information indicated the Debtor was in financial distress.
- Prior to August 23, 2000 when the credit term change between the Debtor and Defendant became effective, the significant and detailed financial information provided by the Debtor to certain members of its vendor community, including Fabrikant, clearly evinced a moribund Debtor that was sliding into bankruptcy.

- When the credit terms were renegotiated in late July to early August 2000 and subsequently became effective on August 23, 2000, the Debtor was moribund and sliding into bankruptcy.

- The Debtor's financial condition continued to deteriorate after the terms change as evidenced by the Debtor's monthly financial information that directly contradicted the generally positive vendor letters the Debtor was disseminating more widely to other creditors.
- Defendant did not present any evidence or testimony that it had received positive vendor letters from the Debtor.

- Defendant stipulated that the Debtor was insolvent thirty-seven (37) days after the terms change, and has failed to present any evidence to the contrary establishing that the Debtor was not in financial distress during the month prior to the Preference Period.

Further, Plaintiff respectfully requests the Court amend its conclusions of law and other aspects of its opinion to account for the newly discovered evidence and corrected record. Plaintiff has demonstrated that extraordinary circumstances exist, due to one of the Joint Jewelry Defendants' misstatements at the Industry Trial and Fabrikant's failure to timely produce evidence, that justify granting the relief requested herein.

**B.      The Evidence Establishes The Transfers Were Outside The Ordinary Course Of Business Between The Parties.**

Section 547(c) of the Bankruptcy Code permits a transferee of a preferential payment to prevent the avoidance of a transfer by satisfying all three requirements set forth in § 547(c)(2):

> (c) The trustee may not avoid under this section a transfer -
>> (2) to the extent that such transfer was -
>>> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>>> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). The second element of the OCB defense -- the "Subjective Test" -- places on Defendant the burden to prove the consistency of transactions between the debtor and creditor before and during the preference period. In re First Jersey Securities, Inc., 180 F.3d 504 (3d Cir. 1999). Courts consider various factors in determining such consistency, including: (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether there appears to be any unusual action by either the debtor or creditor to collect or pay on the debt; and (3) whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition. In re Allegheny Health, 292 B.R. 68 (Bankr. W.D. PA. 2003). Together, this (and other) salient precedent establishes that various factors, including a statistical comparison of preference period and pre-preference period payment patterns, must be employed to establish the baseline dealings between the parties for purposes of the OCB defense. Id.; see also In re Color Tile, Inc., 2000 WL 1373004 (Bankr.D.Del.). Also, creditor pressure is considered strong evidence that a creditor has been preferred, which includes an acceleration of payments, a change in credit terms imposed upon the parties' transactions, a threat to stop shipments which spurs the debtor to pay, etc. In re Roberds, Inc., 315 B.R. 443 (Bankr. S.D. Ohio 2004).

This subsection requires a "peculiarly factual analysis" whose cornerstone is the consistency of the preference payments with the parties' prior business transactions. Comcast Canada, Inc. v. Laclede Steel Co. (In re Laclede Steel Co.), 271 B.R. 127, 130-31 (Bankr. App. 8th Cir. 2002), citing Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991). In order to determine what is in the "ordinary course of business," it is appropriate for the court to make a subjective analysis of whether the transfer was ordinary between the specific debtor and creditor. J.P. Fyfe, Inc. of Florida. v. Bradco Supply Corp., 891 F.2d 66, 69-70 (3d Cir. 1989). The transfers at issue should "conform to the norm established by the debtor and creditor in the period before, preferably well before, the preference period." In re Molded

Acoustical Products, Inc., 18 F.3d 217, 223 (3d Cir. 1994), *citing* In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1032 (7th Cir. 1993).

In this case, the Preference Period Transfers fail the Subjective Test because:

- Defendants applied credit pressure in the form of terms compression just prior to the Preference Period, when orders were already in place for the crucial upcoming holiday season. This was the first time in the Parties' history that terms were so reduced - the terms had been at Net 120 days for at least five years and at Net 60 days for greater than two years prior to the change (with the exception of during the Debtor's first bankruptcy when terms were temporarily established at Net 30 days for all vendors and a very limited special holiday merchandise purchase that affected only thirty-two (32) invoices in 1998). The shorter payment terms came at a time when the Debtor could least afford it as it was having substantial financial and liquidity problems.

- The terms compression resulted in a substantial acceleration of payments to Defendant during the Preference Period as compared to the Parties' prior payment history.

- Defendant was able to eliminate its exposure before the end of the year as compared to its exposure during the 1999 holiday season, which was not even substantially reduced until January, 2000.

- Defendant's efforts resulted in a significant advantage over other creditors, which benefit Defendant admits to having received. Other unsecured creditors including, but not limited to other jewelry vendors, were left with <u>hundreds of millions of dollars in unsecured debt</u>, while Defendant reduced its exposure to nothing.

### 1. <u>Prior Payment Practices Establish That The Transfers Were Outside The Ordinary Course Of Business Between Defendant And The Debtor And Illustrate A Marked Statistical Deviation Therefrom.</u>

Courts within the Third Circuit have repeatedly found that early payments, when there is a history of late payments, are not ordinary. For instance, in In re TWA, Inc., 327 B.R. 706 (Bankr. D.Del. 2005), the debtor filed suit to avoid and recover one payment of $170,000 from a creditor under the early pay theory. The parties had only been doing business a short time so the pre-preference period consisted of only 7 payments made between 23 and 158 days after the invoice due date and at an average of 69 days late. Id. at 708. The preference payment was made by check four days before the due date and the check

was dated five days before that. Id. at 708. The creditor argued that the payment was ordinary because it was made according to credit terms. Id. Judge Paul B. Lindsey held that a "payment made within contract terms during the preference period, when the history of dealings between the parties was that of payments being made well outside such terms, is far more likely to be preferential than it is to be 'ordinary.'" Id. at 709. The court stated that this was so "even in the absence of evidence of material changes in the dealings between the parties during the Preference Period." Id.

In another recent matter in the Bankruptcy Court for the District of Delaware the timing of the payments was deemed very important, when the court held "[t]his sudden reversal of the practice of paying invoices either at the very end of their term or thereafter clearly resulted in Defendant being preferred over other similarly situated creditors, and such payments cannot be found to have been made in the ordinary course of business." In re Hayes Lemmerz International, Inc., et al., 2006 WL 197600 (Bankr.D.Del.). This determination was made by the court even though Net 60 terms were not officially changed between the parties, but discussions were held about payments being received within, and not after, the existing due dates. Id.

Here, not only were payments in the Preference Period made in almost half the time they had been for the two years prior, the terms were officially changed as well. Further, for over two year before the Preference Period the Debtor's payments to Defendant illustrate a weighted average of 80.53 days to pay. During the Preference Period, however, the Debtor averaged a mere 48.08 days to pay. This is 40% faster than the historical payment pattern. Based on **60-day terms**, $2,030,674.00 of invoices were paid before **what would have been** the due date. Exhibit P53 (Summary Aging Analysis of Days To Pay From Invoice Date Comparing Preference Period to Historical Period ).

Similarly, in the case of In re M Group, Inc., 308 B.R. 697 (Bankr. D.Del. 2004), the debtor filed suit to avoid and recover payments from a creditor under the early pay theory. Judge Judith K. Fitzgerald found that the average payment date in the eight months prior to the preference period was 95 days, with a range of payments from 36-455 days, and a preference period average of 112.7 days, but a range of only 84-164 days. The court considered both the difference in the averages and the ranges, stating that the broad range of payment dates in the pre-preference period, "narrowed significantly" during the preference

period. Id. at 702. The court held that the preference period payments, which were made in a much tighter time period than the historical payments, were outside of the ordinary course of business even though the average had increased. Id. (citing In re Continental Energy Assoc. Lim. Partnership, 228 B.R. 96 (Bankr.M.D.Pa. 1998)).

In the matters at hand, as was also the case in M Group, the Preference Period Transfers were much more compressed than historical payments, in addition to being earlier. With respect to payments by the Debtor to Defendant in the **Preference Period, 81% of payments were made** between 41-55 days from invoice date, only **a 15-day time period**. In contrast, to reach 82% of payments in the **historical period you have to include all payments 66 to 120 days** from invoice, a **55-day time period**.

The Bankruptcy Court, in Hechinger Liquidation Trust v. Universal Forest Products, Inc. (In re Hechinger Investment Co. of Delaware, Inc.), 326 B.R. 282, 285 (Bankr.D.Del. 2005), *affirmed* 339 B.R. 332 (D.Del.2006), held that the payments were not made in the ordinary course of business of the parties. The court found that the creditor "very rarely imposed credit limits" on its large retailers and that "prior to February 1999 no such limit had ever been imposed upon Hechinger" during the 15-year history of the relationship between the parties. Id. at 292. In fact, the creditor had taken similar action only twice before in its history, in each case upon a customer that ultimately went into bankruptcy. Id. In imposing the credit limit and shortening the traditional payment terms, the creditor "was admittedly, and openly, attempting to limit its exposure to credit loss should Hechinger default, and at the same time to limit its exposure to preference liability should Hechinger ultimately wind up in bankruptcy." Id. The court was compelled to hold that the payments by the Hechinger to creditor were not made in the ordinary course of business. Id.

Similar to the defendant in the Hechinger matter, Defendant herein also admittedly and openly reduced the Debtor's payment terms by 50% for its own benefit because the reduction increased its cash flow and at the same time eliminated its exposure to credit loss in the event the Debtor filed bankruptcy. As Mr. Rothlein testified, cutting the terms provided Defendant with a "significant benefit." Exhibit P64 (Rothlein Industry Trial Testimony 176:8-13). The terms were changed because Defendant, rather than

the Debtor, wanted to improve its liquidity to the detriment of the financially deteriorating Debtor and eventually to the detriment of the Debtor's other unsecured creditors.

Finally, in In re CCG 1355, Inc., 276 B.R. 377 (Bankr. D.NJ 2002), the debtor sought to avoid three payments made to a transportation carrier, and the payments were found to be outside the parties' ordinary course of business. The carrier company submitted evidence of a four-year business relationship where the average invoice-to-payment interval was 66.47 days. Id. at 381. The average payment interval during the preference period was 89.09 days. Id. at 382. Judge Morris Stern looked beyond the "mere averages" to consider the distribution of the paid invoice ages because it "gives more insight into the ... [debtor-creditor] relationship." Id. The court considered that only 66 of the 409 payments (about 16%) during the historical relationship were made on invoices over 80 days old. Id. During the preference period, all of the payments, except for the advance payments, were made 80 days or more beyond the invoice date. Id. The court stated that the "[m]edian time intervals between invoice date and payment date, both before and during the preference period, are logical comparisons in making such an analysis ... [c]omparison of the 'mix' or distribution of payments against old invoices is also relevant." Id. at 383.

As evidenced by the foregoing, courts analyze payments on "days to pay," "number of days an invoice is outstanding," and "interval between invoice date and payment date" bases. *See also,* In re SGSM Acquisition Co., LLC, 439 F.3d 233 (5th Cir. 2006); In re Moltech Power Sys., Inc., 327 B.R. 675 (Bankr. N.D. Fla. 2005). This is especially appropriate where terms change. Therefore, Plaintiff has utilized the same method in its analyses of the Transfers herein. By using a days past due analysis, Defendant seeks to read out the compression of credit and disguise the disparate treatment between the historic baseline dealings and the Preference Period. In this regard, Defendant requests the Court to adopt its days past due analysis to normalize payments when there has been a change of terms. In the event the Court does so, the Court would be, in effect, creating new law because there is absolutely no case concerning 11 U.S.C. Section 547(c)(2)(B) where a court has compared and analyzed the debtor/creditor payment practices in the historical and preference period based upon days past due approach when there was a change in terms at or near the preference period. Thus, the Court should not condone Defendant's slight of hand and should not give Defendant's days past due analysis any weight since the change of terms

to 30 days was inconsistent with the Parties fifteen year relationship and done at a time when the Debtor had begun its slide into bankruptcy.

        **2.**      **The Actions Taken By Defendant And The Debtor Leading Up To The Preference Period Constitute Unusual Activity Rendering The Payments Resulting Therefrom Extraordinary.**

      If a creditor takes different, unusual, or additional action to collect a debt, courts view such as evidence that a transaction was outside the ordinary course of business for the parties. This different, unusual, or additional action **includes any action that did not normally occur**, not just actions relating to stopping or threatening to stop shipments or services. In In re CM Holdings, Inc., 264 B.R. 141, 154-55 (Bankr. D.Del. 2000), the debtor requested that invoices be sent and then paid within a week instead of their normal practice of waiting to be invoiced with supporting documentation and taking 30 days to review them for accuracy. Also, the invoices were accepted in-person and by facsimile rather than by regular mail. The court in CM Holdings found that the culmination of those facts made the payment in question outside the ordinary course of business. Id.     Courts have held that any payment made following unusual or varying creditor pressure is outside the ordinary course of business for the parties. Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.), 182 B.R. 728, 737 (Bankr. W.D.Va. 1995), *citing* In re Craig Oil Co., 785 F.2d 1563, 1566 (11th Cir. 1986); Miller & Rhoads, Inc. v. Robert Abbey, Inc. (In re Miller & Rhoads, Inc.), 153 B.R. 725 (Bankr.E.D.Va. 1992) ("preferential payments avoidable where collection efforts resulted in weekly payment plan to retire outstanding balance and check postdated and held until debtor could cover").

      When considering the relationship between the Debtor and Defendant herein, the evidence establishes a number of unusual occurrences:

      (1) Defendant initiated discussions and pushed for shorter credit terms (*e.g.*, Net 60 to Net 30) based upon Defendant's desire to improve its own cash flow situation and financial condition;

      (2) Shorter credit terms were imposed to accelerate payment (*e.g.*, Net 60 to Net 30), so that Defendant received cash thirty days quicker;

      (3) The Debtor paid, on average, earlier than the previously-imposed Net 60 day terms;

(4) Defendant eliminated its credit exposure and was paid in full before the end of the calendar year; and

(5) Such events are unprecedented in the Parties' prior course of dealing.

While there may be no evidence of overt creditor pressure, the accelerated payments and payment in full on all of Defendant's invoices before to the end of the year **". . . raise the spectre of creditor pressure or debtor 'fawning' in the preference period payment process."** (emphasis added) <u>CCG</u>, 276 B.R. at 384, *citing* <u>Molded Acoustical Products</u>, 18 F.3d at 223.

Based on the foregoing different and unusual activity, the relationship between the Parties during the Preference Period herein does not comport with their dealings in the previous two years, or in their more than ten to fifteen year relationship. Thus, because the Parties' long-standing relationship was changed at a crucial time and just prior to the Preference Period, Defendant fails to meet the requirements of the OCB Subjective Test.

### C.    The Purpose And Policy Of The Preference Statute Require Defendant To Return The Funds To The Estate For The Benefit Of All Creditors.

Section 547 is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy. <u>In re Jones Truck Lines, Inc.</u>, 130 F.3d 323, 326 (8th Cir.1997). The purpose of the defenses in §547(c) is to encourage creditors to continue doing business with troubled debtors who may then be able to avoid bankruptcy altogether. <u>Id.</u> "Contemporaneous new value exchanges are not preferential because they encourage creditors to deal with troubled debtors and because other creditors are not adversely affected if the debtor's estate receives new value." <u>Id.</u>

The policy behind the ordinary course of business defense does not contradict the elimination of preference liability for a contemporaneous exchange. 11 U.S.C. §547(c)(1) relates less to any economic analysis than to a legislative judgment that it is inequitable to impose preference sanctions in the context of briefly deferred payments or other exchanges. This exception encourages business partners to continue doing business with troubled debtors (potentially enabling them to avoid bankruptcy altogether), and it does not adversely affect other creditors because the debtor's estate receives new value in exchange for the

money or property it gives up. Jones Truck Lines, 130 F.3d at 326. As a practical matter, 11 U.S.C. §547(c)(1) recognizes the complete §547(c)(4) new value defense a vendor would have when it receives a transfer and contemporaneously ships the equivalent amount of new value. The estate as a whole has not been diminished because goods equivalent to the value of the transfer are received substantially contemporaneously with the transfer. Section 547(c)(1) eliminates those transactions (the transfer and the complete new value) entirely from preference consideration, thereby streamlining the analysis.

The Third Circuit has acknowledged two conflicting policies impacting the ordinary course of business defense, each central to the effectuation of the purposes underpinning the preference rule, that must be balanced. In re Molded Acoustical Products, Inc., 18 F.3d 217, 219 (3d Cir.1994). The policies are the equitable treatment of all creditors and the desire to induce creditors to continue dealing with a distressed debtor. Id. However,

> . . . the most important thing is not that the dealings between the debtor and the allegedly favored creditor conform to some industry norm but that they conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period.

Molded Acoustical Products, 18 F.3d at 223 (quoting Tolona Pizza, 3 F.3d 1029, 1032 (7th Cir. 1993)). Here, the Preference Period dealings between the Parties are vastly different from the norm established between the Parties for at least two years prior to the Preference Period (and for more than five years with more extended terms prior to the Debtor's first bankruptcy). The terms between the Parties were cut in half, down to 30 days, only thirty-seven (37) days prior to - not "well before" - the Preference Period.

The legislative history for 11 U.S.C. §547(c)(2) is sparse, providing "the purpose of the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." Molded Acoustical Products, 18 F.3d at 223. "[T]he duration of the parties' relationship is logically pertinent to the touchstone of the statutory policies undergirding §547(c)(2)." Id. at 224.

> "The preference provisions are designed not to disturb normal debtor-creditor relationship, but to derail unusual ones which threaten to heighten the likelihood of the debtor filing for bankruptcy at all and, should that contingency materialize, to

then disrupt the paramount bankruptcy policy of the equitable treatment of creditors."

Id.

Where, as here, the relationship between the Parties has been cemented long before the onset of insolvency – up through and including the Preference Period – the court should not hesitate to require a return of funds from a creditor who did not provide a " . . . confident, consistent, ordinary extension of trade credit," nor give "the strained debtor a fighting chance of side stepping bankruptcy and continuing in business." Id. at 225.  The pressure exerted on the Debtor by Defendant and the resulting compression of terms, disrupted the Parties' consistent and ordinary dealings.  Although Defendant continued to extend credit, it did so on far more restrictive terms, and these terms were imposed as a result of Defendant's attempts to improve its own financial condition at the expense of the Debtor, whose financial condition continued to worsen.  Defendant disrupted the long-term relationship and achieved their goal of receiving payment when thousands of other creditors did not.

If one were to adopt the approach of Defendant and look merely at days past due, such would have the effect of "factor[ing] the change in terms out of the timing analysis."  This would allow potential preference defendants to side step the preference laws simply by changing terms (e.g., if a creditor wanted to be paid on extremely old invoices just prior to a bankruptcy, all the debtor would have to do to prefer the creditor would be to change terms to 60, 90, 120, etc. day terms.  This would make the payments according to terms and, thus, under Defendant's approach, non preferential.  Such is a self-fulfilling prophecy and clearly contrary to Congress' intent as embodied in Section 547 of the Bankruptcy Code.

This Court recognized in its Industry Decision that Defendant ". . . continued to ship on credit right up until the bitter end."  Industry Decision, p. 43.  Although the Court said "[t]heir actions are what Congress sought to encourage," the compression of terms contravene the policy underlying the preference statute.  Id.  Defendant reduced its credit terms with the Debtor for the sole purpose of improving its own liquidity and cash flow situation and ultimately eliminating any credit risk.  Such changes are exactly what the preference statute seeks to avoid, and they cannot be protected by §547(c)(2).  The changes are the actions of one of the mass of creditors of a shaky entity breaking ranks and attempting to devour the

entity's meager assets to the detriment of the others and the bankruptcy estate.  *See* <u>Molded Acoustical Products</u>, 18 F.3d at 223.

This Defendant is not excepted from preference liability, nor is the fact that it severely altered its course of dealings just a few short days prior to the Preference Period erased, merely because it did not alter its terms to the worst possible or worse than all other vendors of the Debtor.  It is true Defendant did not eliminate its potential preference risk entirely by switching to payment in advance or COD terms.  However, whether to compress terms or switch entirely to COD is a business decision.  Each has risks.  Compressing terms does expose a creditor to preference liability, but switching to COD could result in the vendor losing the debtor's business entirely or the debtor's immediate demise, resulting in presently unpaid invoices remaining unpaid. By slowly choking off credit to a struggling debtor the favored creditor can reduce its exposure while other creditors maintain the historical credit risk.  The end result is the more patient creditors are worse off because their debt grows even worse than if the debtor had filed earlier.  Conversely, if the favored creditor had been more willing to work with the struggling debtor survival might have been possible. Either way the real loser in credit compression scenarios are the creditors who adhered to their ordinary business terms.  That is why Congress sought to protect them from preference exposure and not the overreaching creditor such as Defendant herein.

Defendant has received ample credit under 11 U.S.C. §547(c)(4) for the new value extended after their receipt of Transfers from the Debtor up to the Petition Date.  This is the appropriate statutory reward for a creditor who extends credit during the Preference Period.  The mere extension of credit cannot obviate or minimize the creditor's departure from its prior dealings with the debtor.  The departure precludes the application of the §547(c)(2)(B) ordinary course of business exception.

During the holiday season in 1999, Defendant had its highest accounts receivable outstanding balance of approximately $1,783,948.57 on December 12, 1999. Exhibit P55a.  However, on the same day one year later, Defendant's accounts receivable balance was only $66,431.77. Exhibit P55a.  Further, this nominal amount was nearly paid off less than one week later, by December 18, 2000, so that Defendant was owed virtually nothing as of the Debtor's Petition Date.  Exhibit P55a.  Therefore,

Defendant consumed almost $2 million of the Debtor's cash that otherwise would have been available to pay the thousands of other creditors of the Debtor, and this amount should be returned.

**D.    Plaintiff Is Entitled To An Award Of Pre-Judgment Interest From The Date Of The Complaint.**

Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover interest from the date of the filing of the Complaint.[16]  11 U.S.C. § 550(a).  Section 550 allows Plaintiff to recover the value of property transferred under 11 U.S.C. § 547.  11 U.S.C. § 550.  The policy of Section 550 is to restore the estate to the **full value** of the asset transferred to the preferred creditor, thereby compensating the estate for the loss of the time value of the asset.  In re L&T Steel Fabricators, Inc., 102 B.R. 511, 521 (Bankr. N.D. La. 1989) (emphasis added).

The Bankruptcy Code's policy of equal distribution to creditors favors the award of pre-judgment interest from the date of a preferential transfer.  In In re Foreman Indust., Inc., 59 B.R. 145, 155 (Bankr. D. Ohio 1986), the court stated as follows:

> It is necessary to recognize that if litigation to recover a pre-filing transfer is successful, **recovering only the amount originally transferred is not adequate**.  Not only would the one creditor have received one hundred percent of the amount owed by the debtor, but the creditor would have also had total control of and use of the property transferred, including the opportunity to simply invest the amount in question . . . at the same time, the debtor's estate would have been deprived not only of the property transferred, to which it was rightfully entitled, but also the control and use of the property, particularly for investment purposes.  In such a situation, all creditors and claimants of the estate would have had the amount they were entitled to receive diminished not merely by the wrongful transfer of the funds, but also by the continued retention of those funds.

Id. at 155 (emphasis added).  The time value of money is an asset of the estate that should be recovered for the benefit of all creditors under the policy in the Bankruptcy Code, which favors equal treatment for all creditors of a bankruptcy estate.

---

[16] Pursuant to 11 U.S.C. § 1107, the debtor in possession "shall perform all the functions and duties . . . of a trustee serving in a case under" Chapter 11.  In addition, 11 U.S.C. § 550(a) states in relevant part: "to the extent that a transfer is avoided under Section . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made."

For calculations regarding the instant case, *see* Plaintiff's Pre-Judgment Interest Worksheet, Exhibit P63, wherein pre-judgment interest from the date the Complaint was filed is included. The pre-judgment interest has been calculated in the total amount of $129,079.35 (after deduction for the Parties' stipulated maximum amount of new value credit of $443,694.71 under 11 U.S.C. § 547(c)(4)).

## VI.   **CONCLUSION**

For the foregoing reasons and based upon the arguments, documentary evidence and testimony to be presented at trial, each element of 11 U.S.C. § 547(b) is satisfied and the ordinary course exception under 11 U.S.C. § 547(c)(2)(B) does not bar avoidance of the Transfers. Therefore, Plaintiff hereby requests this Court, after trial thereon, enter judgment on Plaintiff's claim for avoidance and recovery of the preferential Transfers in the amount of $2,395,936.60, less Defendant's new value credit under 11 U.S.C. § 547(c)(4), the maximum amount of which is $443,694.71 pursuant to stipulation between the Parties, plus pre-judgment interest of $129,079.35 as of July 20, 2006, which continues to accrue at a daily rate of $92.53.


Dated:  July 14, 2006


   */s/ Daniel B. Butz*
Donna L. Culver, DE SBN 2983
Derek C. Abbott, DE SBN 3376
Daniel B. Butz, DE SBN 4227
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
**Telephone:** (302) 658-9200   **Fax:** (302) 658-3989

and

Primary Counsel

Joseph L. Steinfeld, Jr., DC SBN 297101, MN SBN 0266292, VA SBN 18666
Karen M. Scheibe, MN SBN 0300469, ND SBN 05683, SD SBN 1912
A·S·K FINANCIAL LLP
2600 Eagan Woods Drive, Suite 220
Eagan, MN  55121
**Telephone:** (651) 406-9665  ext. 861  **Fax:** (651) 406-9676

Attorneys For Plaintiff, Montgomery Ward, LLC, et al., Debtor in Possession

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Ward, LLC, et al.,<br>                    Debtor, | Bk. No. 00-4667(RTL)<br><br>Chapter 11 |
| Ward, LLC, et al., Debtor<br>in Possession,<br>                    Plaintiff,<br><br>vs.<br><br><br>OTC International, Ltd.,<br>                    Defendant. | Adv. No. 02-9282<br><br><br>DATE: July 19-20, 2006<br>TIME: 10:00 a.m. EST<br>Clarkson S. Fisher U.S.<br>Courthouse<br>402 East State Street<br>Trenton, NJ  08608 |

TRIAL BRIEF FOR DEFENDANT,
OTC INTERNATIONAL, LTD.

SILVERBERG STONEHILL GOLDSMITH
& HABER, P.C.
Attorneys for Defendant
OTC International, Ltd.
Mitchell L. Kaplan (MLK-9157)
111 West 40th Street
New York, NY  10018
(Tel) (212) 730-1900

-and-

THE BAYARD FIRM
Attorneys for Defendant,
OTC International, Ltd.
Kathryn D. Sallie  (KDS-4600)
222 Delaware Avenue, Suite 900
Wilmington, DE  19801
(Tel) (302) 655-5000
(Fax) (302) 658-6395

Dated:    Wilmington, DE
          July 14, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................. iii

I.    PRELIMINARY STATEMENT............................. 1

II.   PROCEDURAL BACKGROUND............................. 2

    A.    THE   CONSOLIDATED   TRIAL   OF   THE   JOINT
          JEWELRY   DEFENDANTS   WITH   RESPECT   TO
          BANKRUPTCY CODE SECTION 547(c)(2)(C) .......... 2

III.  STATEMENT OF FACTS............................... 13

    A.    THE BUSINESS OF OTC AND WARD ................. 13

    B.    TIMELINE  OF  RELEVANT  EVENTS  BETWEEN  THE
          PARTIES ...................................... 14

    C.    THE    PARTIES'    DEALINGS    DURING    THE
          HISTORICAL   PERIOD   AND   THE   PREFERENCE
          PERIOD ....................................... 16

IV.   ARGUMENT........................................ 23

    A.    THE  TRANSFERS  MADE  BY  WARD  TO  OTC  DURING
          THE   PREFERENCE   PERIOD   WERE   MADE   IN   THE
          ORDINARY  COURSE  OF  BUSINESS  AND  FINANCIAL
          AFFAIRS OF WARD AND OTC ...................... 23

        1.    THIS  COURT  HAS  PREVIOUSLY  DETERMINED
              THAT   THE   TERM   CHANGE   BETWEEN   THE
              PARTIES  PRIOR  TO  THE  PREFERENCE  PERIOD
              WAS   MADE   IN   THE   ORDINARY   COURSE   OF
              BUSINESS  AND  FINANCIAL  AFFAIRS  OF  THE
              PARTIES................................... 25

        2.    THE  TIMING  OF  THE  TRANSFERS  FROM  WARD
              TO  OTC  DURING  THE  PREFERENCE  PERIOD  WAS
              ENTIRELY  CONSISTENT  WITH  THE  HISTORICAL
              PERIOD.................................... 29

        3.    NONE  OF  THE  TRANSFER  AMOUNTS  BETWEEN
              WARD   AND   OTC   DURING   THE   PREFERENCE
              PERIOD WERE UNUSUAL....................... 31

4.   THE TRANSFERS DURING THE PREFERENCE PERIOD WERE MADE AND TENDERED IN A CONSISTENT MANNER WITH THE PARTIES' PRIOR DEALINGS ............................. 32

5.   THERE WAS NO UNUSUAL ACTION BY OTC WITH RESPECT TO ANY OF THE TRANSFERS WHICH IT RECEIVED FROM WARD DURING THE PREFERENCE PERIOD .......................... 33

6.   OTC DID NOT TAKE ANY ACTION TO GAIN AN ADVANTAGE OVER OTHER CREDITORS DURING THE PREFERENCE PERIOD ...................... 34

B.   THE TRANSFERS MADE BY WARD TO OTC DURING THE PREFERENCE PERIOD WERE MADE PURSUANT TO ORDINARY BUSINESS TERMS ................... 37

V.   CONCLUSION ...................................... 38

## TABLE OF AUTHORITIES

**Cases**

In re: A.W. & Associates, Inc. v. Florida Mining and
  Materials, 196 B.R. 900, 906 (Bankr. N.D. Fla. 1996)....26

In re: Allegheny Health, Education, and Research
  Foundation, 292 B.R. 68 (Bankr. W.D.Pa. 2003)...........24

In re: Hechinger Investment Company of Delaware, Inc.
  v. James Austin Company, 320 B.R. 541, 548 (Bankr. D.
  Del. 2004)..............................................24

In re: Molded Acoustical Products, Inc. v. Fiber Lite
  Corporation, 18 F.3d 217, 219-220 (3rd. Cir. 1994)...23,24

## I.    **PRELIMINARY STATEMENT**

Defendant, OTC International, Ltd. ("Defendant" or "OTC") hereby submits this trial brief in further support of its affirmative defenses at the trial of this matter.

The Plaintiff, Ward, LLC et. al., Debtor in Possession (hereinafter referred to as "Plaintiff", "Ward" or "Debtor", and referred to collectively with "OTC" and/or the Defendant, as the "Parties") commenced the above-captioned adversary proceeding by filing a Complaint pursuant to Bankruptcy Code Sections 547 and 550 seeking to avoid and recover certain alleged preferential transfers made by Ward to OTC in the aggregate amount of $2,395,936.60 (collectively, the "Transfers") (Docket Entry No. 1).

For the reasons set forth herein, it is respectfully submitted that pursuant to Bankruptcy Code Section 547(c)(2), OTC has established and proven that the Transfers were: (i) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and OTC [the transferee][1], (ii) made in the ordinary course of business or financial affairs of the debtor and OTC [the transferee]; and (iii) made according to ordinary business terms.    Furthermore, as

---

[1] The Parties have stipulated to this fact and therefore, the only remaining elements which need to be proven are elements (b) and (c).

stipulated to by the parties, OTC has also established a partial "new value" defense under Bankruptcy Code Section 547(c)(4)[2] (Docket Entry No. 2, OTC's Answer to Complaint).

After this Court's determinations and findings of fact at the Consolidated Trial, it is respectfully submitted that the only remaining issues in this lawsuit to be determined at trial are the range of payments between the parties and whether or not the payments by Ward to OTC fell within that range. It will be shown that regardless of whether the Court uses Plaintiff's analysis or OTC's analysis, the result is the same, namely that the Transfers are not voidable or recoverable under Bankruptcy Code Section 547 and the Plaintiff should be denied any recovery from OTC with respect to same whatsoever.

## II.  PROCEDURAL BACKGROUND

### A.  THE CONSOLIDATED TRIAL OF THE JOINT JEWELRY DEFENDANTS WITH RESPECT TO BANKRUPTCY CODE SECTION 547(c)(2)(C)

On or about September 21, 2004, OTC and several other fine jewelry vendor defendants to preference actions commenced by the Plaintiff, which were pending before this Court (the "Consolidated Jewelry Defendants"), filed a

---

[2] The Parties have stipulated to the fact that the maximum amount of new value credit OTC is entitled to is $443,694.71 so no further discussion of same is needed herein.

joint motion seeking to consolidate certain joint issues of fact and law concerning whether or not the transfers between Plaintiff and the Consolidated Jewelry Defendants during the ninety (90) day preference period constituted "ordinary business terms" under Bankruptcy Code Section 547(c)(2)(C), commonly referred to as the "Objective Test" or the "Third Prong" (Docket Entry No. 60).

The Court granted the joint motion as set forth in its Order dated December 15, 2004 (Docket Entry No. 71). Pursuant to this Order, the Court directed that the Consolidated Jewelry Defendants and Plaintiff <u>were bound by any determinations made by the Court with respect to all matters involving issues of fact and law which were to be determined at the consolidated trial</u> (the "Consolidated Trial").

The Consolidated Trial was held before this Court on August 18 and 19, 2005. Pursuant to the Court's verbal decision of the Consolidated Trial read into the record on September 8, 2005 (the "Consolidated Trial Decision") (the Consolidated Trial Decision is listed as D23 on the Parties' Joint Pre-Trial Order and shall be cited as same[3]), the Court made the following determinations and findings of

---

[3] All Defendant's Exhibits shall be referenced by D followed by the Exhibit Number. All Plaintiff's Exhibits shall be referenced by P followed by the Exhibit Number.

fact:

1.    Net thirty (30) days credit terms are within the range of terms offered by fine jewelry wholesalers to national retailers and is an ordinary business term (p.7).[4]

2.    Payments made within 10 days prior to or 45 days after the due date are ordinary.  Payments made outside this window may be ordinary depending upon the circumstances.  For example, if an invoice has been skipped or if payment was delayed because all supporting documentation had not been assembled or there was a discrepancy in pricing, quantity or quality, the late payment may nonetheless be ordinary (p.7, 9).

3.    As to the mode and method of payment, generally national retailers pay by computer generated check delivered by U.S. Mail.  On occasion, manual checks may be issued and may be delivered by messenger or picked up by the payee.  Whether such payment by different mode or method is ordinary depends upon the circumstances.  For example, a manual check could be issued because of a mistake in a computer generated check (p.9).

4.    When the credit terms were renegotiated between Ward and OTC, Ward was not moribund and not on a slide into bankruptcy (p.7).

_____

[4] Page numbers indicated refer to the page numbers of D23.

5.    Neither Ward nor OTC took any unusual action indicative of favoritism by a fawning debtor or exploitation by a pushy creditor.  There is no evidence of concerted action by the Consolidated Jewelry Defendants and no duress exerted by them on Ward (p.7).

6.    Ward retained superior bargaining power throughout 2000 and could have found alternate sources of supply for fine jewelry if OTC refused to ship (p.7).

7.    The jewelry business is seasonal.  Most sales are made during Christmas season with other active periods around Valentine's Day and Mother's Day (p.10).

8.    The Consolidated Jewelry Defendants, along with other jewelry vendors, agreed to offer Ward 60 day terms before and at the beginning of 2000.  Credit terms are heavily negotiated one on one between the retailer and wholesalers.  A variety of factors influence credit terms between the large retailer and the fine jewelry wholesaler, price, discount, volume, give backs, for example, co-op advertising, and bargaining power.  As Mr. Goddu, testified, "Changes in terms are normal" (p.11-12).

9.    Between national retailers and jewelry wholesalers, the retailers enjoy superior bargaining power in light of the heavy volume they purchase.  For some jewelry vendors a department store such as Ward would be a

major customer, representing 25 percent or more of its business. On the other hand, fine jewelry represented a small portion, perhaps 5 percent, of Ward's annual sales (p.12).

10. Fine jewelry is unbranded and there are numerous manufacturers and wholesalers who would jump at the chance to sell to a national retail department store such as Ward. Fine jewelry was a profitable line for Ward and it planned to increase sales by 40 percent in the 2000 Christmas season over the prior year. Nevertheless Ward retained superior bargaining power vis-a-vis any particular jewelry vendor (p.12).

11. All witnesses agreed that the most important factor affecting trade credit from a fine jewelry wholesaler to a national retailer is the ability of the vendor to obtain financing. [In my view] the most articulate witness in this regard was Ward's own expert, Holly Etlin (p. 13).

12. Ms. Etlin testified that jewelry wholesalers are thinly capitalized in a specialty business with an inventory of numerous small items (p.13).

13. The wholesalers need to borrow to pay for manufacturing and importing the jewelry from overseas and then wait until the retailers pay them. When a wholesaler

has reached its borrowing limit with its lender, the only way to finance increased manufacturing of goods is to receive payment faster from the retailer and free up available borrowing (p.13).

14. As part of its campaign to revive itself after bankruptcy, Ward instituted a practice of sending letters to its vendors every few months (p.13-14).

15. In mid 2000 Ward reported positive results from its store remodeling program. Fine jewelry was highlighted as a successful line that Ward planned to expand (p.14).

16. Roger Goddu, Ward's Chairman and CEO ["Mr. Goddu"], attended the annual jewelry show in June 2000 to prepare for the 2000 Christmas season. Mr. Goddu met with Chuck Fortgang of Fabrikant and told him that Ward planned on increasing its fine jewelry sales by 40 percent over the prior year (p.14).

17. Fine jewelry was doing quite well, one of the "very, very positive divisions in the company", according to Mr. Goddu (p.14).

18. [In response to Mr. Goddu's request for input] (D22, P.16, Ln. 14-17) Mr. Fortgang advised Mr. Goddu that Ward could increase its supply of fine jewelry by offering shorter credit terms to the vendors. According to Mr. Goddu, Mr. Fortgang told him, "You would help yourself if

you contract your payment terms". [As I mentioned previously]…, speedier payments by Ward freed up borrowing availability from the wholesalers' lenders, allowing the wholesalers to manufacture and deliver more jewelry" (p.14).

19. Robert Baird, the General Merchandising Manager at Ward, who was responsible for fine jewelry ["Mr. Baird"], testified during his deposition and confirmed that anytime you shorten terms it helps the supplier's cash flow.  Mr. Baird also testified at his deposition that although shortening terms would be a user of cash for Ward, it would be a positive thing if that's what it took to get the product (p.14-15).

20. Following the Goddu/Fortgang meeting at the jewelry show in 2000 and the advice that Mr. Fortgang had given Mr. Goddu at the meeting concerning a shortening of terms, Mr. Goddu presented this information to Ward's executive committee who approved the plan to increase jewelry purchases by offering shorter credit terms (p.17).

21. Mr. Goddu testified during his deposition that the decision to contract terms with Fabrikant was given careful consideration collectively at the executive committee meeting.  Mr. Goddu describes the decision as a "balancing act" and "obviously a judgment call" (p.19).

22.   Mr.   Goddu   testified   at   his   deposition   that   the executive committee didn't think that the term change with Fabrikant would be isolated or remain isolated within the jewelry industry (p.20).

23.   Mr.   Goddu   testified   at   his   deposition   that:   "I think   changes   in   terms   are   normal.     There's   a   natural desire for vendors to keep terms as tight as possible and at the same time there's a natural desire for the retailer to get as generous and lucrative payment terms as possible, and   that's   a   natural   give   and   take.     It   gets   discussed regularly" (p.20).

24.   In   this   instance   regarding   the   jewelry   vendors, the merchandising side of Ward prevailed over the finance department.     To   increase   volume   of   fine   jewelry   Ward decided to accept shorter terms from its jewelry vendors, going from 60 days to 30 days (p.22).

25.   Ward   recognized   that   what   it   did   for   one   jewelry vendor   it   could   expect   to   do   for   the   others   among   the community (p.22).

26.   By   the   fourth   quarter   of   2000,   the   majority   of the fine jewelry vendor terms had been reduced to 30 days, down from 60 days, as had been anticipated and agreed to by the   Chairman   and   CEO   Roger   Goddu,   and   the   executive committee (p.22-23).

27. In the second half of 2000, Randy Brown and the CFO Mr. Goddu both testified that Ward sent out vendor letters that generally contained a positive message and that were meant to induce vendors to continue selling to Ward (p.23).

28. Ward did not tell its vendors about the covenant in its loan documents requiring minimal level of liquidity, nor did it tell its vendors that Ward projected difficulty in avoiding a breach of that covenant. Rather, Ward represented that it was being supported by GE Capital Corp., "which allows Wards ample liquidity to execute our strategy" (p.27).

29. Ward had shown success in its remodeled stores and it had the backing of its owner, GE Capital Corp., one of the largest and strongest financial firms in the world. Ward hardly exhibited morbidity, nor did it appear to be on the slide into bankruptcy from which it had emerged the year previously (p.27).

30. Senior management of Ward were not aware of the decision to file bankruptcy until December, 2000 (p. 27).

31. At all times following the first bankruptcy in August of 1999 until shortly before the second bankruptcy in December of 2000, Ward's senior management ran the business as a going concern, expected it to continue as a

going concern, and represented to vendors, including OTC, that it would be a going concern (p.27-28).

32.   Invoices with a 60 day due date were paid sometime after 60 days from invoice date.   Invoices with a 30 day due date were paid sometime after the 30 days from the invoice date.   On occasion a few invoices that were not yet due would be batched with other invoices in the Sunday run of checks so they might actually be paid a few days before their due date.   Payments up to 45 days after the due date were not unusual (p.28).

33.   Delay in payment beyond the due date was caused by numerous factors, such as lack of accompanying documentation i.e. the shipping, receiving, inspection, price verification documentation et cetera, inefficiencies in data processing with Ward's accounts payable department or even a unilateral decision by Ward to postpone payment for a few days.   These types of factors that caused delay were common throughout the industry involving national retailers and their methods for payment (p.28-29).

34.   From the vendor's point of view, all the witnesses agreed and there was no contradictory evidence that as long as there was a steady stream of payments from the retailer, the Consolidated Jewelry Defendants would not

be concerned and would continue shipping merchandise (p.29).

35. And apparently the facts were that all during the year 2000 Ward did continue to cut checks every Sunday and payments continued to stream in to the jewelry vendors (p.29).

36. At no time during 2000 did OTC undertake or threaten collection activity against Ward (p.30).

37. At no time during 2000 did OTC withhold or threaten to withhold shipments of fine jewelry to Ward (p.30).

38. There is a complete lack of evidence that anyone at Ward believed that unless it acceded to the jewelry vendors' demands they wouldn't be able to fill their cases with jewelry (p.40).

39. OTC changed its credit terms with Ward in August of 2000 from 60 days to 30 days because OTC was having cash flow problems of its own and difficulty in obtaining financing for the volume of business that it wanted to do with Ward and its other customers (p. 43).

41. The Consolidated Jewelry Defendants continued to ship on credit, giving Ward a chance at survival, and the terms they offered were more favorable than other vendors, particularly those who demanded cash in advance. Ward's

willingness to renegotiate terms was not driven by favoritism but by plans to increase jewelry sales and reducing the terms would help Ward meet its own goals (p.45-46).

### III.  STATEMENT OF FACTS

#### A.    THE BUSINESS OF OTC AND WARD

OTC is a wholesaler of fine jewelry business and sells a variety of jewelry such as gold, silver and diamonds.[5] OTC sells its products to national retailers, television shopping networks, large jewelry retailers, and catalog retailers.  Ward was a national retail department store operator with hundreds of stores.

Yoram Sheinman ("Y. Sheinman") is one of the principals and the President of OTC.  Michael Sheinman ("M. Sheinman") is the Director of Sales for OTC and worked on the Ward account since 1998.  Lee Rothlein ("Rothlein") has been the Chief Financial Officer of OTC since February, 1999.

OTC's business relationship with Ward started in the 1990's.  During OTC's fiscal year period from March 1, 2000 to and including February 28, 2001, which encompassed the

---

[5] In light of the fact that OTC's fact witnesses will be testifying at the trial of this matter, factual statements and assertions made by such witnesses will not be referenced by their deposition citations.

ninety (90) day preference period at issue in this adversary proceeding, Ward was OTC's fourth largest customer based upon sales volume (D21). On the other hand, fine jewelry represented a small portion, perhaps 5 percent, of Ward's annual sales (D23, p.12). Within that small percentage of annual sales volume, OTC was not a significant enough vendor to appear on internal memos prepared by Ward's senior management concerning the purported effect of trade compression on Ward's cash flow. These internal memos did, however, indicate four (4) other jewelry vendors that Ward purportedly believed was having such an effect on cash flow, M. Fabrikant, Combine Int'l, MGM, HNJ and a fifth jewelry vendor, Timex that reduced Ward's credit line (P46 and P47).

A timeline of the relevant events between the parties is set forth immediately below.

### B.   TIMELINE OF RELEVANT EVENTS BETWEEN THE PARTIES

**July 7, 1997**   Ward files a Chapter 11 proceeding with Court for the first time. Subsequent to the time of the bankruptcy filing, OTC and Ward had 30 day credit terms (D18).

**June, 1998**   OTC and Ward agreed to change the credit terms to 60 days (P39 and Stipulated Fact in Joint Pre-Trial Order).

**October, 1998**   During the 1998 holiday selling season, OTC and Ward agreed that certain invoices dated in October, 1998 for Christmas

merchandise would be paid on a 30 day credit term basis instead of the 60 day term basis previously in place (D17, D18, and Stipulated Fact in Joint Pre-Trial Order).

**August, 1999**    Ward emerged from bankruptcy with a confirmed plan of reorganization. At that time, the credit terms between the parties were Net 60 days (P59 and D16). At some point after Ward filed bankruptcy, it instituted a practice of sending letters to its vendors every few months updating them on Ward's turnaround efforts (D23, p.13-14).

**June, 2000**    In June, 2000, at the annual jewelry show, Chuck Fortgang of M. Fabrikant & Sons, ("Fabrikant") (one of Ward's largest, if not, its largest fine jewelry supplier) met with Roger Goddu, the Chairman and CEO of Ward. Mr. Goddu told Mr. Fortgang that Ward planned on increasing its fine jewelry sales by 40 percent over the prior year (D23, p.14). [In response to Mr. Goddu's request for input] (D22, P.16, Lns 14-17), Mr. Fortgang advised Mr. Goddu that Ward could increase its supply of fine jewelry by offering shorter credit terms to its vendors (D23, p.14). Following the Goddu/Fortgang meeting at the jewelry show in 2000 and the advice that Mr. Fortgang had given Mr. Goddu at the meeting concerning a shortening of terms, Mr. Goddu presented this information to Ward's executive committee who approved the plan to increase jewelry purchases by offering shorter credit terms (D23, p.17). Mr. Goddu testified during his deposition that the decision to contract terms with Fabrikant was given careful consideration collectively at the executive committee meeting. Mr. Goddu describes the decision as a "balancing act" and "obviously a judgment call" (D23, p.19). Mr. Goddu further testified at his deposition that the executive committee

didn't think that the term change with Fabrikant would be isolated or remain isolated within the jewelry industry (D23, p.20).

**July 13, 2000**    Ward sends a letter to its vendors indicating positive sales momentum in a number of businesses including fine jewelry and further indicating positive results from its store remodeling program (P29).

**Late July-August, 2000**    OTC and Ward changed their credit terms in August of 2000 from 60 days to 30 days because OTC was having cash flow problems of its own and difficulty in obtaining financing for the volume of business that it wanted to do with Ward and its other customers (D23, p.43).

**August 23, 2000**    The credit terms between OTC and Ward formally changed from "Net 60 days 2%" to "Net 30 days 3%" (P45).

**October 6, 2000**    Ward sent another positive letter to its vendors indicating that: (i) it was on track to achieve its Fall 2000 business plan, (ii) September sales were up 5%; and (iii) Ward's remodeling program is being supported by GE Capital Corporation, which allows it ample liquidity to execute its strategy (P34).

**Dec. 28, 2000**    Ward filed its second Chapter 11 proceeding with the Court and liquidated.

### C.  THE PARTIES' DEALINGS DURING THE HISTORICAL PERIOD AND THE PREFERENCE PERIOD

Ward emerged from its first bankruptcy as a reorganized entity on or about August, 1999. During the period following same until on or about August 23, 2000,

OTC and Ward maintained 60 day credit terms with each other with a 2% discount[6] (D16). OTC changed its credit terms with Ward in August of 2000 from 60 days to 30 days because OTC was having cash flow problems of its own and difficulty in obtaining financing for the volume of business that it wanted to do with Ward and its other customers (D23, p.43).

The period of approximately one (1) year immediately prior to the commencement of the ninety (90) day preference period (the "Preference Period") on or about September 29, 2000 shall be referred to hereinafter as the Historical Period (D15 and D16).

The comparisons of the payments made by Ward to OTC between the Historical Period and the Preference Period are as follows:

1.    In the June 28, 2004 expert report of Gerard D'Amato and Jack Williams of BDO Seidman LLP (the "BDO Report") which provided a statistical analysis of the underlying data and payment histories between OTC and Ward in both the Preference Period and the Historical Period, the significantly largest percentage of invoices paid by Ward to OTC during both the Preference Period and the Historical Period were paid between five days to thirty-

---

[6] Although the discount is referred to as a 2% discount, a 2% discount is actually a 12% discount because of advertising and warehousing deductions and a 3% discount is actually a 13% for the same reasons, etc.

five days past the invoice due dates[7] (D13, Exhibit "6").

This is corroborated by the **Plaintiff's own ordinary course analysis** in which it compares the payments made by Ward to OTC during the Preference Period with the payments made by Ward to OTC from approximately September 7, 1998 to approximately September 23, 2000 (P53).

In comparing Exhibit "6" of the BDO Report to the Plaintiff's analysis, the difference in the timing of the payments is inconsequential[8] (P53).

As previously stated above, the Court determined that payments by national retailers to fine jewelry wholesalers in the range of ten days prior to the due date to forty-five days after the due date are ordinary and payments made outside that window may also be ordinary depending upon the circumstances (D23, p.7).

---

[7] This is not say that the invoice payments outside this range are not protected by Bankruptcy Code Section 547(c)(2) but rather, to merely indicate the significantly largest percentage of invoices fall within a fairly narrow range during both the Preference Period and Historical Period.

[8] The only significant difference between OTC's ordinary course analysis and Plaintiff's ordinary course analysis is that Plaintiff measured the payment from the invoice date instead of the due date in spite of the Court's holding which used a days past due approach (D23, p.7). The Plaintiff is obviously using the "invoice date approach" instead of the "days past due approach" used by OTC, in order to "factor out the term change" between the parties and make it incorrectly appear that OTC was getting paid "earlier", when in fact, the only real difference in the timing of the payments between the Preference Period and Historical Period is that the terms had changed from Net 60 days to Net 30 days. Despite the Plaintiff's improper methodology, when one factors the terms back into the Plaintiff's analysis, the timing of the payments in the Preference Period compared to the Historical Period are entirely consistent with one another.

2.     During  both  the  Historical  Period  and  the
Preference  Period,  all  checks  issued  by  Ward  to  OTC  were
computer/system  generated  checks  which  were  dated  on  a
Monday,  which  is  Ward's  regularly  scheduled  check  run  date
(D15,  D16  and  Stipulated  Fact  in  Joint  Pre-Trial  Order).
Timothy   Watkins,   Ward's   former   Head   of   Accounting
Operations  during  the  Preference  Period  ("Mr.  Watkins")  and
Theodore  Penner,  Ward's  former  Director  of  Accounts  Payable
("Mr.  Penner")  during  the  Preference  Period,  confirmed  this
by  testifying  that  OTC  was  generally  paid  by  system
generated  check  ((Watkins)  D26,  P.53,  Lns  18-24,  P.54,  Ln
1)  and  ((Penner)  D25,  P.  30,  Ln  25,  P.31,  Lns  1-2).    In
fact,  according  to  Barbara  McCready,  the  former  Expense
Payables  Manager  for  Ward  during  the  Preference  Period
("Ms.  McCready"),  the  general  payment  method  from  Ward  to
OTC  was  a  mechanical  check  issued  on  a  weekly  basis  once
the  invoices  reached  maturity  and  that  method of payment
did not change at all during the course of Ward's dealings
with OTC with the exception of one manual check  (D24,  P.
67,  Lns  12-15,  P.68,  Lns  8-13).

3.     The  one  manual  check  was  Check  Number  448840
from  Ward  to  OTC  in  the  amount  of  $12,358.77  dated  November
8,  2000.    This  one  "manual"  check  was  caused  by  a  system
wide  problem  experienced  by  Ward  which  effected  all  vendors

(D24, P.67, Lns 21-24, P.68, Lns 1-7), (Stipulated Fact in Joint Pre-Trial Order).

4.    Mr. Watkins stated that one of the reasons why a manual check would be issued would be if Ward was "bouncing up against a credit line" with a vendor and the vendor would not ship unless there was a pay down of the credit line (D26, P.30, Lns 15-20).  Ms. McCready similarly testified that one of the reasons why a manual check would be issued resulted from pressure from a vendor (D24, P. 41, Lns 13-24).  Again, the only manual check issued to OTC was the result of a systemwide error.

5.    OTC's witnesses all testified that OTC had no credit limit with Ward.  This was also confirmed by Ms. McCready (D24, P.68, Lns 21-23).

6.    Mr. Penner has testified that none of the amounts of the checks received by OTC during the Preference Period were unusual nor were they unusual for a Ward's jewelry vendor (D25, P. 42, Lns 4-18).  This was further verified by Ms. McCready, who testified that none of the payments by Ward's to OTC during the preference period were unusual with the exception of the of $12,358.77 manual check previously explained above, which seemed small (D24, P.98, Lns 21-24, P.99, Lns 1-3).

7.  At no time during 2000 did OTC undertake or threaten collection activity against Ward (D23, p.30).  In addition to the Court's determination with respect to same at the Consolidated Trial, Ward's own witnesses have all testified that OTC never took any affirmative action to collect on an invoice during the Preference Period.  Mr. Penner testified that OTC never took any affirmative action to him in order receive payment on an invoice (D25, P.31, Lns 3-5).  This was further confirmed by Mr. Watkins (D26, P.54, Lns 9-12) and Ms. McCready (D24, P.68, Lns 17-20).

8.  During 1999 through 2000, OTC received payments from Ward in a consistent manner.

9.  At no time during 2000 did OTC withhold or threaten to withhold shipments of fine jewelry to Ward (D23, p.30).  Rita Hamilton, Ward's former jewelry buyer who was primarily responsible for vendor relations with OTC ("Ms. Hamilton") testified to this fact (P66, P.24, Lns 20-24, P.25, Lns 1-13, P. 53, Lns 3-7).  This was further corroborated by Ms. Hamilton's boss, Mr. Baird (P65, P.8, Lns 1-25, P.9, Lns 1-4, P. 77, Lns 6-8, P. 88, Lns 9-25, and P.89, Lns 1-2).

10. OTC never requested any collateral or additional security from the Debtor during the Preference Period.

11.  OTC believed that Ward was strong financially during the Preference Period and the Historical Period and was not aware that Ward was considering filing bankruptcy until on or about the petition date. Similarly, Ms. Hamilton did not recall having any conversations with OTC concerning Ward's financial condition in 2000 (P66, P. 27, Lns 7-14).  In fact, Ms. Hamilton testified that if a vendor had asked her about Ward's financial condition in 2000, her response would have been that Ward was doing well because of an increase in jewelry sales volume (P66, P. 28, Lns 2-8). Ms. Hamilton became "unofficially aware" of Ward's bankruptcy filing only approximately one (1) week before it happened through rumors (P66, P.26, Lns 8-16).

In the second half of 2000, Randy Brown, the CFO and Mr. Goddu both testified that Ward sent out vendor letters that generally contained a positive message and that were meant to induce vendors to continue selling to Ward (D23, p.23).

Senior management of Ward were not aware of the decision to file bankruptcy until December, 2000 (D23, p.27).  At all times following the first bankruptcy in August of 1999 until shortly before the second bankruptcy in December of 2000, Ward's senior management ran the business as a going concern, expected it to continue as a

going concern, and represented to vendors, including all
the Consolidated Jewelry Defendants, that it would be a
going concern (D23, p.27-28).

## IV.  ARGUMENT

### A.   THE TRANSFERS MADE BY WARD TO OTC DURING THE PREFERENCE PERIOD WERE MADE IN THE ORDINARY COURSE OF BUSINESS AND FINANCIAL AFFAIRS OF WARD AND OTC

As set forth by the Third Circuit Court of Appeals in
In re: Molded Acoustical Products, Inc. v. Fiber Lite
Corporation, 18 F.3d 217, 219-220 (3rd. Cir. 1994):

> "On the one hand the preference rule aims to
> ensure that creditors are treated equitably, both
> by deterring the failing debtor from treating
> preferentially its most obstreperous or demanding
> creditors in an effort to stave off a hard ride
> into bankruptcy, and by discouraging the
> creditors from racing to dismember the debtor. On
> the other hand, the ordinary course exception to
> the preference rule is formulated to induce
> creditors to  continue dealing with a distressed
> debtor so as to kindle its chances of survival
> without  a costly detour through, or a humbling
> ending in, the sticky web of bankruptcy"
> (citations omitted).

In analyzing the "Subjective Prong" or whether or not
the Transfers by Ward to OTC during the Preference Period
were made in the "ordinary course of business or financial
affairs" of Ward and OTC, Courts look at a myriad of
factors which include:

"(1) the length of time the parties have engaged

in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition."

In re: Hechinger Investment Company of Delaware, Inc. v. James Austin Company, 320 B.R. 541, 548 (Bankr. D. Del. 2004) (citing In re: Allegheny Health, Education, and Research Foundation, 292 B.R. 68 (Bankr. W.D.Pa. 2003).

As set forth immediately below, throughout both the Historical Period and the Preference Period, OTC sold goods to Ward on credit and was paid for those goods in the ordinary course of the parties' business dealings. This is entirely consistent with the legislative history of the ordinary course exception, which reveals that:

"the purpose of the exception [ordinary course exception] is to leave undisturbed normal financing relations, of the preference section to discourage unusual action by either the debtor or his creditors during  the debtor's slide into bankruptcy. . ." (Citations Omitted).

In re: Molded Acoustical Products, Inc. v. Fiber Lite Corporation, 18 F.3d 217, 223 (3rd. Cir. 1994).

1. **THIS COURT HAS PREVIOUSLY DETERMINED THAT THE TERM CHANGE BETWEEN THE PARTIES PRIOR TO THE PREFERENCE PERIOD WAS MADE IN THE ORDINARY COURSE OF BUSINESS AND FINANCIAL AFFAIRS OF THE PARTIES**

As the Court is aware, during the Consolidated Trial, the Plaintiff argued that as a result of the term changes between Ward and the Consolidated Jewelry Defendants from Net 60 day terms to Net 30 day terms, (including OTC) prior to the Preference Period, none of the parties' subsequent dealings with one another could have been pursuant to "ordinary business terms". In short, the Plaintiff unsuccessfully argued to the Court that none of the Transfers made by Ward to the Consolidated Jewelry Defendants during the Preference Period were protected by Bankruptcy Code Section 547(c)(2).

As set forth in the Consolidated Trial Decision referenced above, the Court clearly rejected the Plaintiff's arguments and held that 30 day credit terms were within the range of terms offered by fine jewelry wholesalers to national retailers and is an ordinary business term (D23, p.7).

It is respectfully submitted that the Plaintiff's primary logical fallacy in this case is that a term change in and of itself can never be ordinary. This is simply not

reflective of the evidence in this case to date and the holdings in the applicable case law.

Mr. Goddu testified that changes in terms are "normal", "get discussed regularly", are a "balancing act" and a "judgment call" (D23, p.19-20).

For example, the Court held in <u>In re: A.W. & Associates, Inc. v. Florida Mining and Materials</u>, 196 B.R. 900, 906 (Bankr. N.D. Fla. 1996) that:

> a change in payment terms from 2% 10th net 30 days" to "Due 10th of following month" was not an extraordinary debt collection practice that fell outside the ordinary course of business exception to preference avoidance, where the payment date was established pursuant to a new construction job contracted by debtor, supplier set up the contract without regard to for existing overdue obligations, not as a means of expediting overdue payments owed by supplier and over course of relationship, supplier consistently shipped newly ordered materials to the debtor regardless of the status of overdue payments and delinquent accounts.

This Court determined at the Consolidated Trial that OTC changed its credit terms with Ward in August of 2000 from 60 days to 30 days because OTC was having cash flow problems of its own and difficulty in obtaining financing for the volume of business that it wanted to do with Ward and its other customers (D23, p.43).

As stated in the Consolidated Trial Decision, OTC's actions gave Ward a chance at survival, and the terms they

offered were more favorable than other vendors, particularly those who demanded cash in advance (D23, p.45).

As this Court previously determined, OTC did not pressure or coerce Ward (D23, p.30). The simple truth of the matter is that Ward's business was much more financially significant to OTC than vice versa. Ward was OTC's fourth largest customer, based upon sales volume (D21). On the other hand, fine jewelry represented a small portion, perhaps 5 percent, of Ward's annual sales (D23, p.12). Within that small percentage of annual sales volume, OTC was not a significant enough vendor to appear on internal memos prepared by Ward's senior management concerning the purported effect of trade compression on Ward's cash flow.

These internal memos did, however, indicate four (4) other jewelry vendors that Ward purportedly believed was having such an effect on cash flow, M. Fabrikant, Combine Int'l, MGM, HNJ and a fifth jewelry vendor, Timex that reduced Ward's credit line (P46 and P47).

As indicated in the Consolidated Trial Decision, fine jewelry was not a "branded" product and Ward could have found other suppliers to replace OTC and the other jewelry vendors (D23, p.12).

At the time the term change arose, the Court determined that Ward was not moribund and not on a slide into bankruptcy (D23, p.7). Regardless, OTC believed at the time that Ward was not in financial difficulty. Ward retained superior bargaining power throughout 2000 and could have found alternate sources of supply for fine jewelry if the Consolidated Jewelry Defendants refused to ship (D23, p.7).

Ward agreed to the term change with Fabrikant after an executive committee meeting and expected to agree to similar changes with respect to its other jewelry vendors (D23, p.20, 22). Subsequent to Ward's meeting, the term change was offered to OTC.

In fact, term changes between OTC and Ward were common throughout their history. Thirty day terms were in effect between the parties on two prior occasions. Shortly after Ward filed its first Chapter 11 proceeding on or about July, 1997, OTC and Ward did business on thirty (30) day terms up until April, 1998 when the terms were changed to Net 60 days.

**In addition, on or about October, 1998, the parties agreed that OTC would ship to Ward certain Christmas merchandise on Net 30 day terms with a 4% discount instead of the Net 60 day terms which were in effect at that time**

**(Stipulated Fact in Joint Pre-Trial Order, D17, D18). In short, there was already a precedent between the parties to reduce the terms during the holiday season prior to the term reduction during the 2000 holiday season.[9]**

Thirty day terms are also 'ordinary' between OTC and its other customers during the relevant time period (D20, D21). The Court correctly noted that OTC had 30 day terms with Kohl's, a national retailer (D23, p.35). Thirty day terms were also within the range of ordinary payments between Ward and its jewelry vendors. As determined by the Court, during the Historical Period, approximately 27 percent of Ward's vendors were on 30 day terms (D23, p.36).

In conclusion, the overwhelming evidence demonstrates that the term change between OTC and Ward from Net 60 days 2% to Net 30 days 3% prior to the Preference Period was in the ordinary course of business and financial affairs of the Parties.

### 2. THE TIMING OF THE TRANSFERS FROM WARD TO OTC DURING THE PREFERENCE PERIOD WAS ENTIRELY CONSISTENT WITH THE HISTORICAL PERIOD

As set forth in the BDO Report, which provided a statistical analysis of the underlying data and payment histories between OTC and Ward in both the Preference

---

[9] Although it is respectfully submitted that even if there was no such precedent, the negotiated term change in question would be no less 'ordinary'.

Period and the Historical Period, the significantly largest percentage of invoices paid by Ward to OTC during both the Preference Period and the Historical Period were paid between five days to thirty-five days past the invoice due dates (D13, Exhibit "6"). This is not to say that the invoice payments outside this range are not protected by Bankruptcy Code Section 547(c)(2), but rather, to merely indicate that the significantly largest percentage of invoices fall within a fairly narrow range during both the Preference Period and Historical Period.

This is corroborated by the **Plaintiff's own ordinary course analysis** in which it compares the payments made by Ward to OTC during the Preference Period with the payments made by Ward to OTC from approximately September 7, 1998 to approximately September 23, 2000 (P53).

In comparing Exhibit "6" of the BDO Report to the Plaintiff's analysis, the difference in the timing of the payments is inconsequential.

The only significant difference between OTC's ordinary course analysis and Plaintiff's ordinary course analysis is that Plaintiff measures the payment from the invoice date instead of the due date of the invoice (P53). The Plaintiff is obviously using the invoice date measure in order to "factor out the term change". The Plaintiff is using this

approach despite the fact that during the Consolidated Trial, the Court held that payments made within 10 days prior to or 45 days after the **due date** are ordinary (emphasis supplied) (D23, p.7).

### 3. NONE OF THE TRANSFER AMOUNTS BETWEEN WARD AND OTC DURING THE PREFERENCE PERIOD WERE UNUSUAL

None of the amounts of the Transfers received by OTC from Ward during the Preference Period were unusual or unordinary. Mr. Penner and Ms. McCready confirmed this during their respective deposition testimony ((Penner) D25, P.42, Lns 4-18); ((McCready) D24, P.98, Lns 21-24, P. 99, Lns 1-3).

OTC did receive a payment in the amount of $865,371.67 during the Preference Period in November, 2000, which was larger than the amounts received during the Historical Period but the reason for this is simple. In early October, 2000, OTC shipped a large amount of goods to Ward which all became due at the same time (D13, D14, D15 and D16). These invoices were simply paid as they became due during Ward's regularly weekly check run by a computer generated check and in an entirely consistent manner with the way payments had always been made between the parties. The timing of the payment of these invoices was also entirely consistent with the timing of the range of payment between the parties

both during the Historical Period and the Preference Period
(D13, D14, D15 and D16). In short, the invoices subject of
this $865,371.67 check weren't paid earlier than usual or
later than usual (D13, D14, D15 and D16).

### 4. THE TRANSFERS DURING THE PREFERENCE PERIOD WERE MADE AND TENDERED IN A CONSISTENT MANNER WITH THE PARTIES' PRIOR DEALINGS

All payments made by Ward to OTC in both the
Historical Period and the Preference Period were made by a
computer generated check dated Monday, which is Ward's
regularly scheduled weekly check run day (D15, D16 and
Stipulated Fact in Joint Pre-Trial Order). Mr. Watkins and
Mr. Penner confirmed this by testifying that OTC was
generally paid by system generated check ((Watkins) D26, P.
53, Lns 18-24 and P.54, Ln 1); ((Penner) D25, P.30, Ln 25,
P.31, Lns 1-2). In fact, according to Ms. McCready, the
general payment method from Ward to OTC was a mechanical
check issued on a weekly basis once the invoices reached
maturity and that method of payment did not change at all
during the course of Ward's dealings with OTC with the
exception of one manual check (D24, P.67, Lns 12-15, P.68,
Lns 8-13).

The only check which was not issued in that fashion
was Check Number 448840 dated November 8, 2000 in the

amount of $12,358.77. This payment was made by a "manual" check resulting from a system wide problem experienced by the Debtor that affected all vendors (D24, P.67, Lns 21-24, P.68, Lns 1-7)(Stipulated Fact in Joint Pre-Trial Order).

### 5. THERE WAS NO UNUSUAL ACTION BY OTC WITH RESPECT TO ANY OF THE TRANSFERS WHICH IT RECEIVED FROM WARD DURING THE PREFERENCE PERIOD

At no time during 2000 did OTC withhold or threaten to withhold shipments of fine jewelry to Ward (D23, p.30). Ward's own witnesses consistently and repeatedly testified that there were no threats, pressure or other unusual activities taken by OTC concerning the Transfers it received during the Preference Period.

Ms. Hamilton also testified to this fact (P66, P.25, Lns 8-13 and P.53, Lns 3-7). This was further corroborated by Mr. Baird (P65, P.77, Lns 6-8).

At no time during 2000 did OTC undertake or threaten collection activity against Ward (D23, p.30). In addition, Ward's own witnesses have all consistently testified that OTC never took any affirmative action to collect on an invoice during the Preference Period. Mr. Penner testified that OTC never took any affirmative action to him in order receive payment on an invoice (D25, P.31, Lns 3-5). This

was further confirmed by Ms. McCready and Mr. Watkins ((Watkins) D26, P.54, Lns 9-12); ((McCready) D24, P.68, Lns 17-20).

### 6. OTC DID NOT TAKE ANY ACTION TO GAIN AN ADVANTAGE OVER OTHER CREDITORS DURING THE PREFERENCE PERIOD

As set forth in the Consolidated Trial Decision, OTC and the Consolidated Jewelry Defendants did not do anything to gain an advantage over other creditors prior to the time that Ward filed its second bankruptcy proceeding on December 28, 2000.

In fact, as set forth in the Consolidated Trial Decision, the evidence is clear that the credit terms in effect between Ward and OTC during the Preference Period were much more favorable than those given by its other vendors who: (i) reduced credit terms to 15 days, (ii) significantly reduced their credit lines; and/or (iii) demanded cash in advance payments (D23, p.45-46, P46, P47).

OTC, on the other hand, shipped goods to Ward on credit, as it always had and continued to be paid for those goods as the invoices matured pursuant to Ward's weekly check runs. OTC never requested any collateral from Ward or additional security.

OTC never imposed a credit limit or restriction on Ward. This was confirmed by Ms. McCready (D24, P.68, Lns

21-23). In addition, this lack of pressure and lack of "credit restrictiveness" on the part of OTC was also evidenced by the fact that OTC did not receive any manual checks during the preference period with the exception of the $12,358.77 check dated November 8, 2000 which was issued as a result of a systemwide error (D24, P.67, Lns 21-24, P.68, Lns 1-7), (Stipulated Fact in Joint Pre-Trial Order).

Mr. Watkins stated that one of the reasons why a manual check would be issued would be if Ward was "bouncing up against a credit line" with a vendor and the vendor would not ship unless there was a pay down of the credit line (D26, P.30, Lns 15-20). Ms. McCready similarly testified that one of the reasons why a manual check would be issued resulted from pressure from a vendor (D24, P. 41, Lns 13-24).

As set forth in the Consolidated Decision, at the time of the term change between OTC and Ward in 2000, "Ward was not moribund and not on a slide into bankruptcy" (D23, p.7). At all times following the first bankruptcy in August of 1999 until shortly before the second bankruptcy in December of 2000, Ward's senior management ran the business as a going concern, expected it to continue as a going concern, and represented to vendors, including all the

Consolidated Jewelry Defendants, that it would be a going concern (D23, p.27-28).

The very purpose of the vendor letters sent by Ward to OTC and its other vendors was to paint a positive and optimistic picture of Ward's restructuring. In the second half of 2000, Randy Brown, the CFO and Mr. Goddu both testified that Ward sent out vendor letters that generally contained a positive message and that were meant to induce vendors to continue selling to Ward (D23, p.23, P23, P29, P34).

OTC believed that Ward was conveying a positive message concerning its business going forward and was unaware that it intended to file bankruptcy a second time. This is not surprising given the vendor letters and the fact that Ms. Hamilton testified that she did not have any conversations with OTC concerning Ward's financial condition, but if a vendor asked her how Ward was doing, her response would have been that Ward was doing well because of the increase in jewelry sales (P66, P. 68, Lns 2-8).

In fact, Ward's own senior management was not aware of the decision to liquidate the company until December, 2000 (D23, p.27). Ms. Hamilton testified that she heard rumors about a bankruptcy filing only about one (1) week before,

but did not become officially aware of it until the day before Ward's actual filing on December 28, 2000 (P66, P.26, Lns 8-16).

In sum, Ward went out of its way to convey a positive message concerning its financial condition to OTC and its other vendors.  OTC was not aware that Ward was even struggling, let alone attempt to put itself in a position to take advantage of any such purported struggles such as demanding extra collateral, security, reducing credit limits, demanding cash in advance payments, receiving manual checks, threatening to stop shipping goods and/or taking any extraordinary collection action.

In conclusion, OTC acted in a way that the Bankruptcy Code encourages creditors to act, namely, it continued to engage in normal financial relations with Ward and extended credit throughout the Preference Period.

### B. THE TRANSFERS MADE BY WARD TO OTC DURING THE PREFERENCE PERIOD WERE MADE PURSUANT TO ORDINARY BUSINESS TERMS

For all the reasons set forth in the Consolidated Trial Decision and in this trial brief, it is respectfully submitted that all of the Transfers were made pursuant to "ordinary business terms" under Bankruptcy Code Section 547(c)(2)(C).

## V.   CONCLUSION

For all of the reasons set forth in this trial brief, it is respectfully submitted that the Transfers are not voidable or recoverable under Bankruptcy Code Section 547 and the Plaintiff should be denied any recovery from OTC with respect to same whatsoever.

Dated: July 14, 2006

By: _____

Kathyrn D. Sallie    (KDS-4600)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE  19801

-and-

SILVERBERG STONEHILL GOLDSMITH
& HABER, P.C.
Attorneys for Defendant
OTC International, Ltd.
Mitchell L. Kaplan (MLK-9157)
111 West 40th Street
New York, NY  10018
(Tel) (212) 730-1900

Attorneys for Defendant,
OTC International, Ltd.